# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT A. RICHMOND, SR.,
      Plaintiff

v.           CIVIL ACTION NO. 99-192 ERIE

JAMES S. PRICE, et al.,
      Defendants


### JURY TRIAL - DAY NO. 1


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Monday, March 13, 2006.


APPEARANCES:
      ROBERT A. RICHMOND, SR., Plaintiff herein,
      appearing Pro Se.

      CRAIG E. MARAVICH, Esquire, Deputy Attorney

General, appearing on behalf of the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3    WITNESSES:          DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFF:

5  BRUCE FERRELL          69    77    --      --

6  RANDY MCELRAVY            --    83     --      --

7  GREGORY WILKES            --   109    --      --

8

9                 - - -

10

11    EXHIBITS:          IDENTIFIED    ADMITTED

12   FOR THE PLAINTIFF:

13   Plaintiff's Exhibit 1          68        --

14  Plaintiff's Exhibit 2          68       --

15  Plaintiff's Exhibit 3          96       --

16

17

18

19

20

21

22              - - -

23

24

25


3


1              P R O C E E D I N G S

2

3              (Whereupon, the Jury Trial proceedings began at

4  9:02 a.m., on Monday, March 13, 2006, in Courtroom C.)

5

6              THE COURT:  This is the time that we've set for a

7  trial at Civil Action No. 99-192 Erie.  We have a couple of

8   pretrial matters to dispose of.  And first I want to review the

9   proposed voir dire that that had been submitted by the

10   defendants.  Mr. Richmond, do you have the voir dire there

11   handy?

12        MR. RICHMOND:  Yes, your Honor.

13        THE COURT:  There you go.  Did you bring with you

14   today or was it your intention to submit any proposed voir dire

15   questions?

16        MR. RICHMOND:  Yes, it is, I did bring them with me

17   here today.

18        THE COURT:  Please bring those up.  Before we get

19   started copying, is there anything else you brought with you

20   today by way of pleading or paperwork that you intend to

21   present to me that I haven't seen?

22        MR. RICHMOND:  Well, I didn't have a chance to

23   formally prepare the paperwork per se because I was only

24   allowed to get to the library just yesterday.

25        THE COURT:  My question is do you have any points

4

1   for charge, for instance?

2          MR. RICHMOND:  Not for the jury, sir.  In reference

3    to an earlier ruling that was made in your 2003 pretrial

4    conference, in reference to exhibits that I believe should be

5    excluded that would be prejudicial --

6          THE COURT:  That's a motion in limine.  You'll have

7    an opportunity to talk to me about that as well.

8          (Whereupon, a brief recess was taken.)

9          THE COURT:  Let's first look at the defendants'

10   proposed voir dire.  With respect to voir dire number one,

11   those questions are covered in the court's standard voir dire.

12          The same is true with number two.

13          Number three we will give.  The panel in general

14   will be asked that question, if anyone raises their hand, they

15   will be examined privately on the details.

16          Four we'll give.

17          Five we'll give.

18          Six, seven, eight will be given.

19          Nine will be given.

20          Ten will be given.

21          Eleven will be asked individually in its entirety,

22   so as to encourage a full and frank answer.

23          If anyone answers in the affirmative to 12, they

24  will be individually voir dired as well.

25      Thirteen also will be given.


5


1       Fourteen, "have any of you heard or read things in

2  the media which relate to prison conditions?"  We could be here

3  forever on that, we're not going to give that.

4       MR. MARAVICH:  Yes, sir.

5       THE COURT:  Fifteen we'll give.  All right.  Do you

6  have another copy of your voir dire, Mr. Richmond, in front of

7  you?

8       MR. RICHMOND:  Yes, I do, your Honor.

9       THE COURT:  First of all, with respect to your

10  question at the top how many challenges for the plaintiff when

11  it comes time to select a jury, you'll have three challenges.

12      Number one, that's covered I believe in the

13  defendants' voir dire, it's redundant.  We're going to ask it

14  anyways.

15      Number two, "what do you think should be done to a

16  prison official if it is shown that he beat a prisoner without

17  provocation or saw others doing so and did not interfere?"

18  I'm not going to give that one in voir dire, that suggests an

19  answer.  And I do not get into the details of a case like that.

20        Three.  I'm not giving three for the same reason.

21        Four.  "Have you ever been inside a jail or prison?"

22  That question is being asked anyways in the context of have you

23  or any member of your family ever been convicted of a crime.

24  Actually, that's five.  What do you mean on four -- do you mean

25  if you haven't been convicted of a crime, Mr. Richmond,

6

1  presumably four would simply mean have you ever toured a

2  prison, is that what you're talking about?

3        MR. RICHMOND:  I think it's very similar to

4  defendants --

5        THE COURT:  I can't hear you, pull the mike over.

6        MR. RICHMOND:  It is very similar to the voir dire

7  question at 11 that Mr. Maravich proposed.

8        THE COURT:  Then it's redundant, we're not going to

9  give four.  Five is already covered, also, by virtue of the

10  defendants' voir dire.  Let me read to each of you the proposed

11  description of this case that I'm going to give the jury.  What

12  was the date, by the way, that the incident allegedly occurred?

13      MR. RICHMOND:  28 February, 1999.

14      THE COURT:  This is the brief description I propose

15  to give to the jury.  In this case the plaintiff claims that

16  his Eighth Amendment right to be free from the infliction of

17  cruel and unusual punishment was violated by the defendants

18  alleged excessive use of force against him on February 28,

19  1999, while he was incarcerated as a prisoner at SCI-Greene.

20      The defendants deny that the plaintiff's Eighth

21  Amendment right was violated and contend that any force

22  utilized was done in a good faith effort to maintain order and

23  was neither maliciously nor wantonly inflicted.  Do you have

24  any problem with that, Mr. Maravich?

25      MR. MARAVICH:  I don't, your Honor.  The only thing

7

1  I would say if is SCI could be set out as state correctional

2  institute, to save you from being asked what an SCI is.

3      THE COURT:  All right.  Thank you for moving it

4  along in that regard, I agree with that.  Is that acceptable to

5  you as well, sir?

6          MR. RICHMOND:  Yes, your Honor.

7          THE COURT:  All right.  Then we're down to number

8  six, education.  We ask that question in our standard voir

9  dire.  Military, is there a question about that, Nicole?

10          DEPUTY CLERK:  No, not in our standard, nothing

11  about military.

12          THE COURT:  In the total scheme of things, to pursue

13  the military, what ranks, what duties, I just think it's time

14  consuming and it is not particularly probative, given all the

15  inquiries we're going to be making, we're not going to give

16  seven.  What magazines do you regularly read, what are your

17  hobbies?  I'm not going to give that, that is overly broad and

18  intrusive and irrelevant in my view.

19          Nine.  "Do you know of anyone who was or is employed

20  by or in any way connected with the Department of Corrections?"

21  I think that's covered by six in the defendants' proposed voir

22  dire.

23          Then ten, "in this case the defendants are

24  represented by attorneys from the Pittsburgh Attorney General's

25  Office, do you understand that this title has no particular

1   significance and that these attorneys are merely lawyers

2   employed by the government?"  I'm not going to give that.

3        Eleven.  That's covered by one of the defendants'

4   voir dire questions.

5        Twelve.  "Do you think prisoners are treated too

6   lightly?"  I'm not going to give that.

7        Thirteen.  I'm not going to give that, it's

8   completely speculative.

9        Fourteen.  I'm not going to give that -- largely for

10  the same reasons.  And so the record is clear, voir dire

11  questions, in my view, should not be based on hypothetical

12  possibilities in the future.

13       Fifteen is covered in the defendants' voir dire.

14       All right, so that's that for that.  Now, before we

15  took our last break, Mr. Richmond, you indicated you want to

16  raise with me orally a motion in limine, is that right?

17       MR. RICHMOND:  Yes, sir.

18       THE COURT:  All right, go ahead, sir.

19       MR. RICHMOND:  There was an oral motion in limine

20  that was raised back in November of 2003, in which you had

21 agreed to exclude certain prejudicial information, to wit, the

22 misconduct report, the DC-17 file, history of my misconducts

23 and so forth.  This was all excluded previously, I just wanted

24 to make sure --

25        THE COURT:  It still is.


                                9


1        MR. RICHMOND:  It's still in effect.

2        THE COURT:  Mr. Maravich, I'm sure you recall that

3 ruling?

4        MR. MARAVICH:  Yes, your Honor.  But I don't believe

5 that includes the misconduct report regarding this incident.

6        THE COURT:  Let's make sure what we're talking about

7 here.  I do not have the text of my previous order in front of

8 me.  But, if I remember correctly, there had been listed in

9 your pretrial narrative by way of exhibits, a number of

10 exhibits that would have dealt with a past history of

11 misconduct in the system.  It was those previous misconducts

12 that I indicated in my opinion had no relevancy to this

13 excessive force claim.  Now, that said, you indicated that

14 there was another document which you think would be relevant?

15        MR. MARAVICH:  Yes, your Honor.

16        THE COURT:  What is that?

17        MR. MARAVICH:  It would just be the misconduct

18  that -- when we're talking about misconducts, the misconduct

19  that was related to this specific incident.

20        THE COURT:  The misconduct report that was generated

21  as a result of the incident which brings us here to court

22  today?

23        MR. MARAVICH:  Yes, sir.

24        THE COURT:  Let me make it clear.  That report is

25  admissible.  What we're talking about, Mr. Richmond, is the


10


1  report that would have been generated by the DOC as a result of

2  the altercation that brings us here today.  That's coming in,

3  it may be relevant.  My ruling is any previous misconduct

4  reports unrelated to this incident was ruled inadmissible and

5  is still inadmissible.

6        MR. RICHMOND:  That's the main contention that I

7  had, your Honor, in reference to the misconduct involving the

8  incidents, to give credibility to that particular misconduct

9   and the reports what were written by the officers, who either

10  witnessed or were involved in the incident, from my

11  understanding of the rules, under 404, that should not be

12  allowed.  Because of its inherent prejudicial probability.

13          THE COURT:  The mere fact that evidence may not be

14  helpful to one side or the other doesn't necessarily mean it's

15  inadmissible.  And it's going to be for the jury to decide

16  who's credible, what oral testimony is credible, what written

17  evidence is credible, so it's coming in.  Do you have any

18  other -- before we move on and talk a little bit more about

19  what's going to be happening this morning, do you have any

20  other issues that you want to bring to my attention briefly?

21          MR. RICHMOND:  Yes, sir.  When I spoke to you on the

22  telephone on the 31, it was mentioned to me that if anything

23  was to occur while I was at SCI-Albion, I was very concerned

24  about being transported and being housed at SCI-Albion.  I in

25  turn had sent a letter to you that you probably won't receive


11


1   until today.  Because I haven't even had an opportunity to

2   speak with my witnesses.

3          THE COURT:  Are you talking about the witnesses who

4   are going to testify in this case?

5          MR. RICHMOND:  I haven't had any chance to speak

6   with anybody.

7          THE COURT:  Given the logistics that are involved,

8   that does not surprise me.  So, just to cut to the chase here,

9   because we're on a relatively short time line today, do I take

10   it that before your witnesses would testify, you would want a

11   brief opportunity to talk to each of them, is that it?

12          MR. RICHMOND:  I think that would be standard, sir.

13          THE COURT:  Hang on a second.  Let me make something

14   very clear.  This case is going to move along very nicely.  I

15   am obligated, since you are a pro se litigant, to kind of give

16   you a little more direction than I would the next person.  And

17   it's my intention to do that.  And it would be my intention to

18   do whether you are a presently incarcerated prisoner, whether

19   you're a man on the street or anybody else, I'm going to give

20   you that deference.  At the same time, what you need to do is

21   listen to my questions, I don't need speeches from you, it's

22   going to work a lot faster that way.  Fair enough?

23          MR. RICHMOND:  Yes, sir.

24          THE COURT:  Okay.  Now, first of all, let me ask Mr.

25   Barton, do we have all the prisoners here who are supposed to

12

1   be here?

2        U.S. MARSHAL BARTON:  We do, your Honor.

3        THE COURT:  Can arrangements be made for Mr.

4   Richmond to chat in some form or fashion with his witnesses?

5        U.S. MARSHAL BARTON:  Yes.

6        THE COURT:  All right.  Mr. Richmond, you're going

7   to have a chance to do that.

8        MR. RICHMOND:  Thank you, your Honor.

9        THE COURT:  Now, who is the individual, Mr.

10   Maravich, that fell off his garage?

11        MR. MARAVICH:  That's defendant Bedilion, your

12   Honor.  I believe that it was his roof.

13        THE COURT:  Well, whether it was a roof or a garage,

14   it still took its toll?

15        MR. MARAVICH:  You're correct, your Honor.

16        THE COURT:  Mr. Richmond, for the record, that

17   particular defendant was rather severely injured in a fall.

18   However, he is going to be available to testify and available

19   for you to cross-examine.  And the way we're going to do that

20   is once we figure out what time he's going to testify, we're

21   going to hook him up via video conferencing, that will probably

22   take place, I presume, sometime tomorrow.  Any other pretrial

23   matters from the standpoint of the defendants?

24          MR. MARAVICH:  No, your Honor.

25          THE COURT:  How about the plaintiff?


                              13


1          MR. RICHMOND:  I would just like for you to be able

2    to get a copy of the letter that I forwarded to you.

3          THE COURT:  I will do that.  Actually I'll grab it

4    right now.  And I will read your letter, Mr. Richmond.  But for

5    purposes of this case going forward right now, whatever

6    complaints you may have about SCI-Albion, is there anything you

7    need to bring to my attention?

8          MR. RICHMOND:  Not at this time, sir.

9          THE COURT:  All right.  Let me make sure that these

10   are the only witnesses that are going to be called.  Bruce

11   Ferrell.  Christopher Kaminski.  Robert A. Richmond.  Gregory

12   Wilkes.  Randy McElravy.  And James Bedilion.  Is there anybody

13  else -- are all those people going to be called?

14        MR. MARAVICH:  Yes, your Honor.

15        THE COURT:  Sounds about it?

16        MR. MARAVICH:  Yes, your Honor.

17        THE COURT:  We're going to take a brief recess, the

18  jury should be up here within five or ten minutes.  I'll come

19  out and give my introductory speech, then we'll get going on

20  jury selection.  And I would suggest that during this break and

21  any individual breaks, that Mr. Richmond be given the

22  opportunity to start his interviews of his witnesses so as to

23  not waste any time on that.  Let's take a short recess.

24        (Recess from 9:30 a.m.; until 9:55 a.m.)

25        THE COURT:  Ladies and gentlemen, welcome to the


14


1  United States District Court for the Western District of

2  Pennsylvania.  My name is Sean McLaughlin and I am one of the

3  United States District Court judges.  In this District Court we

4  try cases that arise under the Constitution and laws of the

5  United States, either criminal or civil, and we also try civil

6  cases involving disputes between citizens of the different

7   states.  The criminal proceedings here involve cases where

8   Congress has declared that a particular activity is a violation

9   of the laws of the United States.  Those cases are prosecuted

10  by the United States Attorney or by one of her assistants.

11  Civil cases, on the other hand, are lawsuits between private

12  parties or between private parties and the government arising

13  out of a dispute between them.  They usually involve claims for

14  money.

15          Now, I suppose that your first question when you

16  received the questionnaire was why me.  Well, your name has

17  been drawn for jury service in accordance with a plan that

18  attempts to achieve, as closely as possible, a true

19  cross-section of the entire community of the Western District

20  of Pennsylvania.  That community consists of twenty-five

21  counties that extend from Erie in the north to the West

22  Virginia and Maryland lines in the south; from the Ohio line in

23  the west to the Breezewood-Beford-Altoona area in the east.

24  Therefore, the presence of each and every one of you is needed

25  so that each jury can represent a true cross-section of this

15

1  community.  In the process of jury selection, no party is

2  entitled to seek a jury that will be favorable to his or her

3  side, but only to make selections so that a fair jury will be

4  chosen.  You should not be disappointed if you are not selected

5  for this jury.  Typically, only eight persons serve on our

6  juries in civil cases.

7          Jury service is a high duty of citizenship.  And we

8  realize that service as a juror is oftentimes performed by a

9  citizen at considerable inconvenience, and perhaps actual

10  hardship to their own personal affairs.  Jury service may be

11  considered as the highest form of service that the ordinary

12  private citizen may render to his or her country and to their

13  fellows citizens, just as military service is in time of war.

14  Often jurors are called upon to exhibit great patience because

15  they may spend a number of hours, for instance, waiting in the

16  jury assembly room, etc.  I can assure you that we will do

17  everything possible in the management of this case to make sure

18  that each of you suffer the least possible inconvenience.

19          Other events beyond our control sometimes cause a

20  delay.  For instance, a frequent cause of a delay is the

21  settlement of a case just before or just after it may have been

22  called for trial.  It's important to remember that the jury

23  plays a very important part in this process because it is

24  certain that if there had not been the pressure of jurors

25  waiting to be chosen, the case would not have been settled.


16


1       Now, if you are chosen as a juror on this case, I

2  will give you further specific instructions later on.  But here

3  are a few general rules that you should keep in mind.

4       When you are chosen as a juror, it will be your duty

5  to pay close attention to the testimony of the witnesses and

6  the other evidence that is produced.  It will be your duty to

7  decide this case only on the evidence that has been produced

8  before you in court.  Other evidence may have been excluded for

9  various legal reasons.  Therefore, do not speculate or guess

10  about matters that were not introduced into evidence in the

11  trial before you, and avoid all sources of outside information

12  on the matter.  Do not discuss the case with anyone, including

13  lawyers, witnesses or parties, and do not permit anyone to talk

14  to you about it.  If anyone attempts to communicate with you in

15  any way or attempts to influence your action as a juror, you

16    should report that fact to one of the court attendants.

17        Some cases here receive publicity, although by and

18    large most do not.  But in any event, you should avoid reading

19    newspaper accounts of the matter or listening to television or

20    radio news reports.  I can assure you that you will know more

21    of the facts that are necessary to a decision of this case from

22    what you have seen and what you have heard in this courtroom

23    than any other person, and your verdict must be based solely on

24    the evidence that has been produced before you in the court and

25    not what anybody else may think about the case.


                                17


1        I also caution you not to discuss the details of

2    this case on which you may be sitting with other jurors in the

3    case before all the evidence is produced and I have instructed

4    you on the law.  It is your duty to decide the case on all of

5    the evidence and on the law which applies to that evidence.

6    Therefore, any discussion between you and your fellow jurors

7    while the case is in progress might lead you to make up your

8    mind before all of the evidence is in.  That, of course, would

9    not be fair.  Neither should you discuss the case with your

10  friends or any members of your family while the case is going

11  on for the very same reason.

12      Remember that after you have been dismissed as a

13  juror, you are not required to discuss the case upon which you

14  may have sat with any party.  No one has any right to know how

15  you or your fellow jurors felt or voted on any of the matters

16  that were under your consideration.  Of course there is no law

17  that says you cannot talk about these matters after you have

18  been discharged, but we believe on balance that it is the best

19  and wisest course of action for you to keep the opinions and

20  deliberations of yourself and your fellows jurors in the

21  confidence in which they were given and in which they were

22  taken in the jury room.

23      As I said, I'm not going to give you further

24  instructions right now, but I think the procedures as to how a

25  trial works are well set forth in the Handbook for Jurors


18


1  Serving in the United States District Court, which I'm sure has

2  been distributed to each of you.  I will simply commend that

3  book to you.

4          Only one final instruction now.  You jurors will be

5   the judges of the facts that are in dispute between the parties

6   to this lawsuit.  You will be bound by your oath to well and

7   truly try the facts.  In deciding the facts, you are duty-bound

8   by your oath to accept the law that governs the facts as given

9   you in the instructions of the trial judge.  Even if you should

10  think a different rule should apply, you must follow the

11  instructions of the trial judge.  All right, at this point we

12  are going to commence the process of jury selection.

13          DEPUTY CLERK:  Good morning, my name is Nicole

14  Kierzek and I am Judge McLaughlin's courtroom deputy.  Right

15  now I am going to administer the oath.  If you would all stand

16  and raise your right hand.

17          (Whereupon, the Jury Panel was sworn.)

18          DEPUTY CLERK:  I'm going to call 14 names, and

19  starting with the first name I call, sit here and go down the

20  row, and the eighth name will be in the second row.  Lawrence

21  Sullivan.  Tiffany Reichert.  Paula Gleeson.  Richard Canavan.

22  Rebecca Berry.  Judith Smock.  Michael Carlstrom.  Patricia

23  Wise.  Thomas Briggs.  James Harris.  Linda Wilson.  Pauline

24  Gausman.  Richard Maas.  And Christine Fillgrove.

25          All right, I'm going to tell you who the parties are

19

1  and who they're represented by.  And if any of the questions I

2  ask of you of, you have an answer to any of them, why just

3  raise your hand, stand up and state your name and juror number.

4        The caption of this case is Robert A. Richmond v.

5  Correctional Officer Wilkes, et al.  The plaintiff in this case

6  is Robert A. Richmond.  Do any of you or any member of your

7  immediate family know Robert A. Richmond?  Could you please

8  stand, Mr. Richmond.

9        (No response.)

10       DEPUTY CLERK:  The defendants in this case are C.O.

11 Gregory Wilkes -- would you please stand.  C.O. Randy McElravy.

12       THE COURT:  That's correctional officer, C.O.

13       DEPUTY CLERK:  And James Bedilion, Corrections

14 Officer James Bedilion, who is not here today, but do you or

15 any member of your immediate family know any of these three

16 men?

17       (No response.)

18       THE COURT:  Let me make a quick statement about

19 Corrections Officer Bedilion.  He is not here as a result of

20   having sustained an accidental injury while at home.  However,

21   he will be here in the sense that he will be testifying via

22   video conference hookup, which likely will occur tomorrow.  So

23   that's the reason he's not at counsel table today.  Go ahead.

24          DEPUTY CLERK:  The plaintiff in this case is

25   representing himself.  And the defendants are represented by


20


1   Attorney Craig E. Maravich.  Do you or any member of your

2   immediate family know Attorney Maravich?

3          (No response.)

4          DEPUTY CLERK:  Do any of you have any difficulty in

5   seeing, hearing or understanding the English language that

6   would impair your full attention to this trial?

7          JUROR NO. 5:  I have a slight hearing problem.

8          DEPUTY CLERK:  Please stand up, give your name and

9   juror number?

10          JUROR NO. 5:  Paula Gleeson, number five.  I wrote

11   that down on my statement when I mailed that in.  I can hear

12   you through the microphone, but when you're at a distance, I

13   couldn't hear you.

14          THE COURT:  Ma'am, let me ask you this.  When I'm

15   speaking to you like this, is it fine?

16          JUROR NO. 5:  Yes.

17          THE COURT:  As long as we were to insure, as much as

18   I can, that all witnesses and people examining the witnesses

19   used the microphones, are you confident that will not cause you

20   a problem?

21          JUROR NO. 5:  No, that will be fine.

22          THE COURT:  Very good, thank you very much for

23   bringing that to our attention.

24          DEPUTY CLERK:  Do any of you take any medication

25   that might make you drowsy or prevent you from giving your full

                                    21

1   concentration during the course of this trial?

2          (No response.)

3          DEPUTY CLERK:  Do any of you have any physical

4   problems that would make it difficult for you to sit as a juror

5   in this case?  Again, give your full name and juror number?

6          JUROR NO. 9:  Richard Maas, juror number nine.  I'm

7   actually fine now, but this Friday I'm going to have surgery on

8  my legs.

9        DEPUTY CLERK:  But you could sit here until Friday?

10        JUROR NO. 9:  Right.

11        DEPUTY CLERK:  Thank you.  The witnesses in this

12  case that may be called are the following.  Bruce Ferrell.

13  Christopher Kaminski.  Robert Richmond.  Gregory Wilkes.  Randy

14  McElravy.  And James Bedilion.  Do you or any member of your

15  immediate family know any of these witnesses?

16        (No response.)

17        DEPUTY CLERK:  I'm just going to read a

18  summarization of this case, okay.  In this case the plaintiff

19  claims that his Eighth Amendment right to be free from the

20  infliction of cruel and unusual punishment was violated by the

21  defendants alleged excessive use of force against him on

22  February 28, 1999, while he was incarcerated as a prisoner at

23  the State Correctional Institution at Greene.

24        The defendants deny that the plaintiff's Eighth

25  Amendment right was violated and contend that any force

22

1  utilized was done in a good faith effort to maintain order and

2  was neither maliciously or wantonly inflicted.

3        What we're going to do now is there's a sheet right

4  there, if you can stand up and answer those questions.  And

5  then just pass it down to the next person.  Stand up, give your

6  name and your juror number?

7        JUROR NO. 238:  Lawrence Sullivan, juror number 238.

8  I live in Erie, PA, County of Erie.  Pharmaceutical sales rep.

9  I'm married.  My wife's occupation is a housewife.  Two

10  children, ages one and four.  Currently I own my own home.  Do

11  not have an attorney.  Educational background, a four-year

12  degree in business administration.  And there's no reason in

13  the world why I couldn't sit on this jury.

14        DEPUTY CLERK:  Thank you.  If you could pass it down

15  and have a seat.

16        JUROR NO. 20:  Tiffany Reichert, juror number 20.

17  I'm a Full-time student.  I'm not married, I'm single.  No

18  children.  I currently live at home with my parents.  No

19  attorney.  Educational, I'm going for my bachelor's.  The only

20  reason I couldn't serve is because I'm a full-time student.

21        THE COURT:  I'm sorry, I couldn't hear you?

22        JUROR NO. 20:  I said I'm a full-time student is the

23  only reason I couldn't serve.

24          THE COURT:  And you're in classes right now?

25          JUROR NO. 20:  Uh-huh.


23


1          THE COURT:  What type of burden is that placing on

2   you if you had to be out for two days?

3          JUROR NO. 20:  No burden, just for two days.

4          THE COURT:  Okay.  Two or three days I should say.

5          JUROR NO. 20:  Okay.

6          DEPUTY CLERK:  All right, ma'am.

7          JUROR NO. 5:  I live at 8219 --

8          DEPUTY CLERK:  Ma'am, I'm sorry, we don't need your

9   address, just the city and county?

10          JUROR NO. 5:  Okay, Erie County.  My occupation is

11   mailer, I work for the Erie-Times News.  Yes, I am married.  I

12   have no children.  I own my home.  I don't have an attorney.  I

13   have never been a party to a lawsuit.  My educational

14   background was high school graduate.  No.  And there is no

15   reason why I cannot sit on this jury outside of my hearing.

16          THE COURT:  We'll accommodate that for you.  Thank

17   you very much, ma'am.

18        DEPUTY CLERK:  Thank you.

19        THE COURT:  Sir, give your name and your juror

20   number?

21        JUROR NO. 39:  Richard Canavan, juror number 39.  I

22   live in the city of Erie, Erie County.  I work at General

23   Electric as a locomotive assembler.  I am single.  I have no

24   children.  I own my current home.  I have an attorney, but it's

25   just simply real estate.  I've been a party to a lawsuit --


                                24


1    when you're a landlord, you're taken to court occasionally.

2    And occasionally I have taken people to court.

3         THE COURT:  So you've gone to court as both the

4    plaintiff and the defendant, is that right?

5         JUROR NO. 39:  Yes.

6         THE COURT:  Go ahead.

7         JUROR NO. 39:  High school education.  There's no

8    reason that I can't serve on this jury.

9         THE COURT:  Thank you, sir.

10        JUROR NO. 30:  Rebecca Berry, juror number 30.  I

11  live in Reno, Venango County.  I'm an LPN, and also a

12  gymnastics instructor.  I'm married, my spouse is a

13  steelworker.  I have three children, their ages are 19,

14  college, 17 and 13.  I own my own home.  I do not have an

15  attorney.  I've never been involved in a lawsuit.  I have an

16  LPN background as far as schooling.  And there's no reason I

17  can't sit on this jury.

18        DEPUTY CLERK:  Thank you.

19        JUROR NO. 123:  My name is Judy Smock, juror number

20  123.  I live in Erie County, Harborcreek.  My occupation is I'm

21  a retired teacher.  I am married.  My husband's an electrician.

22  I have four children, 34, 32, approximately 29 and 24.  I own

23  my own home.  I have an attorney intermittently, I don't have

24  one now.  I don't think I've ever been a party to a lawsuit.

25  My educational background is a master's plus.  The only reason


25


1  I might not be able to sit on this jury is that I'm a volunteer

2  in the state prison system.  So is my husband.

3        THE COURT:  Before you sit down, ma'am, what was

4  your juror number?

5          JUROR NO. 123:  Number 123.

6          THE COURT:  All right.

7          JUROR NO. 23:  My name is Michael Carlstrom.  I live

8  in Erie County.  I'm a truck driver.  Married, my wife is a

9  nurse's aide.  I don't have any children.  I rent my home.  I

10  don't have an attorney.  I've never been in court.  High school

11  background.  And there is no reason I shouldn't serve on the

12  jury.

13          THE COURT:  Thank you.

14          DEPUTY CLERK:  If we could start down there.

15          JUROR NO. 3:  My name is Pat Wise, juror number 3.

16  I've live in Meadville, Crawford County.  And my occupation is

17  I am a mold operator.  And I am married.  And my husband is a

18  retired firefighter, and he works part-time at Allegheny

19  College as a dispatcher.  I have two children, 36 and 33.  We

20  own our own house.  And I've had an attorney for selling

21  property and making a will.  And for my father's affairs.  I

22  can't say I have one now.  I've never been a party to a

23  lawsuit.  I'm a high school graduate.  There's no reason why I

24  couldn't sit on this jury.

25          THE COURT:  Thank you, ma'am.

1          JUROR NO. 35:  I'm Thomas Briggs, juror number 35.

2  I live in Meadville, Crawford County.  Occupation, CNC

3  programmer.  I'm married, spouse's occupation is assistant

4  court administrator for Crawford County.  Do you have

5  children -- yes, two grown adult children.  Ages 29 and 24.

6  And they work.  I own my own home.  I do not have an attorney.

7  Have not been a party to a lawsuit.  Education, a bachelor of

8  science degree.  And there's no reason why I can't sit on this

9  jury.

10          THE COURT:  Thank you.

11          JUROR NO. 1:  Good morning, my name is James Harris,

12  juror number one.  I live in Wesleyville, Erie County.  I am

13  retired from General Electric Company, and a 22 year military

14  retirement.  I'm single.  I have no children, I own my own

15  home.  I do not have an attorney except for my will.  I've

16  never been involved in a lawsuit, other than an arbitration for

17  an auto accident in 1972.  I have a high school education.  And

18  I have a military education.  There is no reason why I might

19  not sit on this jury.

20          THE COURT:  Thank you, sir.

21          JUROR NO. 38:  My name is Linda Wilson, I'm juror

22   number 38.  I live in Erie, Erie County.  My occupation is a

23   secretary at Morgan Stanley.  And I am single.  I have one

24   child, age 26.  I own my home.  I do not have an attorney.

25   I've never been a party to a lawsuit.  My education and

27

1   background is high school, one year of college.  The only

2   possible reason that I could not serve on this jury is that I

3   am a diabetic, I have an insulin pump.  I need to monitor my

4   glucose often during the day.

5          THE COURT:  With what frequency, if I could ask you,

6   ma'am?

7          JUROR NO. 38:  Five times a day I check.

8          THE COURT:  Would it be accurate for me to say that

9   five times a day would represent somewhat of a significant

10   problem or inconvenience to you if you were required to spend

11   an hour and a half at a shot out here in the courtroom?

12          JUROR NO. 38:  Probably not, no.

13          THE COURT:  It would not present a problem?

14          JUROR NO. 38:  I check it once before each meal,

15  before bedtime, like two hours after breakfast.

16          THE COURT:  Okay.  Then you're the person who would

17  know, as long as you feel comfortable with that, that's fine.

18  But I appreciate you calling that to my attention.

19          JUROR NO. 21:  My name is Pauline Gausman, I'm juror

20  number 21.  I live in St. Marys, which is in the County of Elk.

21  My occupation is I'm a registered nurse with a certification in

22  geriatrics.  I am currently the liaison manager on the

23  geriatric behavioral health unit with the Elk Regional Health

24  Center.  I am divorced.  I have two children, one is age 24,

25  living in Oklahoma.  I have a 15-year-old.  I own my own home.


28


1  Currently I do not have an attorney.  I have been a party to a

2  lawsuit because I am also a land rental owner.  And I have been

3  involved in an auto accident and was involved in a lawsuit.  My

4  educational background, I have an associate degree in nursing,

5  with a specialty in geriatrics.  There is no reason why I could

6  not serve on this jury.

7          THE COURT:  Thank you, ma'am.

8          JUROR NO. 9:  My name is Richard Maas, juror number

9  9. I live in North East, in Erie County. I am self-employed.

10  I'm married, three children, 27, 24 and 12. I do own my own

11  house. I do have an attorney. And I was involved in a

12  lawsuit. High school background.

13      THE COURT: What was the nature of the lawsuit, sir?

14      JUROR NO. 9: It was a civil suit, I was being sued

15  by another parent through the basketball program.

16      THE COURT: Go ahead.

17      JUROR NO. 9: The only problem I have, I have to

18  have surgery on Friday. Other than that, I can serve.

19      THE COURT: This case will be done before that.

20      JUROR NO. 9: Okay.

21      THE COURT: Thank you, sir.

22      JUROR NO. 37: I am Christine Fillgrove, I am juror

23  number 37. I live in Oil City, Venango County. I'm retired

24  from nursing. Are you married -- I'm a widower. I have two

25  children, ages 32 and 31. I do own my own home. I am not

29

1  currently in a lawsuit. A lawsuit, I've been through a

2  divorce. A real estate venture thing with my spouse. Several

3   nursing courses for education.  And a high school diploma.

4   There is no reason why I can't serve on this jury.

5           THE COURT:  Thank you, ma'am.

6           DEPUTY CLERK:  All right, I have several other

7   questions.  Have you or any member of your immediate family

8   ever been employed in law enforcement, either by a state or

9   local police department, government agency, investigative

10  agency, private detective or security guard agency or

11  prosecuting attorney's office?  Would you stand up, give your

12  name and juror number?

13          JUROR NO. 35:  Thomas Briggs, juror number 35.  My

14  wife is the assistant court administrator for Crawford County,

15  I don't know if that falls under the question.

16          THE COURT:  Civil or criminal?

17          JUROR NO. 35:  She's criminal.

18          THE COURT:  All right, thank you, sir.

19          JUROR NO. 33:  Debra Boylan, juror number 33.  My

20  father was an officer many, many years ago.

21          THE COURT:  Where was he employed?

22          JUROR NO. 33:  Well, my father is deceased, my

23  father was a state cop, was a state trooper.  Pennsylvania

24  State Police in Bloomsburg, Pa.  He originally was in the

25  Hazeltown area.  My father is dead many, many years, though.


30


1          THE COURT:  The fact that your father was a police

2  officer, would that affect your decision here or would you be

3  able to keep an open mind?

4          JUROR NO. 33:  No, absolutely not.

5          DEPUTY CLERK:  It wouldn't affect your decision?

6          JUROR NO. 33:  No.

7          THE COURT:  Yes, ma'am.

8          JUROR NO. 21:  Pauline Gausman, juror number 21.  My

9  brother was the sheriff of Elk County.

10          DEPUTY CLERK:  Is he still the sheriff of Elk

11  County?

12          JUROR NO. 21:  No.

13          DEPUTY CLERK:  Would that play any role in the

14  decision you would make, having a brother that was in law

15  enforcement?

16          JUROR NO. 21:  No.

17          THE COURT:  You're a volunteer, right?

18          JUROR NO. 123:  Yes.  My husband and I both go into

19   a variety of state, only the state correctional facilities.

20   It's ministry, all volunteer ministry.

21          THE COURT:  So you serve only in a ministerial

22   capacity, is that right?

23          JUROR NO. 123:  Correct.

24          THE COURT:  May I assume that the work that you do

25   in the prisons would not in any way affect your ability to be

31

1   completely fair to both parties here?

2          JUROR NO. 123:  I would think so.  I would think

3   that it would be okay.

4          THE COURT:  In other words, you don't have any

5   reason to believe that your ministry in prison would cause you

6   to favor one side or the other in this case?

7          JUROR NO. 123:  Because I was just going to tell her

8   my brother-in-law was assistant head of the Indiana crime lab

9   for the state police.

10          THE COURT:  Would that fact in any way affect your

11   ability to be fair in this case?

12        JUROR NO. 123:  I don't think so, no.

13        THE COURT:  Well, you've got to be kind of sure?

14        JUROR NO. 123:  No.

15        THE COURT:  Okay.  Go ahead.

16        DEPUTY CLERK:  Have you or any member of your

17   immediate family ever been employed by or in any way connected

18   with the Commonwealth of Pennsylvania, other than what you just

19   told us?

20        JUROR NO. 3:  Pat Wise, juror number 3.  I don't

21   know whether this really is anything, my husband, he was a

22   dispatcher for the Meadville Police Department.  But with the

23   city crunch, he was let go.  He's now a dispatcher at Allegheny

24   College.

25        DEPUTY CLERK:  That really would not interfere with


32


1    any jury service?

2         JUROR NO. 3:  Right.

3         JUROR NO. 238:  Lawrence Sullivan, juror number 238.

4    My sister is a parole officer in Pittsburgh.  And my

5    brother-in-law is a sheriff down in Pittsburgh as well.  That

6   would not deter --

7        DEPUTY CLERK:  That would not affect your decision?

8        JUROR NO. 238:  No.

9        THE COURT:  When you say that would not deter --

10   that would not in any way affect your ability to be fair and

11   impartial?

12        JUROR NO. 238:  No, it would not.

13        MR. MARAVICH:  Your Honor, I think I saw another

14   hand up for the previous question.

15        THE COURT:  Let's see, did someone raise their hand,

16   was someone missed, they wanted to say something?

17        JUROR NO. 35:  It was me.  I answered the second

18   time.  Thomas Briggs, juror number 35.  My wife is employed for

19   the Department of Environmental Resources.  I don't know if it

20   falls under state police, state employment.

21        JUROR NO. 37:  Christine Fillgrove, juror number 37.

22   My father --

23        THE COURT:  Could you please speak up?

24        JUROR NO. 37:  My father was a right-of-way

25   administrator for the Commonwealth of Pennsylvania for years.

33

1          THE COURT:  Right-of-way administrator?

2          JUROR NO. 37:  Right.

3          THE COURT:  Okay.  Would that affect your ability to

4    be fair?

5          JUROR NO. 37:  No.

6          DEPUTY CLERK:  Did I miss anybody?

7          (No response.)

8          DEPUTY CLERK:  Have you or any member of your

9    immediate family ever been employed by or in any way connected

10   with the Pennsylvania Department of Corrections?

11         (No response.)

12         DEPUTY CLERK:  Have you or has any member of your

13   immediate family ever been employed in a jail or prison, or as

14   a parole or probation officer?  Stand and give your name and

15   juror number?

16         JUROR NO. 238:  Lawrence Sullivan, juror 238.  My

17   sister.

18         DEPUTY CLERK:  Would that affect your ability to be

19   fair?

20         JUROR NO. 238:  No, it would not.

21         JUROR NO. 123:  Judith Smock, juror number 123.

22  My brother-in-law taught at SCI-Cambridge Springs.

23       THE COURT:  Would that affect your ability to make a

24  fair decision on the evidence?

25       JUROR NO. 123:  No.


34


1        DEPUTY CLERK:  Would you tend to believe the

2  testimony of a corrections official simply because he or she is

3  a corrections official, more than the testimony of a citizen of

4  the state?

5        (No response.)

6        DEPUTY CLERK:  Everybody says no to that, okay.

7  Would you tend to disbelieve the testimony of a corrections

8  official simply because he or she is a corrections official,

9  more than the testimony of a citizen of the state?

10        THE COURT:  Yes, sir.

11        JUROR NO. 39:  My name is Richard Canavan, juror

12  number 39, I believe --

13        THE COURT:  Hang on a second, Nicole, bring him over

14  here to side bar.

15        (At side bar on the record.)

16          THE COURT:  What is your juror name and number

17  again?

18          JUROR NO. 39:  Richard Canavan, number 39.

19          THE COURT:  The question is would you tend to

20  disbelieve the testimony of a corrections official simply

21  because he or she is a corrections official, more than the

22  testimony of a citizen of the state?

23          JUROR NO. 39:  Yes -- if I would believe a

24  corrections officer or a person, I would believe a corrections

25  officer.


                                35


1          THE COURT:  Okay.

2          JUROR NO. 39:  I believe they are in the

3  institution --

4          THE COURT:  Start that all over again.

5          JUROR NO. 39:  I'm nervous.  I believe people that

6  are in that situation --

7          THE COURT:  Let me help you out, tell me if this is

8  accurate.  What you're telling me, for all the reasons you just

9  said about correctional officers, you're not sure that you

10  could be entirely fair in this case?

11       JUROR NO. 39:  That's a good way to put it.

12       THE COURT:  That's good enough, I'm going to

13  discharge you.  We want people to be candid, thank you very

14  much, you're excused.

15       (End of discussion at side bar.)

16       DEPUTY CLERK:  Replacing juror 39 will be Dana

17  Wells, juror number 29.  I'm going to have you read those

18  questions; give your name and your juror number and answer

19  these questions, please?

20       JUROR NO. 29:  Dana Wells, juror number 29.  I live

21  in Bradford, McKean County.  I'm a plant manager.  I am

22  married.  My wife's occupation is a receptionist.  I have two

23  children, six and nine.  I do own my own home.  I have no

24  attorney.  I have never been in any kind of a lawsuit.  I have

25  an associate's degree.  There is no reason why I couldn't sit

36

1  on this jury.

2       THE COURT:  I didn't hear you?

3       JUROR NO. 29:  There is no reason why I couldn't sit

4  on this jury.

5       THE COURT:  Thank you, very much.

6       DEPUTY CLERK:  I'm going to ask you the same

7  questions I asked them.  You can have a seat.  Have you or any

8  member of your immediate family ever been employed in law

9  enforcement, either by a state or local police department,

10  government agency, investigative agency, private detective or

11  security guard agency or prosecuting attorney's office?

12       JUROR NO. 29:  Not state, federal.  I have a brother

13  who's a correctional officer for FCI-McKean.

14       THE COURT:  All right.  With your brother being a

15  correctional officer, would that fact affect your ability to be

16  fair and impartial in this case?

17       JUROR NO. 29:  No, it would not.

18       DEPUTY CLERK:  Have you or has any member of your

19  immediate family ever been employed by or in any way connected

20  with the Commonwealth of Pennsylvania?

21       JUROR NO. 29:  No.

22       DEPUTY CLERK:  Have you or any member of your

23  immediate family ever been employed by or in any way connected

24  with the Department of Corrections?

25      JUROR NO. 29:  No.


37


1       DEPUTY CLERK:  Have you or has any member of your

2  immediate family ever been employed in a jail or prison or as a

3  parole or probation officer; other than your brother you

4  already mentioned?

5       JUROR NO. 29:  No.

6       DEPUTY CLERK:  Would you tend to believe the

7  testimony of a corrections official simply because he or she is

8  a corrections official, more than the testimony of a citizen of

9  this state?

10       JUROR NO. 29:  No.  I would be impartial.

11       DEPUTY CLERK:  Would you tend to disbelieve the

12  testimony of a corrections official simply because he or she is

13  a corrections official, more than the testimony of a citizen of

14  this state?

15       JUROR NO. 29:  No.

16       DEPUTY CLERK:  Okay.  I'm going back to the group

17  question again.  Have you or has any member of your immediate

18  family been associated with a prisoners' rights organization?

19        (No response.)

20        DEPUTY CLERK:  No for everybody.  Would your

21   personal religious beliefs or convictions affect your ability

22   to serve as a fair and impartial juror and render a fair and

23   impartial verdict based on the evidence presented in court and

24   the court's instructions on the law concerning a prisoner?

25        (No response.)


                              38


1         DEPUTY CLERK:  That's all my questions.

2         THE COURT:  Members of the jury, I'm going to ask

3    you one additional voir dire question that does not appear on

4    the list of questions that were submitted, but I'm going to ask

5    it anyways.  And the question is this.  Would you tend to

6    believe the testimony of a corrections official simply because

7    he or she is a corrections official, more than the testimony of

8    a citizen of this state who happened to be incarcerated?

9         (No response.)

10        THE COURT:  Now, the next couple of questions we're

11   going to go through are going to be asked individually over

12   here at side bar.  The follow-up questions would be asked

13  individually.  Actually, I'm going to ask the initial question

14  right here.

15        DEPUTY CLERK:  Lawrence Sullivan.

16        (At side bar on the record.)

17        THE COURT:  Tell me your juror number and name,

18  please?

19        JUROR NO. 238:  Juror number 238, Lawrence Sullivan.

20        THE COURT:  Have you or has any member of your

21  immediate family ever been incarcerated in a local, state or

22  federal prison for conviction of a criminal offense?

23        JUROR NO. 238:  No.

24        THE COURT:  Have you or has any member of your

25  immediate family ever been the victim of a crime?


39


1         JUROR NO. 238:  No, sir.

2         THE COURT:  Thank you, very much.

3         DEPUTY CLERK:  Tiffany Ann Reichert.

4         THE COURT:  Tell me your name and juror number?

5         JUROR NO. 20:  Tiffany Reichert, number 20.

6         THE COURT:  Have you or has any member of your

7    immediate family ever been the victim of a crime?

8         JUROR NO. 20:  No.

9         THE COURT:  Have you or has any member of your

10   immediate family ever been incarcerated in a local, state or

11   federal prison for conviction of a criminal offense?

12        JUROR NO. 20:  No.

13        THE COURT:  Thank you.

14        DEPUTY CLERK:  Paula Gleeson.

15        THE COURT:  First of all, tell me your name and

16   juror number?

17        JUROR NO. 5:  Paula Gleeson, juror number five.

18        THE COURT:  Have you or any member of your immediate

19   family ever been the victim of a crime?

20        JUROR NO. 5:  No.

21        THE COURT:  Have you or has any member of your

22   immediate family ever been incarcerated in a local, state or

23   federal prison for conviction of a criminal offense?

24        JUROR NO. 5:  No.

25        THE COURT:  Thank you.

1          DEPUTY CLERK:  Dana Wells.

2          THE COURT:  State your name and juror number?

3          JUROR NO. 29:  Dana Wells, juror number 29.

4          THE COURT:  Have you or has any member of your

5   immediate family ever been the victim of a crime?

6          JUROR NO. 29:  Yes.

7          THE COURT:  Tell me about that?

8          JUROR NO. 29:  My wife and I had a lawsuit.

9          THE COURT:  Anything else?

10          JUROR NO. 29:  No.

11          THE COURT:  What was the resolution of that case?

12          JUROR NO. 29:  Settled.

13          THE COURT:  Was that a criminal case or civil?

14          JUROR NO. 29:  Civil.

15          THE COURT:  I was asking criminal not civil, but

16   that's okay.  Let me ask again.  Have you or any member of your

17   immediate family ever been the victim of a crime; I'm talking

18   where criminal charges were actually pressed?

19          JUROR NO. 29:  No.

20          THE COURT:  Okay.  Have you or has any member of

21   your immediate family ever been incarcerated in a local, state

22   or federal prison for conviction of a crime?

23          JUROR NO. 29:  No.

24          THE COURT:  Thank you, sir.

25          DEPUTY CLERK:  Rebecca Berry.


                              41


1           THE COURT:  What is your name and juror number?

2           JUROR NO. 30:  Rebecca Berry, number 30.

3           THE COURT:  Have you or has any member of your

4    immediate family ever been the victim of a crime?

5           JUROR NO. 30:  No.

6           THE COURT:  Have you or has member of your immediate

7    family ever been incarcerated in a local, state or federal

8    prison for conviction of a criminal offense?

9           JUROR NO. 30:  No.

10          THE COURT:  Thank you.

11          DEPUTY CLERK:  Judith Smock.

12          THE COURT:  I know your name is Judith Smock, your

13   juror number is 123, is that right?

14          JUROR NO. 123:  Right.

15          THE COURT:  Have you or any member of your immediate

16   family ever been the victim of a crime?

17          JUROR NO. 123:  Yes.

18          THE COURT:  Tell me about that?

19          JUROR NO. 123:  My son a year ago was a victim of a

20    holdup in a Radio Shack store, he was shot at, the bullet

21    missed him by eight to ten inches.

22          THE COURT:  Anything else?

23          JUROR NO. 123:  No.

24          THE COURT:  Would the fact that your son had been

25    victimized in that fashion in any way affect your ability to be


                                42


1    completely fair and impartial to both sides in this case?

2          JUROR NO. 123:  I don't think it would.

3          THE COURT:  Well, I'm going to give you a minute to

4    think about it?

5          JUROR NO. 123:  No, it wouldn't.

6          THE COURT:  It wouldn't at all, okay.  Have you or

7    has any member of your immediate family ever been incarcerated

8    in a local, state or federal prison for conviction of a

9    criminal offense?

10          JUROR NO. 123:  No.

11          THE COURT:  Thank you, very much.

12          DEPUTY CLERK:  Michael Carlstrom.

13          THE COURT:  Give me your name and juror number?

14          JUROR NO. 23:  Michael Carlstrom, number 23.

15          THE COURT:  Have you or has any member of your

16  immediate family ever been the victim of a crime?

17          JUROR NO. 23:  No.

18          THE COURT:  Have you or has any member of your

19  immediate family ever been incarcerated in a local, state or

20  federal prison for conviction of a criminal offense?

21          JUROR NO. 23:  No.

22          THE COURT:  Thank you.

23          DEPUTY CLERK:  Patricia Wise.

24          THE COURT:  Would you tell me your name and juror

25  number again?


43


1          JUROR NO. 3:  Patricia Wise and it's number three.

2          THE COURT:   Have you or has any member of your

3  immediate family ever been the victim of a crime?

4          JUROR NO. 3:  No.

5          THE COURT:  Have you or any member of your immediate

6    family ever been incarcerated in a local, state or federal

7    prison for conviction of a criminal offense?

8          JUROR NO. 3:  No.

9          THE COURT:  Thank you.

10          DEPUTY CLERK:  Thomas Briggs.

11          THE COURT:  All right, Mr. Briggs, would you tell me

12    your juror number, please?

13          JUROR NO. 35:  Number 35.

14          THE COURT:  Have you or has any member of your

15    immediate family ever been the victim of a crime?

16          JUROR NO. 35:  No, sir.

17          THE COURT:  Have you or any member of your immediate

18    family ever been incarcerated in a local, state or federal

19    prison for conviction of a criminal offense?

20          JUROR NO. 35:  No, sir.

21          THE COURT:  Thank you.

22          DEPUTY CLERK:  James Harris.

23          THE COURT:  Mr. Harris, would you tell me your juror

24    number, please?

25          JUROR NO. 1:  Number one.

44

1          THE COURT:  That's easier to remember than 123.

2    Have you or has any member of your immediate family ever been

3    the victim of a crime?

4          JUROR NO. 1:  I do have one thing, I do have an

5    uncle, who's deceased now, that was incarcerated in prison.

6          THE COURT:  I'm going to ask you about that in a

7    second.  Nobody in your family has ever been the victim of a

8    crime, is that right?

9          JUROR NO. 1:  No.

10          THE COURT:  Now, my next question was have you or

11    any member of your immediate family ever been incarcerated in a

12    local, state or federal prison for conviction of a criminal

13    offense; and you said that your uncle --

14          JUROR NO. 1:  He died in prison, too.

15          THE COURT:  What was he in for?

16          JUROR NO. 1:  Molestation.

17          THE COURT:  In a state prison, is that right?

18          JUROR NO. 1:  In Smethport, I guess that's a state

19    prison.

20          THE COURT:  Anybody else in your family?

21          JUROR NO. 1:  I have a cousin that was in jail for

22  something like that.  He's since been out of prison.

23          THE COURT:  Now, would the fact that you have had

24  those family members, one deceased, incarcerated, would that in

25  any way affect your ability to be fair and impartial in this


                              45


1  case?

2          JUROR NO. 1:  No.

3          THE COURT:  All right, thank you, sir.

4          JUROR NO. 1:  I do have one question for you, sir.

5  She was asking about do I have any family members or relatives

6  involved in law enforcement.  When I did my military time, I

7  had an association with a member who's a corrections officer.

8          THE COURT:  Run that by me again?

9          JUROR NO. 1:  When I was in the military, a member

10  of our unit is now a corrections officer.  I think it's in

11  Albion.

12          THE COURT:  Would the fact that a member of your

13  unit when you served in the military, who works as a

14    corrections officer at a SCI facility, in any way affect your

15    ability to be fair here?

16          JUROR NO. 1:  No.

17          THE COURT:  Thank you, sir, for calling that to my

18    attention.

19          DEPUTY CLERK:  Linda Wilson.

20          THE COURT:  Hello, Ms. Wilson, your juror number,

21    please?

22          JUROR NO. 38:  Thirty-eight.

23          THE COURT:  Have you or has any member of your

24    immediate family ever been the victim of a crime?

25          JUROR NO. 38:  I had my car broken into and a tape

46

1    player stolen.

2          THE COURT:  How long ago was that?

3          JUROR NO. 38:  Thirty years ago.

4          THE COURT:  Would the fact that that happened in any

5    way affect your ability to be fair here today?

6          JUROR NO. 38:  No.

7          THE COURT:  Have you or has any member of your

8    immediate family ever been incarcerated at a local, state or

9    federal prison for conviction of a criminal offense?

10          JUROR NO. 38:  What's immediate family -- uncle,

11   aunt?

12          THE COURT:  That would include uncle, aunt, cousin?

13          JUROR NO. 38:  I have an uncle that's in prison.

14          THE COURT:  Where?

15          JUROR NO. 38:  I'm not really sure.

16          THE COURT:  For what?

17          JUROR NO. 38:  Sexual molestation.

18          THE COURT:  All right.  Anybody else?

19          JUROR NO. 38:  No.

20          THE COURT:  Thank you.  Wait a second, come back

21   just one second.  Would the fact that your uncle is

22   incarcerated in any way affect your ability to be fair to both

23   sides in this case?

24          JUROR NO. 38:  No.

25          THE COURT:  Thank you.


                              47


1           DEPUTY CLERK:  Pauline Gausman.

2          THE COURT:  Ms. Gausman, give me your juror number,

3    please?

4          JUROR NO. 21:  Twenty-one.

5          THE COURT:  Have you or has any member of your

6    immediate family ever been incarcerated in a local, state or

7    federal prison for conviction of a criminal offense?

8          JUROR NO. 21:  Yes, I had a niece who was arrested

9    and jailed for driving without a license.

10          THE COURT:  Anybody else?

11          JUROR NO. 21:  No.

12          THE COURT:  Would the fact that your niece had been

13    arrested in any way affect your ability to be fair in this

14    case?

15          JUROR NO. 21:  No.

16          THE COURT:  Have you or any member of your immediate

17    family ever been convicted of a crime?

18          JUROR NO. 21:  Yes, I have.

19          THE COURT:  What happened to you?

20          JUROR NO. 21:  Some gentleman exposed himself to me

21    and various members of the community.

22          THE COURT:  Okay.  How long ago did that happen?

23          JUROR NO. 21:  Twelve years ago.

24          THE COURT:  Was he prosecuted?

25          JUROR NO. 21:  Yes, but it was settled, nobody had

48

1   to testify, it was settled beforehand.

2          THE COURT:  Now, would the fact that you have had

3   that experience in any way affect your ability to be fair and

4   impartial here?

5          JUROR NO. 21:  No.

6          DEPUTY CLERK:  Richard Maas.

7          THE COURT:  Would you state your name, sir?

8          JUROR NO. 9:  Richard Maas, juror number 9.

9          THE COURT:  Have you or has any member of your

10  immediate family ever been the victim of a crime?

11         JUROR NO. 9:  In 1982, '83, my store was robbed.

12         THE COURT:  All right.  Would the fact that you had

13  that experience in any way affect your ability to be fair in

14  this case?

15         JUROR NO. 9:  It wouldn't have any effect.

16         THE COURT:  Have you or has any member of your

17  immediate family ever been incarcerated in a local, state or

18  federal prison for conviction of a federal offense?

19        JUROR NO. 9:  Not to my knowledge.

20        THE COURT:  All right, thank you.

21        DEPUTY CLERK:  Christine Fillgrove.

22        THE COURT:  Would you give me your name and juror

23  number, please?

24        JUROR NO. 37:  Christine Fillgrove, 37.

25        THE COURT:  Have you or has any member of your

49

1  immediate family ever been the victim of a crime?

2        JUROR NO. 37:  Yes.

3        THE COURT:  What happened?

4        JUROR NO. 37:  My daughter, she wrote bad checks.

5        THE COURT:  Keep your voice up a little bit.  The

6  question is have you or any member of your immediate family

7  been the victim of a crime?

8        JUROR NO. 37:  No.

9        THE COURT:  Have you or has any member of your

10  immediate family ever been incarcerated in a local, state or

11  federal prison for conviction of a criminal offense?

12          JUROR NO. 37:  Yes, my daughter.

13          THE COURT:  For writing bad checks?

14          JUROR NO. 37:  Right.

15          THE COURT:  How long ago did that happen?

16          JUROR NO. 37:  Three years ago.

17          THE COURT:  Is she still in prison?

18          JUROR NO. 37:  No.

19          THE COURT:  Would the fact that that happened with

20  your daughter in any way affect your ability to be fair in this

21  case?

22          JUROR NO. 37:  No, not at all.

23          THE COURT:  Thank you.  Members of the jury, that

24  completes the questioning in the jury selection process.  The

25  next thing that's going to happen is that Mr. Richmond and Mr.


50


1  Maravich will begin the process of striking and getting down to

2  the final jury.  While that process is going on, I'm going to

3  go back into my chambers and my clerk will get me when it's

4  done.  We'll come out and we'll swear the final jury panel in.

5  And at that point we'll give you a break.

6          (Whereupon, the Plaintiff and the Defense select the

7   Jury.)

8          DEPUTY CLERK:  When I call your name, it's going to

9   be one, two, three, four, five, six, seven and eight.  Seat

10   number one, we're going to have Linda Wilson.  In seat number

11   two will be Tiffany Reichert.  Seat number three will be

12   Pauline Gausman.  Seat number four will be Dana Wells.  Seat

13   number five will be Rebecca Berry.  Seat number six will be

14   Christine Fillgrove.  Seat number seven will be Michael

15   Carlstrom.  Seat number eight will be Patricia Wise.  Every

16   time we come back, this is where you will be sitting.

17          THE COURT:  All right, swear the jury panel, please.

18          DEPUTY CLERK:  Stand up and raise your right hand,

19   please.

20          (Whereupon, the Jury was sworn.)

21          THE COURT:  Please be seated.  First of all, with

22   respect to the rest of the jury panel back here.  Thank you

23   very much for coming in today.  The weather, although it was

24   warm, turned somewhat inclement.  Thank you for your effort,

25   you're going to be excused now.  The only thing I would ask is

1   that each of you just poke your head into the Clerk's Office,

2   the Clerk's Office would be directly across from where you

3   gathered this morning, just to see if they have any specific

4   instructions for you.  I suspect they probably don't.  Thank

5   you very much, you're free to go now.

6        Members of the jury, now that you have been sworn,

7   I'm going to give you some preliminary instructions to guide

8   you in your participation in this case.  It will be your duty

9   to find from the evidence what the facts are.  And you and you

10  alone are the judges of the facts.  You will then have to apply

11  those facts to the law as I give it to you.  You must follow

12  the law, whether you agree with it or not.  Nothing that I may

13  say or do during the course of the trial is intended to

14  indicate or should be taken by you as indicating what your

15  verdict should be.

16       The evidence from which you will find the facts will

17  consist of the testimony of witnesses, documents and other

18  things received into the record as exhibits.  And any facts

19  that the lawyers agree to or stipulate to or that the court may

20  instruct you to find.

21        Now, certain things are not evidence and must not be

22   considered by you as evidence, I will explain them now.

23   Statements, arguments and questions by lawyers or parties are

24   not evidence.  Let me say that again.  That's accurate,

25   statements, arguments and questions by lawyers are not


52


1   evidence.  Let me clarify that.  In this case Mr. Richmond is

2   representing himself.  So if he makes any argument to you in a

3   closing statement or should ask a question of another witness,

4   that's not evidence.  But when Mr. Richmond is on the witness

5   stand in a sworn capacity and is testifying as a party, well

6   then that is evidence.  Objections to questions are not

7   evidence.  Lawyers have an obligation to their clients to make

8   objections when they believe evidence is being offered for an

9   improper purpose under the rules of evidence.  You should not

10   be influenced by the objection or by my ruling on it.  If the

11   objection is sustained, ignore the question.  If it is

12   overruled, treat it like any other.  Testimony that the court

13   has excluded or told you not to consider is not evidence.

14   Anything you may have heard or seen outside this courtroom is

15  not evidence.

16      There are two types of evidence, direct and

17  circumstantial.  Direct evidence is direct proof of a fact,

18  such as the testimony of an eyewitness.  Circumstantial

19  evidence is proof of facts from which you may infer or conclude

20  that other facts exist.  I will give you further instructions

21  on direct and circumstantial evidence later in the case.  But

22  for present purposes simply bear in mind that you may consider

23  both types.  It will be up to you to decide which witnesses to

24  believe, which witnesses not to believe and how much of any

25  witness's testimony to accept or reject.  I'll also give you


53


1  guidelines on determining a witness's credibility at the

2  conclusion of the case.

3      Now, this is a civil case.  That means that Mr.

4  Richmond has the burden of proving his case by what is called

5  the preponderance of the evidence.  That means that the

6  plaintiff has to produce evidence which considered in light of

7  all the facts leads you to believe that what the plaintiff

8  claims is more likely true than not.  To put it differently, if

9   you were to put the plaintiff's and defendants' evidence on

10  opposite sides of the scales, the plaintiff would have to make

11  the scales tip somewhat on his side.  If the plaintiff fails to

12  meet this burden, the verdict must be for the defendant.  Those

13  of you who may have sat on criminal cases will have heard the

14  term proof beyond a reasonable doubt.  That requirement does

15  not apply in a civil case.  And, therefore, you should put it

16  out of your mind.

17          A few quick words about your conduct as jurors.

18  First, I instruct you that during the trial, as I said before,

19  you're not to discuss the case with anyone or permit anyone to

20  discuss it with you.  Until you retire to the jury room at the

21  end of the case to deliberate on your verdict, you simply are

22  not to talk about the case.

23          Second, do not read or listen to anything touching

24  on this case in any way.  If anyone should try to talk to you

25  about it, bring it to the court's attention.


54


1           Third, do not try to do any research or make any

2   investigation about the case on your own.

3         And, finally, and very importantly, do not form any

4   opinion about the case until all the evidence is in, and you

5   have had an opportunity to begin your deliberations.

6         Shortly the trial is going to begin.  And the way it

7   goes is this.  First, each side may make an opening statement.

8   An opening statement is neither evidence nor argument.  It is

9   simply an outline of what that party intends to prove offered

10  to help you follow the evidence.  Next the plaintiff will

11  present his witnesses, and the defendant may cross-examine

12  them.  Then the defendant will present their witnesses, and the

13  plaintiff may cross-examine them.  After that the attorney and

14  Mr. Richmond will make what is known as their closing arguments

15  to summarize and interpret the evidence for you.  And at that

16  point I will give you instructions on the law.  You will then

17  retire to deliberate on your verdict.

18         Now, by my clock here it's about 11:25.  What I'm

19  inclined to do is this.  The next thing would be the opening

20  statements, which would take us probably up through noon.  But,

21  in any event, you haven't had a break since you've been here.

22  I'm going to suggest that we take an early lunch right now.

23  And I'm going to ask that you be back and ready to go at

24  1 o'clock.  At 1 o'clock we'll hear the opening statements and

25  we'll start to take some evidence.  I'm going to stay on the


55


1   bench for a minute.

2        (Whereupon, the Jury was dismissed from the

3   courtroom.)

4        THE COURT:  Mr. Richmond, one of my reasons for

5   breaking now till one o'clock is to give you an additional

6   opportunity to talk to your other witnesses up there.  So

7   that's why we're doing it this way.  So we're in recess until

8   1 p.m.

9        (Luncheon recess from 11:24 a.m.; until 1:10 p.m.).

10       THE COURT:  All right, members of the jury, at this

11  time we're going to hear the opening statements in the case.

12  Mr. Richmond, are you ready to go on that?

13       MR. RICHMOND:  Yes, sir.

14       THE COURT:  All right, Mr. Richmond.

15       MR. RICHMOND:  Good afternoon, ladies and gentlemen,

16  my name is Robert Richmond.  I'm 45-years-old.  And I'm an

17  inmate currently at SCI-Greensburg.  The incident that you're

18  going to hear about, the reason why we're here today is for a

19   civil action that I filed against three corrections officers.

20   The incident took place while I was housed at SCI-Greene.  I'm

21   presently housed, as I said before, at SCI-Greensburg.

22        This incident took place in 1999, February 28.  I've

23   served about 11 years on a 15-year sentence for robbery.  And I

24   anticipate I'll probably be released in the next, anywhere from

25   three to six months on parole.  I have roughly about four years

56

1   left to do on my sentence.  I came to prison, as I said

2   earlier, it's been about 11 years now.  So in 1996 I came to

3   prison.

4        Prior to that I spent about 10 years in the United

5   States military.  I was in the Air Force.  I'm

6   married/separated.  I'm the father of three adult children.

7        In my civil suit I've made allegations and testimony

8   and evidence that will be presented to you today and probably

9   over the next day or two, will prove that I was without

10   provocation assaulted by three corrections officers, two of

11   which are seated at the defense table now.

12        I'm alleging that these three officers repeatedly

13  slammed my hand, using the wicket, which is the opening in the

14  cell door, which is used to feed inmates or pass the meals to

15  inmates.  I'm alleging that these three officers repeatedly

16  slammed my hand using the wicket slot as a weapon.

17       And as a result of that particular incident, I have

18  sustained damages.  The damage that I've sustained is probably

19  of indefinite, in terms of, I can't say it's irreparable, but

20  there is some neurological damage.

21       Regardless of how the altercation began, because

22  you're going to hear some conflicting testimony, you're going

23  to hear some testimony from my witnesses, you're going to hear

24  some testimony from the defendants.  Regardless of how the

25  altercation began, I in fact have been injured.


57


1       I attempted to obtain counsel before presenting this

2  case pro se or as my own attorney.  It's not my choice to

3  present it this way, but it's my understanding that it's a

4  simple case, and that all you have to do is tell my side of the

5  story of what happened, and let the jurors be the determining

6  factor as far as deciding the proof of the matter.

7        You're going to hear testimony from prisoners who

8    witnessed the incident.  One of the first testimonies that

9    you're going to hear from is an inmate, Mr. Bruce Ferrell.  He

10   was present on the day that I was injured.  We're talking about

11   some, almost eight years ago, 1999.  So we're not talking about

12   something that just happened recently.  And as a result, you're

13   going to hear testimony from the officers, which I'm sure is

14   going to be conflicting to the testimony that I will present,

15   along with my witnesses.

16       You're also going to see reports.  They're going to

17   introduce into evidence misconduct reports from the date of the

18   incident.  I actually have some documents I'd like to introduce

19   for you to be able to review and consider as a whole all of the

20   information in determining the matter at hand.

21       I'm also going to submit as evidence some of the

22   responses that defendants made during the course of what's

23   called discovery.  That's the period when questions were asked

24   about the incident and sworn testimony was provided by the

25   officers.  Some of that information is going to be put on the

58

1   exhibits as well.  I also have medical reports from a

2   neurosurgeon, that will demonstrate that I have received damage

3   to my hand.

4        And you're also going to hear testimony from another

5   inmate, Chris Kaminski.  Mr. Kaminski was present on the day of

6   the incident, and he personally eyewitnessed what happened to

7   me.

8        From a proof standpoint or from a standpoint of

9   what's going to be required for me to prove my case -- so that

10  the case can be handled or taken care of, resolved, is the best

11  way I can put it, there are two components to prove excessive

12  force.

13        One of the components is subjective.  And that's the

14  injury that I have sustained has to be significantly serious.

15  From a subjective standpoint, that particular element of my

16  case has already been proven.  I have been injured, that's

17  without a doubt.

18        There is an objective element involving proving

19  excessive force or whether excessive force has been used as I'm

20  alleging.  To prove the objective element of excessive force,

21  it goes to the officers' state of mind.  What were they

22  actually thinking at the time that the incident occurred.

23      So there is, as I said, there's two elements.  One

24  is subjective, that's the injury has to be significant.  That's

25  already been pretty much established.  The other element and


59


1  probably the most significant element is the objective element

2  of excessive force.  That's what was in the officers' mind at

3  the time the incident occurred.

4      What you won't see in terms of evidence is the

5  videotape.  There's videotape that is running on the pod or in

6  the area where prisoners are housed at any given time.  But you

7  won't see a videotape.  One of the main reasons you won't see a

8  videotape is because the videotape would show conclusively that

9  what I'm alleging actually took place.  Excessive force was

10  employed upon me, it was without provocation, and there was no

11  justification for the excessive force, and as a result I was

12  injured.  So you won't see a videotape.

13      I'm not sure if the defense intends to put into

14  evidence photographs.  But I'm of the suspicion that the

15  photographs that you will see, if photographs are entered into

16  evidence, they won't show any of the blood or any of the actual

17  photos of when the incident actually took place.  Because my

18  hand was cleaned and then several photographs were taken.  And

19  that's about it from an opening statement standpoint.

20        I would like to say I don't have any training in the

21  law.  I have about three years of college, and about 10 years

22  in the military.  I've been in prison now for about a little

23  over 10 years.  I'm due to go out and to go home soon.  I was

24  injured, and as a result I brought a case against these

25  officers, and that's what I intend to prove to you over the


                                60


1  next couple of days.  Thank you very much.

2        THE COURT:  All right, Mr. Maravich.

3        MR. MARAVICH:  Thank you, your Honor.  Mr. Richmond.

4  Good afternoon, ladies and gentlemen of the jury.  As Mr.

5  Richmond told you, he is pro se.  He did an excellent job of

6  giving an opening statement.  Not everything he told you in

7  that opening statement will come that you will see in evidence.

8  I'll tell you that first.  Nor do I agree with everything that

9  Mr. Richmond told you.

10          Let me tell you why we're here.  You heard it now a

11   few times, but there's a lot of words that sometimes go into

12   this sentence, okay.  We are here for the claim of excessive

13   force under the Eighth Amendment based on an incident from

14   February 28, 1999, while Corrections Officer Wilkes was passing

15   out the inmate meals.  The plaintiff grabbed Corrections

16   Officer Wilkes, and the two other defendants responded in order

17   to have the inmate release hold of the officer.  That's why

18   we're here.  Okay.

19          You've already heard a little bit about the burden

20   of proof.  And the judge instructed you already on the

21   preponderance of the evidence.  What this means is that the

22   plaintiff, Mr. Richmond, has to prove to you that the force was

23   used maliciously and sadistically to cause harm to him.  There

24   is no question force was used here.  Okay.  You will hear that.

25          The question will come down to was the force that


                                    61


1   was used against him done for malicious and sadistic reasons,

2   or to maintain order and security within the institution.  If

3   you find that it was done for malicious and sadistic reasons,

4    then you're going to find for the plaintiff.  If you find that

5    he does not prove to you that it was done for malicious and

6    sadistic reasons, then we're going to ask you that you find for

7    the defendants.

8            Corrections officers are allowed to use force when

9    necessary.  It will be shown to you that force in this instance

10   was necessary.  That's the breakdown of the case in its simple

11   form.

12           Now, I want to step back and thank you for your

13   patience with the jury selection process this morning.  It's a

14   long, cumbersome process, but it's very important.  What

15   happens during the jury selection is that the case is in search

16   of fact finders.  And you have now been chosen as the fact

17   finders.  You will need to be willing to listen to the facts,

18   then you will need to be willing to listen to the judge give

19   you legal instructions and then follow the instructions, find

20   the facts, and make a determination.  Because the process,

21   because it's so important, the process takes a long time to try

22   to find people that we believe can do all of the things I just

23   outlined.

24           As days go on, you will be sitting here, you will be

25   hearing other people talk, you'll be hearing us ask questions.

62

1  There is a concentration factor.  And you know that also plays

2  in to why you've been chosen.  The parties believe that we've

3  gotten an excellent jury that can listen to the facts, listen

4  to the judge and the instructions and make a proper

5  determination.

6        Now, I'm just going to do a couple introductions

7  here because I've found that when people that I've not met

8  before just say names, it sort of escapes me.  So you've

9  already met Mr. Richmond.  Mr. Richmond is the plaintiff in

10  this case.  Mr. Richmond, as he told you, is an inmate.  And he

11  brings a civil action, not a criminal proceeding, this is a

12  civil action, where he seeks damages.  He is seeking damages

13  from these people over here.

14        These are the defendants.  First is Corrections

15  Officer Greg Wilkes.  Mr. Wilkes works for the Department of

16  Corrections, he's at the State Correctional Institution at

17  Albion.  As a brief aside, I do many of these cases, sometimes

18  the acronyms just slip in.  Just so you know if I start saying

19  SCI, that means state correctional institute, we're not talking

20    about something else.

21        Mr. Wilkes, as I already informed you, on the day of

22    the incident, February 28, 1999, Mr. Wilkes was passing out

23    food to the inmates.  While Mr. Wilkes is passing out the food

24    to the inmates, Mr. Richmond will grab him, and the other two

25    officers will respond because Mr. Richmond grabs Mr. Wilkes.


63


1        Sitting to Mr. Wilkes' left is Lieutenant Randy

2    McElravy.  That name, I think I might have even said it

3    incorrectly this morning, but the name is McElravy.  Mr.

4    McElravy was also there as part of the duties and

5    responsibilities of passing out the meals.  He will respond to

6    the incident when Mr. Richmond grabs Mr. Wilkes.  And he will

7    attempt to free Mr. Wilkes from Mr. Richmond's grasp.

8        The third defendant, who is not here today and will

9    not be here in person, is Corrections Officer James Bedilion.

10    Mr. Bedilion had an unfortunate accident recently.  Where he

11    suffered severe injuries and he can't make the trip.  We are

12    intending on bringing you Mr. Bedilion and his testimony

13    through satellite.  And that will be set up with a video, and

14  hopefully we can all watch it, and Mr. Richmond will have the

15  opportunity to question Mr. Bedilion.  I, too, will have the

16  opportunity to question him.  And he also responded to the

17  incident when Mr. Richmond grabbed Mr. Wilkes.  I apologize

18  that he can't be here, but under the circumstances with his

19  physical condition, we are trying to do the best we can to

20  present to you a defense for Mr. Bedilion.

21       This case, you may ask yourself why did the case

22  take this long.  This case has been around a very long time.

23  The caption reads 1999, that's when Mr. Richmond filed this

24  case.  The incident occurred in February of 1999.  And we are

25  trying to move on then and not have anymore delays regarding


64


1  Mr. Bedilion and Mr. Bedilion's health.

2       I can tell you that in '99 I was still in school,

3  and I inherited this case from a person who has since left the

4  office.  But it does date back a long time.  Most of -- well,

5  much of that has to do with things that were beyond both his

6  Honor's control and really everybody elses.

7       As Mr. Richmond has told you, that he was in the

8  military, the defendants were in the military, we have somebody

9  who was on active duty.  So we also had an injury.  So that's

10  part of the reason why it's taken so long to come here.  But

11  that may affect on all the witnesses' memory, as you can

12  imagine.  Because this incident happened seven years ago.  But

13  there is documentation and we will present documentation.  I

14  think both or all of the parties might have some recollection

15  which isn't the freshest.  But I think that you'll find over

16  seven years that it comes across pretty clear what happened.

17        My name is Craig Maravich, I'm with the Attorney

18  General's Office, I represent the defendants in this case.

19  And that's really it for me.

20        Concerning a few of the things that were brought to

21  your attention through Mr. Richmond's opening statement.  Force

22  was used here, okay.  It is his burden to show to you that

23  force was for a malicious and sadistic reason.  We will show to

24  you that the force that was used was not for a malicious and

25  sadistic reason, but was for the safety and security of the

65

1  officers and the institution.

2          Injury.  Mr. Richmond was injured.  However, it is

3    not agreed what his injuries consist of.  There will be a

4    conflict there.  Mr. Richmond will present to you or attempt to

5    present to you evidence of what he says his injuries are.  I

6    don't believe that the evidence will be presented to you on

7    what he says his injuries are.  So if you think based off his

8    opening statement that those things have already been asked and

9    answered, they have not, that is what your job is.

10          Regarding the statement of a videotape.  There was

11   never a videotape.  And that's not to say that the Department

12   of Corrections lost the videotape.  They didn't.  There is no

13   videotape there.  Many inmates believe because there are

14   cameras in the institution, that every of their actions are

15   taped, and that they should have an opportunity, once they

16   bring a civil action, to view all of the videotapes in the

17   prison.  That is not the case.

18          The Department of Corrections does not videotape

19   every inmate at every time.  Cameras exist, just like cameras

20   exist in office buildings, PAT transit, at the airport, that

21   are used and hooked up to screens where people watch the

22   screens to see if an incident is happening.  But they are not

23   videotaped, and somebody is not assigned to watch every inmate

24   through a video camera.  I just want to make sure we understand

25   that beforehand.


66


1         Once again, I thank you for listening to me.

2   Sometimes I think it's a bit unfair the way that it's set up

3   because I'm the one getting to do the talking, I'm sure you

4   folks would want to ask questions or want to just speak out.

5   But as the system is set up, it's set up in an adversarial

6   position, where Mr. Richmond can ask questions, I can ask

7   questions, and you get to sit and listen.

8         The final thing that I bring to your attention is

9   that what I just said to you right now is not into evidence.

10  This is not evidence.  And when Mr. Richmond is talking to you,

11  as I am talking to you, that, too, is not evidence.  Mr.

12  Richmond can, if he wishes, has the opportunity to take the

13  stand, just like the other witnesses.  And when he's on the

14  stand, he is under oath and that is evidence.  But as we stand

15  out here, he really is acting as his own attorney.  I believe

16  that this case will not take a full week.

17          THE COURT:  Mr. Maravich, let's start wrapping it up

18   so we can start to hear the evidence.

19          MR. MARAVICH:  Yes, sir.  I believe we will be out

20   of here at the most in three days.  At that time I will have

21   another opportunity to address you.  And I will request at that

22   time for a decision in favor of the defendants.  Thank you.

23          THE COURT:  All right.  Now, Mr. Richmond, this is

24   the time where you get to start to put on your case.  Have you

25   made a decision as to who you want to call as your first

67

1   witness?

2          MR. RICHMOND:  Yes, your Honor, I'd like to call

3   inmate Bruce Ferrell as my first witness.  May I introduce a

4   couple of documents into evidence?

5          THE COURT:  I'm sorry, sir, you're going to have to

6   speak into the microphone, I couldn't hear you?

7          MR. RICHMOND:  Excuse me, your Honor.  I was just

8   asking if I may introduce a couple of documents into evidence?

9          THE COURT:  Well, the way you do it is typically

10   you'll introduce a document into evidence through a witness.  I

11    don't know what the nature of those documents are.  It's also

12    possible that there are documents which your adversary will

13    simply stipulate to.  What are the documents?

14        MR. RICHMOND:  I have two documents, one is the

15    misconduct report that I received from the incident.  The other

16    is the use of force policy for the Department of Corrections.

17        THE COURT:  If memory serves and may not

18    necessarily, are those two documents that the defendants have

19    independently listed in the pretrial narrative statement?

20        MR. MARAVICH:  Yes, your Honor.

21        THE COURT:  If you want to introduce them in your

22    own case or submit them in your own case, I'm going to let you

23    do that.  Have you marked them as exhibits?

24        MR. RICHMOND:  No, sir.

25        THE COURT:  All right, then why don't you go ahead


68


1    and do that.  Then we'll get to that momentarily.

2        DEPUTY CLERK:  Please raise your right hand.

3        BRUCE FERRELL, PLAINTIFF WITNESS, SWORN

4        THE COURT:  Pull your chair in a little bit, speak

5    directly into the microphone so everybody can hear you.

6    Mr. Richmond, when you're ready to go, I would ask you to come

7    up to the podium where the microphone is and similarly speak

8    directly into the microphone.  One other instruction for both

9    you gentlemen, the court reporter has to get down everything

10   that's being said.  So if you would be so kind as to wait until

11   he finishes asking the question before you answer it.  And, Mr.

12   Richmond, if you would be so kind as to wait until he finishes

13   answering the question before you ask a new one.  Fair enough?

14         MR. RICHMOND:  Yes, your Honor.

15         MR. MARAVICH:  Your Honor, just regarding some

16   housekeeping for this.  Plaintiff's Exhibit No. 1 for

17   identification purposes is misconduct A-149874, issued to Mr.

18   Richmond and written by Mr. Wilkes.  It's a two-page document.

19   That will be marked for identification purposes as Plaintiff's

20   Exhibit 1.

21         THE COURT:  All right.

22         MR. MARAVICH:  Regarding what we have marked for

23   identification purposes as Plaintiff's Exhibit 2, that is

24   entitled Use of Force Policy, DC-80-M-201, with an effective

25   date of November 30, 1992.  It is numbered, but some of the

1   numbers at the bottom do disappear.

2          THE COURT:  That's a sufficient description.  That's

3   fine.

4          MR. MARAVICH:  It's six pages, your Honor.

5          THE COURT:  Thank you, very much.  All right, Mr.

6   Richmond.

7          MR. RICHMOND:  Thank you.  Ladies and gentlemen and

8   your Honor --

9          THE COURT:  Let's start by asking him for his full

10  name first.  Would you please state your full name for the

11  record, sir?

12          THE WITNESS:  Bruce Ferrell, F-e-r-r-e-l-l.

13                DIRECT EXAMINATION

14  BY MR. RICHMOND:

15  Q.   Mr. Ferrell, as a witness in this case you're being

16  called in relation to an incident that occurred on 28 February,

17  1999.  Were you present at SCI-Greene on that date?

18  A.   Yeah.

19  Q.   Were you on the pod where the incident occurred?

20  A.   Yeah.

21  Q.   Briefly, in your own words, from your own recollection,

22  can you give us a description of what you in fact saw on that

23  date?

24  A.   Well, if I remember right, they passed out the trays --

25       THE COURT:  Sir, you'll have to keep your voice up

70

1  just a little bit.

2       THE WITNESS:  All I remember about the incident is

3  that they passed out the trays, I heard some hollering, some

4  noise.  I came to the door and that's when I seen this incident

5  going on with you and the guards at the door.  Right.  They

6  slammed it, trying to shut the door back and forth on your arm

7  inside the pie hole.

8       MR. RICHMOND:  I'd like to read, your Honor, if I

9  may, the misconduct report that I received on that date from

10  the incident?

11       THE COURT:  All right.

12  BY MR. RICHMOND:

13  Q.   This is a copy of the misconduct report that I received

14  as a result of the incident of 28 February, 1999.  This is the

15  misconduct report that was written by Officer Wilkes, the

16  gentleman seated in the middle. He's the primary defendant in

17  this case. And the misconduct report reads as follows:

18  "Class 1 Cat A #1A assault, including any aggressive physical

19  contact with a potential for injury towards an employee. Class

20  1 Cat A #7, refusing to obey an order."

21      The staff member's version of the incident is as

22  follows: "On the above date and time while feeding FD-pod,

23  Inmate Richmond, DB-7852, who is housed in FD-15, was given a

24  direct order to remove his right arm and hand from outside his

25  wicket. He refused this order. At that time Inmate Richmond

71

1  threw his tray lid and cup filled with juice at Officer

2  McElravy and myself in an attempt to strike us. As I attempted

3  to close the wicket, Inmate Richmond put both his arms and

4  hands through the wicket and grabbed my forearms. At that time

5  Officer McElravy gave Inmate Richmond a direct order to let me

6  go. He refused this order. To prevent me from injury, Officer

7  McElravy used an controlling technique in an attempt to release

8  Inmate Richmond's left hand from my right forearm. At that

9   time Officer Bedilion responded to the incident.  Officer

10  Bedilion used a controlling technique on his right hand in an

11  attempt to the release his right hand from my left forearm."

12  This is Officer Wilkes speaking.  "After the controlling

13  techniques were successful, Inmate Richmond still refused to

14  pull his hands and arms back into his cell.  I then applied

15  pressure to the wicket in an attempt to get Inmate Richmond to

16  retrieve his hands and arms back into his cell.  I was

17  successful at this time.  After Inmate Richmond pulled his

18  hands and arms through the wicket, Officer Bedilion secured the

19  wicket."  That's the misconduct report as it was written by

20  Officer Wilkes.  From your memory and by hearing the misconduct

21  report as was indicated by Officer Wilkes, my question to you,

22  Mr. Ferrell, would be that I was inside a locked cell at the

23  time the incident took place.  Mr. Wilkes is stating that I

24  reached through a small opening, which is a wicket opening of

25  about maybe 15-inches long and about 4-inches high, he's

72

1   indicating that I reached through this wicket opening and I

2   grabbed both of his forearms.  If this is the truth as it's

3    stated in the misconduct report, from your observation, what

4    would Officer Wilkes have to do to simply be released from my

5    alleged grasp on him as it's stated in the misconduct report?

6    A.    That's impossible, all you have to do is pull back, step

7    back from him.  You can't stick your arms out and grab him --

8            THE COURT:  Say that again one more time?

9            THE WITNESS:  You can't stick two arms out, it's

10    impossible, and grab them like that.  You can't do that.

11    BY MR. RICHMOND:

12    Q.    The reason that I wanted to emphasize that it's

13    impossible, it's virtually impossible for me to grab a hold of

14    the officer --

15            MR. MARAVICH:  Objection, argument, your Honor.

16            THE COURT:  You're going to have a chance to argue

17    at the end, but this is your opportunity to ask him questions,

18    so just ask questions to the witness.

19            MR. RICHMOND:  Okay.

20    BY MR. RICHMOND:

21    Q.    When the altercation began as you saw it, what was,

22    again, for the jurors and for the court, could you please state

23    what you specifically saw take place from your first

24  recollection of the incident?

25  A.   Like I said, some noise, some hollering, screaming, I

73

1  came to the door and looked.

2  Q.   Who was doing the hollering, Mr. Ferrell?

3  A.   I heard you holler, my neighbor was saying let him go or

4  something.  That's what brought me to the door, when I looked

5  out there, I looked up on the top tier, I seen your arm outside

6  the pie slot.  Trying to pull it in, he slammed the pie slot on

7  your arm.

8  Q.   At any time did you see the officers actively strike me

9  by using the pie slot as the wicket?

10  A.   As a wicket?

11  Q.   The wicket slot door, did you physically see the officers

12  strike me?

13  A.   Yeah, they kept slamming, kept slamming it.

14  Q.   At any time did you see me physically grab a hold of,

15  holding on to any or either of the officers?

16  A.   How are you going to do that when they're slamming your

17  arm off the pie slot.

18          THE COURT:  Just a second, listen to his question.

19   The question was what did you see?

20   BY MR. RICHMOND:

21   Q.    What did you see?

22   A.    That's it.  All I saw was your hand out there, they kept

23   slamming it in the pie slot, your arm.

24   Q.    If you were to take an estimate, how many times would you

25   say that you witnessed the officers slamming the pie slot on to

74

1   my arm?

2   A.    It was more like five to six times on your arm.

3          MR. MARAVICH:  Objection, your Honor.

4          THE COURT:  Hang on, stand up for the objection so I

5   can hear you.  What is the basis for the objection?

6          MR. MARAVICH:  I believe it's a lack of foundation

7   for that question, your Honor.  I don't think that he has

8   testified that even seen it being slammed in the wicket.

9          THE COURT:  Well, it's going to be for the jury to

10   decide whether he did or didn't.  But he's testified to having

11   been present and observed, that is a sufficient foundation,

12  overruled.  Go ahead, re-ask the question.

13  BY MR. RICHMOND:

14  Q.   How many times, if you were to take an estimate, did you

15  physically see any one or all of the officers simultaneously

16  slamming my hand by using the wicket slot as a weapon; how many

17  times would you say they slammed my hand?

18  A.   Probably like five times, I probably be able to see.

19  Once they converged on the slot and trying to work with the

20  slot, right.

21  Q.   Did you see the incident when it initially began, could

22  you say --

23  A.   No, I can't say I seen it.  Like I said, I was in the

24  cell.  What brought me to the door was the screaming and the

25  noise.  That was when I came to the door and looked out to see


                              75


1  what was going on.  That's when I seen -- when I seen what was

2  going on up on the top tier.

3  Q.   In reference to Mr. Wilkes, are you familiar with Officer

4  Wilkes?

5  A.   Yeah.

6   Q.    Have you had any previous dealings with Officer Wilkes

7   while you were on FD-pod at SCI-Greene?

8   A.    Yes, as a guard, I mean.

9   Q.    And what were those dealings, if you can tell the court?

10  A.    Daily activities -- I mean as to his job.  Pass out the

11  food, supplies, things of that nature.

12  Q.    Was there or was there not, from a history standpoint,

13  was there a history of violence that was going on at SCI-Greene

14  during the timeframe in question, 1999?

15  A.    Ain't no doubt.  Ain't no doubt, they had investigations

16  going on down there, had some guards get fired for abusing

17  prisoners at that time.  They had state police people in there.

18  They had the DA's office in there.  I mean it was a major

19  scandal.  Some guards got fired, some got transferred out to

20  Albion, some went to Fayette now.

21  Q.    And this was covered in the media, is that correct?

22  A.    It was published information.  It was published, they

23  were assaulting, beating prisoners down there.  This was all in

24  the newspaper.

25  Q.    In your opinion, was the forced that was used, was it to

76

1  harm or was it to control a dangerous situation, being that I

2  was already in a locked cell?

3  A.   In that situation, which you're being already in the

4  cell, right, normally stand there, go to the lieutenant and

5  come back.  That's the first thing, go get a lieutenant.  The

6  lieutenant will come and find out what's going on, straighten

7  out the problem.  Before they get into physical stuff, that's

8  how they think.  It only got to the point in 1998 --

9        THE COURT:  Hang on a second, sir, I think there

10  might be a disconnect between the question and the answer.

11  Keep your voice up, ask the question one more time, and key

12  into it, listen to the question very carefully.  Ask it again.

13  BY MR. RICHMOND:

14  Q.   My initial question was, was there a prevalence of

15  violence during the 1999 timeframe involving the excessive use

16  of force at SCI-Greene; you stated that there was?

17  A.   Yeah.

18  Q.   Have you personally experienced any violence while you

19  were at SCI-Greene involving the defendants or any other

20  corrections officers while you were there?

21  A.   I had incidents with some COs down there, right.  Because

22  the fact is when you come from a strip search, they

23  automatically slammed you into the wall, right.  So yeah, I had

24  incidents.  With him per se, no.

25  Q.    The second part of my question was, was the force that

77

1  was used, in your opinion, was it to restore order or was it to

2  actually inflict harm?

3  A.    Inflict harm.  Restore what order, you are already in

4  your cell.  You don't have a knife or gun or anything, restore

5  what.

6        MR. RICHMOND:  That's all the questions I have, your

7  Honor.

8        THE COURT:  Mr. Richmond, you can resume your seat.

9                    CROSS-EXAMINATION

10  BY MR. MARAVICH:

11  Q.    Good afternoon, Mr. Ferrell.  Is it Ferrell?

12  A.    Yeah.

13  Q.    My name is Craig Maravich, I'm an with the Attorney

14  General's Office.  I'm representing the defendants in this

15  case.  I don't believe we've had an opportunity to meet.  So I

16  just want to introduce myself.  And I apologize for saying your

17  name incorrectly.  So regarding -- do you remember what date

18  this incident occurred?

19  A.    I know it was February because my birthday was right

20  after this.

21  Q.    It was on February 28, 1999.  So it was seven years ago.

22  You already testified that you did not see this incident begin,

23  correct?

24  A.    Yeah.

25  Q.    You testified that you did not see it?


78


1  A.    I didn't see it begin.  The noise brought me to the door.

2  Q.    That noise consisted of hearing Officer Bedilion say let

3  him go, is that correct?

4  A.    That ain't what I said.  What I said was I heard some

5  screaming, right.  And when I came to the door, he still was

6  screaming, right.  Some other prisoners next door to him were

7  saying something let him go.  I didn't say that I heard the CO

8  screaming saying to anybody, that ain't what I said.

9  Q.    I misunderstood you, I apologize.  You did say that a man

10  can't fit two arms out of the pie slot?

11  A.   No, a grown man can't do that, not at the same time.

12  Nobody you know can do that.

13  Q.   Sir, on this date what cell were you in?

14  A.   I think I was in like 10 cell, nine or 10 cell.  I looked

15  straight upstairs, where he was at.

16  Q.   Do you know what cell Mr. Richmond was in?

17  A.   He was upstairs.  I looked straight out my cell, he was

18  upstairs, I don't know what cell number it was.  He was right

19  upstairs where I could see.  I was on the first tier, he was

20  right across from me up top.

21  Q.   So the block has how many tiers?

22  A.   Two.

23  Q.   Two tiers, and you were on the bottom?

24  A.   Yeah.

25  Q.   The bottom tier, is that correct?

79

1  A.   I was on the bottom tier.

2  Q.   And Mr. Richmond was on the second tier, is that correct?

3  A.   On the second tier right in front of me, directly in

4  front of me.

5  Q.  When you said you could look out of your cell, what are

6  you looking out of?

7  A.  The window.

8  Q.  Window?

9  A.  Yeah.

10  Q.  So the cell is an open cell with bars or is the cell a

11  closed cell with a closed door, with just a window?

12  A.  No, it's a cell door.  You got two wide windows, you got

13  a tray slot right there where they put your food through.

14  Q.  The door is solid, is that correct?

15  A.  I don't understand it like that.  Like I said, it's a

16  door, you got two windows.  You got two windows to look out of.

17  You got the pie slot right there.

18  Q.  If you know, how big are the two windows on the cell

19  door?

20  A.  One is this big, this long, (indicating), and about this

21  wide, (indicating).  The only little space of metal is to

22  separate the two windows.

23  Q.  Okay.  You indicated with your hands the windows were

24  about this long, (indicating), is that correct?

25  A.   Longer.  The windows was long.


80


1  Q.   About this long (indicating)?

2  A.   About this long, (indicating).

3  Q.   Is it your opinion that the window is about three-feet

4  long?

5  A.   Probably.  Might be.

6  Q.   Might it be longer, might it be shorter?

7  A.   Maybe I ain't not take all that into consideration.  All

8  I know is the window is about this long, (indicating), right.

9  Q.   It look likes you're indicating that it's about

10  three-feet long?

11  A.   Yeah.  And I can look out both of them and see the whole,

12  everything in front of me, on the side of me.  The office over

13  there, I could see that.  I could see the door.

14  Q.   You also indicated the width of the window.  Is it safe

15  to say in your estimate that the width of the window is

16  approximately six-inches wide?

17  A.   It's probably about this wide, (indicating).

18  Q.   Six inches?

19  A.   If that's what you say, I ain't sure.

20  Q.   Where are you currently housed within the Department of

21  Corrections?

22  A.   SCI-Fayette.

23  Q.   SCI-Fayette?

24  A.   Yeah.

25  Q.   For this trial where are you housed?

81

1  A.   Albion.

2  Q.   SCI-Albion?

3  A.   Yeah.

4  Q.   Sir, did you meet with Mr. Richmond before testifying

5  today?

6  A.   I talked to him this morning.  He let me know he was

7  trying to use the law library, he couldn't use the law library

8  and stuff.

9  Q.   He said he couldn't use the law library?

10  A.   With me.

11  Q.   But you spoke with him?

12  A.   Yeah.

13          MR. MARAVICH:  Your Honor, I have nothing further.

14          THE COURT:  All right.  Mr. Richmond, do you have

15   any final questions for this witness?

16          MR. RICHMOND:  No, your Honor, I don't.  No, sir, I

17   don't.

18          THE COURT:  You're excused then, sir.  Who would

19   your next witness be, Mr. Richmond?

20          MR. RICHMOND:  That would be Mr. Bedilion, Officer

21   Bedilion.

22          THE COURT:  All right.  You said he would be

23   available on videotape?

24          MR. MARAVICH:  Your Honor, may we address it over at

25   side bar.


                            82


1          THE COURT:  Yes, let me see you over at side bar.

2          (At side bar on the record.)

3          THE COURT:  What's this fellow's name, last name?

4          MR. MARAVICH:  Bedilion.

5          THE COURT:  C.O. Bedilion will be available for you

6   to examine tomorrow.  He's not available today.  He will be

7    available for you to examine presumably after the defense

8    counsel has taken him on his direct examination.  So who would

9    be your next witness then you would call?

10        MR. RICHMOND:  That would be Officer McElravy.

11        MR. MARAVICH:  That's fine.

12        (End of discussion at side bar.)

13        THE COURT:  All right, call your next witness.

14        MR. RICHMOND:  Plaintiff would like to call Officer

15   McElravy to the witness stand.

16         RANDY McELRAVY, DEFENDANT HEREIN, SWORN

17        THE COURT:  Since you're proceeding pro se, let me

18   tell you that you're entitled to take this witness what they

19   call as on cross-examination.  You're allowed to ask leading

20   questions, you're allowed to cross-examine him because he's the

21   other party.  Go ahead.

22        MR. RICHMOND:  One of the first things I introduced

23   into evidence was a use of force policy.  Could I have that use

24   of force policy, I don't have a copy of it with me, your Honor?

25        THE COURT:  Yes.

83

1          (Called as on CROSS-EXAMINATION)

2    BY MR. RICHMOND:

3    Q.    Officer McElravy, would you please read from the use of

4    force policy, DC ADM 201, Section (A)(2)?

5    A.    "When force is used, the least amount of force reasonably

6    necessary to achieve the authorized purpose is to be used and

7    the use of force will stop once control is achieved."

8    Q.    And (3), please?

9    A.    "That use of force is not authorized as a means of

10   punishment or revenge."

11   Q.    On the date in question, that being February 28, 1999,

12   were you present for duty on that day?

13   A.    Yes, I was.

14   Q.    Where were you assigned, where were your duties -- where

15   were you assigned?

16   A.    Two to ten shift, F-pod, F-block, excuse me.

17   Q.    During the time in question, I believe it was around four

18   or five in the afternoon, what were your duties entailing at

19   that specific time?

20   A.    We was at 1550, we were passing out food trays on the

21   unit.

22          THE COURT:  For the benefit of the jury and those

23  who may not know on the jury, tell the jury what 1550 means in

24  non-military time?

25          THE WITNESS:  Excuse me, your Honor.  At

84

1  approximately ten to four in the afternoon.

2  BY MR. RICHMOND:

3  Q.    Could you please tell us what you were doing at that

4  time?

5  A.    Passing out food trays.

6  Q.    What is the normal routine for passing out food trays;

7  can you give us a glimpse into how that procedure actually

8  takes place?

9  A.    We usually have three or four officers.  On the day in

10  question, myself, I was going up to the pie holes, the wickets,

11  passing out the juice and the soup cups.  Officer Wilkes was

12  behind me, he was passing out food trays.  And Officer Bedilion

13  was the number three man, he was passing out the fruit and

14  closing the food trays.

15  Q.    When you say passing out the food -- are all the

16  occupants that are on that particular pod, are they already

17  inside of their cells that are already locked, the doors are

18  locked on the cells?

19  A.   Yes, they are.

20  Q.   And the meals are passed out through -- could you

21  describe the apparatus that we were referring to as the wicket

22  or the pie hole, can you describe that for the jurors so they

23  have an idea as to what we're dealing with, what we're talking

24  about?

25  A.   It's a slot in the door, it's on hinges.  It's a hinged


85


1  door, when you open it up, it falls down.  It's approximately

2  16 to 18 inches long and approximately six-inches high.  We use

3  that to pass food trays in and out, any type of property.

4  That's how we handcuff the inmates if we have to remove them

5  from the cells.  And after they get the food trays, the food

6  slot is closed and locked.

7  Q.   Did you say at that particular time on that day that you

8  were assisting Officer Wilkes in passing out the meals, the

9  distribution of the evening meal, is that correct?

10  A.   That is correct.

11  Q.    In your own words, what do you recall that actually took

12  place when you first intervened or when you first interceded,

13  however you'd like to characterize it?

14  A.    Mr. Richmond, after I opened your food tray slot, I

15  placed a cup of juice and a cup of soup and I proceeded on to

16  the next cell.  Officer Wilkes was behind me passing out the

17  trays.  I heard Mr. Richmond complaining that he didn't have

18  enough soup in his cup.  Officer Wilkes told him to file a

19  grievance with the dietary department, there was nothing we

20  could do, we don't make or prepare the food.  At which time I

21  heard a commotion and I heard Officer Wilkes giving direct

22  orders to put hands inside the pie hole.  When I turned to go

23  back to the cell, Mr. Richmond threw the food tray out and the

24  juice out at Officer Wilkes and myself.  Then you reached out

25  and grabbed Officer Wilkes by both forearms.


86


1  Q.    If I might stop you right there.  You said that I threw,

2  what was it that you're alleging that I threw at Officer

3  Wilkes?

4  A.    The food tray, you pushed the food tray back out through

5   the slot at Officer Wilkes.

6   Q.   What happened after that?

7   A.   Then you reached out and grabbed him by both forearms.

8   Q.   Now, this is the same testimony that you just indicated

9   on the misconduct report, that I reached through and grabbed

10  Officer Wilkes by the forearms.  You just indicated that that

11  aperture, the wicket, is about 16-inches wide, is that correct?

12  A.   Sixteen to 18-inches long.

13  Q.   About maybe four-inches wide?

14  A.   I said six-inches high.

15  Q.   We're talking about an aperture that's about this long

16  and approximately that high (indicating), is that correct?

17  A.   That's correct.

18  Q.   And you're saying I reached through -- what height level

19  is that wicket at, would you say it's about waist level?

20  A.   I would have to say waist level, probably four to four

21  and a half feet up off the floor.

22  Q.   And you're saying that I reached through and I grabbed

23  Officer Wilkes by the forearms, is that correct?

24  A.   That's correct.

25  Q.   Okay.

file:///A|/RICHDAY1.TXT

87

1        MR. RICHMOND:  If I may, your Honor, can I step up

2   to Mr. McElravy, if you don't mind.

3        THE COURT:  Actually -- let me see you at side bar,

4   come over here first.

5        (At side bar on the record.)

6        THE COURT:  What do you want to do?

7        MR. RICHMOND:  Use the officer just to demonstrate

8   what happened.  It would be virtually impossible for me to grab

9   him, all he would have to do is simply back up and he would be

10  free from my grasp.

11       THE COURT:  All right.  As far as I'm concerned, I

12  don't have a problem, but I routinely refer to the correctional

13  institution folks on something like this.

14       MR. RICHMOND:  Right.

15       THE COURT:  All right, I'm going to send the jury

16  out while we discuss this.

17       (End of discussion at side bar.)

18       THE COURT:  Members of the jury, we're going to take

19  a short break now.

20          (Whereupon, the Jury was excused from the

21   Courtroom.)

22          THE COURT:  Now, tell me again what you want to

23   demonstrate?

24          MR. RICHMOND:  What I want to demonstrate, your

25   Honor, for the jury is the fact that the wicket, the slot

88

1   opening is about waist high, for demonstration purposes, it's

2   about maybe 16-inches long and about four-inches high.  I

3   essentially was on my knees at the time the incident occurred.

4   The wicket slot door was open.  Officer Wilkes is alleging that

5   I reached through the wicket and grabbed both of his forearms.

6   For me to reach through the wicket and grab a hold of both of

7   his forearms, the only thing that Officer Wilkes would have to

8   do is simply back up.  I mean I'm inside a locked cell.  So I

9   can't get out of my cell, and this aperture is only 16 inches.

10          THE COURT:  So you want to kneel down, put your

11   hands forward and hold onto the forearms of somebody?

12          MR. RICHMOND:  To essentially demonstrate that I

13   can't go anywhere and all Officer Wilkes had to do, he is

14  significantly larger, he's probably 6'1", maybe 240, 250

15  pounds, all he had to do was back up, if it happened as he

16  alleged that it did.  It didn't even actually happen that way,

17  but that's the way Officer Wilkes is alleging that it happened.

18       THE COURT:  Captain, do you have any problem with

19  that physical demonstration?

20       CORRECTIONAL OFFICER:  I do with him grabbing one of

21  the officers actually.  But whatever you want to do, we'll do,

22  your Honor.

23       MR. MARAVICH:  How about if I do it then?

24       THE COURT:  All right.

25       MR. RICHMOND:  It's hard for the jurors to really


89


1  picture a door --

2       THE COURT:  Hang on a second.  It isn't whatever I

3  want to do.  Because ultimately in some sense what goes on in

4  this courtroom is what I want to do, but I oftentimes defer in

5  situations like this.  Do you have some reason to believe under

6  the circumstances of the demonstration that he just described,

7  that if he were to kneel down and grab a hold -- you know this

8    man -- are you telling me that there is some significant threat

9    to the attorney here if he does that?

10         CORRECTIONAL OFFICER:  No.

11         THE COURT:  Then we're going to do that.  All right,

12   we're going to take a short recess.

13         (Recess from 2:15 p.m.; until 2:30 p.m.)

14         (The Jury is present in the Courtroom.)

15         THE COURT:  All right, Mr. Richmond, go ahead.

16   BY MR. RICHMOND:

17   Q.   Mr. McElravy, before we broke for the brief recess, I

18   wanted to do a demonstration to basically let the jurors be

19   able to get an idea of what it was like from my viewpoint and

20   from Officer Wilkes, and from your viewpoint.  One of the

21   officers I believe is going to assist me or defense counsel,

22   Mr. Maravich.  Ladies and gentlemen, what I'm trying to

23   emphasize was that, a, I was inside of a locked cell; that, b,

24   the aperture that we were referring to, that you have heard

25   referred to as the wicket, it's only about 16-inches long and

90

1    maybe four-inches or six-inches high.  Officer Wilkes is

2   alleging that I reached through the wicket, that opening and

3   that I grabbed on to his forearms.  We happened to be on the

4   top tier.  There is a considerable distance between the door

5   and the edge of the tier, if you will.  What I'd like to try to

6   demonstrate for you so you can have an idea of what actually

7   took place.

8        THE COURT:  Keep your voice up -- actually, my

9   suggestion is come closer to the court reporter so he can hear

10   you better.

11        MR. RICHMOND:  The wicket is about 16 inches, as I

12   mentioned before.  The door between us is a locked door.  So

13   I'm on my knees and I'm receiving my evening meal that is being

14   passed out on the trays and in the cups.  After the passing out

15   of the tray, the meal tray, after receiving a meal tray,

16   Officer Wilkes is alleging that I reached through this 16-inch

17   aperture and that I grabbed on to his forearms.  If you'd just

18   let your arms hang down by your sides.  He's alleging that I

19   grabbed through and held on to his forearms like this,

20   (indicating).  There is a locked door between us.  So I can't

21   go any further than the door will allow me.  My emphasis or my

22   point for the demonstration is that if I allegedly grabbed

23   Officer Wilkes, which I did not grab him, all Officer Wilkes

24  would have had to do to release himself from my grasp is simply

25  to back up.  Would you mind backing up, taking two steps back.


91


1          THE COURT:  All right, thank you, Mr. Maravich, you

2  can resume your seat.

3          THE COURT:  Mr. Richmond, please resume the podium.

4  BY MR. RICHMOND:

5  Q.    At that particular time when you say that you responded

6  to me holding Officer Wilkes' forearms, what in fact did you

7  do?

8  A.    I gave you several direct orders to release Officer

9  Wilkes, which you refused.

10  Q.    And then at that time what did you do, Officer McElravy?

11  A.    At which time I applied a controlling technique to your

12  left hand, forcing you to release Officer Wilkes right forearm.

13          THE COURT:  Keep your voice up, sir.

14  BY MR. RICHMOND:

15  Q.    You said you applied a controlling technique, would you

16  describe for the jury what this controlling technique is, what

17  does that consist of?

file:///A|/RICHDAY1.TXT

18  A.   A controlling technique is commonly referred to as a

19  gooseneck.  I just grabbed Mr. Richmond's right hand and

20  basically applied pressure to make him release the hold he had

21  on Officer Wilkes.  I attempted to push his arm back inside the

22  pie hole.

23  Q.   You went a little bit further, you said after this

24  controlling technique, what was it that you then did, Mr.

25  McElravy?

92

1  A.   I attempted to place your hands back inside the pie hole

2  so we could secure the door.

3  Q.   Are you're saying you attempted to place my hands back

4  inside the pie hole?

5  A.   Yes, I am

6  Q.   And how would you have done that, Officer McElravy?

7  A.   After I got you to release Officer Wilkes, I just

8  attempted to push your hands back inside the pie hole opening.

9  And you continued to reach out at Officer Wilkes.

10  Q.   I continued to reach out at Officer Wilkes and you

11  attempted to push my hand back into the pie hole, is that

12  what -- I believe this is what you're trying to say to the

13  jury?

14  A.    Yes, it is.

15  Q.    Okay.  The interesting part about your theory, sir, and

16  one thing that is very contradictory, is that where was Officer

17  Bedilion during all this time, and what was Officer Wilkes

18  doing?

19  A.    Officer Wilkes was attempting, after you reached out,

20  after you threw the tray at him and the cup of juice, he was

21  attempting to close the pie hole.  Officer Bedilion is the

22  third one --

23  Q.    Maybe if you could slow it down a little bit for the

24  jurors.

25        THE COURT:  Hang on a second.  I think it's probably


93


1  a good idea if you both slow down.  You're going a little fast,

2  you're going a little light, you got to raise your volume.  And

3  you're definitely going too fast, you're talking over the

4  witness.  Let's start this whole line of questioning all over

5  again.  Go ahead.

6    BY MR. RICHMOND:

7    Q.    During the alleged incident, after you allegedly applied

8    this controlling technique to get me to release Officer Wilkes'

9    left forearm with my right hand, you say you attempted to push

10   my arms back into the cell, is that correct?

11   A.    I attempted to push your left hand, your left arm back

12   into the cell, yes.

13   Q.    What would you have used to do that with?

14   A.    I had a hold of your left hand, your wrist.

15   Q.    So you were pushing my arm back into the cell?

16   A.    And giving you direct orders to release him and pull your

17   hands inside the pie hole.

18   Q.    And my next question was where was Officer Bedilion

19   during this time?

20   A.    He was behind us.  As I said earlier, I was the first

21   one, then it was Officer Wilkes, and Officer Bedilion was

22   bringing up the rear, he was a couple cells back down.  He

23   would have been to Officer Wilkes's left.

24   Q.    So are you, if I'm understanding you correctly, are you

25   saying that you actively participated in the use of force?

1  A.    Yes, I did.

2  Q.    Did you at any time apply any active strikes by using the

3  wicket to put pressure on the wicket to get me to pull my hands

4  back into the cell?

5  A.    No, I did not.

6  Q.    Who was applying the pressure to the wicket then?

7  A.    Officer Wilkes was attempting to close the pie hole --

8  the wicket, I'm sorry.

9  Q.    And where was Officer Bedilion during this time?

10  A.    While you had a hold of Officer Wilkes or while he was

11  trying to close the pie hole, I don't understand the question.

12  Q.    During the incident, when the incident occurred, there

13  were three officers that were involved in the incident.  There

14  was Officer Wilkes -- Officer Wilkes initiated the incident.

15  You responded to the incident, and then Officer Bedilion

16  responded to the incident.  My question to you, sir, what was

17  Officer Bedilion's part during the incident?

18  A.    He was to Officer Wilkes' left.  He was attempting to

19  remove your right arm, your right hand off of Officer Wilkes'

20  left forearm.

21  Q.   Do you think you might have that reversed, could you

22  repeat that, you got me a little confused?

23  A.   Officer Wilkes was directly in front of your cell.  I was

24  off to Officer Wilkes' right.  Officer Bedilion was to Officer

25  Wilkes' left.  Your right arm, your right hand had a hold of


95


1  Officer Wilkes' left forearm.  Officer Bedilion applied a

2  controlling technique to get you to release Officer Wilkes.

3  The same as he did on the other side.

4  Q.   So you were on Officer Wilkes' right side or left side?

5  A.   I was on his right side.

6  Q.   And you were attempting to release my left hand from

7  Officer Wilkes?

8  A.   Correct.

9  Q.   Right forearm.

10  A.   Correct.

11  Q.   Is that correct?

12  A.   Yes.

13  Q.   You do admit that you did participate in use of force

14  against me on 28 February, '99?

15  A.  Yes, I did.

16  Q.  And again, for the record, who applied force to the

17  wicket?

18  A.  To get it closed you mean?

19  Q.  Yes, to put pressure onto my hand and arm and my wrist?

20  A.  Officer Wilkes attempted to close the pie hole.  At which

21  time he was closing it is when you reached out and grabbed him.

22  Q.  If I may ask you a question, Officer McElravy, have you

23  ever reported a co-worker for an alleged misbehavior?

24      MR. MARAVICH:  Objection, your Honor.

25      THE COURT:  Sustained, it's irrelevant.


96


1  BY MR. RICHMOND:

2  Q.  Have you ever been sued by a prisoner or another inmate?

3      MR. MARAVICH:  Objection, your Honor.

4      THE COURT:  Sustained, irrelevant.

5  BY MR. RICHMOND:

6  Q.  You stated that the pie hole was open, then you stated

7  that I pushed it open, which was it?

8  A.  You pushed it open when Officer Wilkes was attempting to

9   close it.  After you threw the food tray and juice out, Officer

10  Wilkes attempted to close the pie hole, you pushed it open and

11  grabbed him.

12          MR. RICHMOND:  I'd like to introduce, if I may, your

13  Honor, one of the responses by Officer McElravy to an

14  interrogatory question.

15          THE COURT:  All right, go ahead.  How are you going

16  to identify that particular document -- Plaintiff's Exhibit

17  what?

18          MR. RICHMOND:  These will be Plaintiff's Exhibit 3.

19          THE COURT:  All right.

20          MR. MARAVICH:  Your Honor, for efficiency purposes,

21  this is going to be for identification purposes Plaintiff's

22  Exhibit 3.  Which is purported as plaintiff's first request for

23  interrogatories to defendant McElravy, and defendant McElravy's

24  answers to interrogatories.  Because they were separated, I'll

25  have to look that over this evening.  But at this time it's


97


1   purported that these are the answers to and the interrogatories

2   that are consistent with each other.

3        THE COURT:  Let me just ask you this, to cut to the

4   chase.  Having looked at them, do you have any reason to

5   believe that those aren't the answers that addressed those

6   questions?

7        MR. MARAVICH:  Your Honor, at this time I don't.

8   Typically, the way that our answers and the responses are sent,

9   they're usually combined, they're stapled together.  That's the

10  only reason I bring that up at this stage.

11        THE COURT:  Subject to that potential qualification,

12  it's being marked as Plaintiff's Exhibit 3.  All right, go

13  ahead.

14  BY MR. RICHMOND:

15  Q.   If you would, Officer McElravy, would you please read

16  question number eight?

17  A.   "What was the purpose of attempting to close the wicket

18  hatchway (slot) door while plaintiff's hand, wrist, arm was

19  lodged in between, other than to cause him harm?  Explain."

20  Q.   Would you like to answer that question?

21  A.   You was given several direct orders to release Officer

22  Wilkes, place your arm in the pie hole.  You already assaulted

23  Officer Wilkes, when he attempted to close the pie hole the

24  first time, you pushed it open.  As I said earlier, myself and

25  Officer Bedilion, we applied the controlling technique.  We

98

1  moved your hands off Officer Wilkes.  At which time we placed

2  your hands inside that pie hole and closed it.  While we was

3  closing it, you was still attempting to reach out and grab

4  Officer Wilkes.

5  Q.   Okay.  For the jury, I'd like to show you Officer

6  McElravy's response of the question that you see before you.

7       THE COURT:  Before you do that, these are purported

8  answers to interrogatories?

9       MR. RICHMOND:  Yes, sir.

10       MR. MARAVICH:  Yes, sir.

11       THE COURT:  All right.  Let me take a minute and

12  just tell the jury what interrogatories are, if they don't

13  already know.  Interrogatories are written questions which

14  either party can send to the other during the course of a

15  lawsuit.  Once you get the interrogatories or the questions,

16  then you are obligated to supply a written answer.  And you may

17  consider, for purposes of interrogatories, an answer the same

18  way as you would consider an answer by someone who was

19   testifying, provided it comes from a party.  Go ahead.

20   BY MR. RICHMOND:

21   Q.    Could you please read the response at number eight, Mr.

22   McElravy in reference to the question that you just read?

23   A.    "When Officer Wilkes attempted to close the pie hole,

24   Inmate Richmond threw a cup of juice and his tray at defendant

25   McElravy and Officer Wilkes.  Officer Wilkes again ordered


99


1    Inmate Richmond to put his hand inside the pie hole.  Richmond

2    refused to obey this order, pushed the pie hole open and

3    grabbed Officer Wilkes by both forearms.  Richmond refused to

4    obey defendant McElravy's orders to let go."

5    Q.    My point for the jury and for your Honor is that your

6    response to question number eight, as you read it and then you

7    just read your response to it, it differs, it's quite

8    contradictory to what you just testified to about the incident

9    as it actually took place in your words --

10          MR. MARAVICH:  Objection, argumentative.

11          THE COURT:  I'm going to sustain the objection.  If

12   in your mind there is a contradiction, you should ask the

13  question by pointing out what you believe to be the

14  contradiction, and then let him answer the question.  Do you

15  understand what I'm saying to you?

16      MR. RICHMOND:  Yes, sir.

17  BY MR. RICHMOND:

18  Q.   I guess from the standpoint of the incident as I

19  experienced it, I never grabbed Officer Wilkes' forearms --

20      MR. MARAVICH:  Objection, your Honor.  This is

21  exactly what we were just talking about as being argumentative.

22  He's making conclusions factually as to what he experienced.

23      THE COURT:  Let me see you at side bar.

24      (At side bar on the record.)

25      THE COURT:  Tell me in your own words the point

100

1  you're trying to make?

2      MR. RICHMOND:  That I never grabbed Officer Wilkes'

3  forearms to cause Mr. McElravy to allegedly apply a control

4  technique to my person.

5      THE COURT:  So I'm clear, what inconsistency do you

6  believe exists to what he testified to and how they answered

7  the interrogatory?

8         MR. RICHMOND:  In the interrogatory response he says

9  that when he responded to the situation, that the pie hole was

10  closed and he pushed it open.  As opposed to the pie hole was

11  open the entire time.  And Officer Wilkes initiated --

12         THE COURT:  Then ask him that question.

13         (End of discussion at side bar.)

14  BY MR. RICHMOND:

15  Q.   When did you first, Mr. McElravy, first physically

16  encounter me, the plaintiff, when did you first physically

17  encounter me during this incident?

18  A.   After Officer Wilkes gave you several direct orders to

19  remove your arms from the pie hole and when you reached out and

20  grabbed him, I heard Officer Wilkes give you direct orders to

21  let him go.

22  Q.   You admitted earlier that you attempted to push my hands

23  back into the cell?

24  A.   Through the pie hole, yes, I did.

25  Q.   Do you deny that you actively used the pie hole, along

101

1  with Officer Wilkes, to repeatedly strike my forearm and my

2  hand, do you deny that?

3  A.    Yes, I do.

4  Q.    I have another question for you.  Were you ever charged

5  or prosecuted for allegedly impersonating a police officer

6  while off duty?

7        MR. MARAVICH:  Objection, your Honor.

8        THE COURT:  Let me see you at side bar.  Members of

9  the jury, let me make a quick comment about side bar

10  conferences.  The reason we go over there is -- and we try to

11  keep them to a minimum, that's where we're just discussing

12  questions of law.  Remember, you're the finders of fact, that

13  doesn't really involve you.  So that is why we do it, all

14  right.

15        (At side bar on the record.)

16        THE COURT:  The question was, was he ever charged or

17  prosecuted for impersonating a police officer?

18        MR. RICHMOND:  Yes, sir.

19        THE COURT:  What do you believe is the truth of

20  that?

21        MR. RICHMOND:  The truth of the matter is that he

22  was.  He was prosecuted or charged initially.  It goes to

23  credibility, Officer McElravy's credibility.

24          THE COURT:  Was he convicted of that crime?

25          MR. RICHMOND:  That was part of the crime --


                                102


1           THE COURT:  You say he was charged or prosecuted, do

2   you know if he was convicted for impersonating a police

3   officer?

4           MR. RICHMOND:  I do not know if he was convicted.

5           THE COURT:  Do you know anything about this?

6           MR. MARAVICH:  I do, your Honor.  I'm putting an

7   objection on the record, this is immaterial, irrelevant and

8   highly prejudicial.  This is not part of this case.  I don't

9   know the answer.

10          THE COURT:  What if he was -- what if he was charged

11   with impersonating a police officer, I'm not saying he was,

12   just hypothetically.  If he was convicted of impersonating a

13   police officer, which involves a crime I think of crimen falsi

14   within the last 10 years, why wouldn't that arguably come in as

15   impeachment under the federal rules?

16          MR. MARAVICH:  This wasn't based on impeachment --

17          MR. RICHMOND:  I'm trying to impeach his

18   credibility.

19          THE COURT:  I'm trying to find out the factual

20   basis.  On what basis do you contend or believe that this

21   officer was convicted of the crime of impersonating a police

22   officer?

23          MR. RICHMOND:  At the time of the incident, shortly

24   after, there were reports that this particular crime had

25   occurred where Officer McElravy worked, I guess in the capacity


103


1   of inmate versus corrections officer.  He was not present for

2   duty -- during the period of time involving somebody being

3   apprehended and/or prosecuted for this offense.  There was a

4   depiction that was ran in one of the local newspapers of a

5   photograph resembling or having the resemblance of McElravy.

6   It was pretty widely understood.

7          MR. MARAVICH:  Your Honor, if that is the offer of

8   proof, I do not believe that is enough to go to crimen falsi.

9   Because he has not demonstrated that he knows or he

10    acknowledged that crime occurred.  You would have to attack

11    credibility on the crimen falsi.  You need to have, through an

12    offer of proof, that a crime occurred.  Not just that an

13    allegation was made.  Even that an arrest occurred.

14         THE COURT:  Let me bring this full circle.  As you

15    testify here today, you have no direct proof that the man was

16    charged, much less convicted of that crime, do you?

17         MR. RICHMOND:  No, I don't.

18         THE COURT:  Would it be accurate to say that you did

19    not see -- you indicated there was a newspaper report, that you

20    did not see this corrections officer's name in the newspaper,

21    is that right?

22         MR. RICHMOND:  I can't say that I did personally.  A

23    lot of that has gone on the fact I'm pro se, I don't have

24    access to certain information.

25         THE COURT:  In any event, sir, beyond what you just


104


1    told me here today, do you have any other proof with you, do

2    you have any proof, documentary or other, that this man was

3    convicted of that crime?

4          MR. RICHMOND:  No, sir.

5          THE COURT:  The mere fact that you have been

6    prosecuted, the mere fact that you may have been sued in the

7    past doesn't mean that it is admissible in a subsequent suit.

8    Now, I'll tell you how I'm going to handle this thing.  I'm

9    going to send this jury out.  I'm going to let you ask the

10   witness whether he's ever been convicted.  And that answer then

11   will dictate whether it's time to move on to something else.

12          MR. RICHMOND:  Yes, your Honor.

13          (End of discussion at side bar.)

14          THE COURT:  Members of the jury, you're probably

15   going to start feeling like long-distance runners.  I want you

16   to just go back in for two minutes maybe even one minute, my

17   clerk will come and get you.  We have to do something out of

18   the presence of you.  So if you'd be so kind.

19          (Whereupon, the Jury was excused from the

20   Courtroom.)

21          THE COURT:  Ask the question.

22   BY MR. RICHMOND:

23   Q.   Were you ever charged, Officer McElravy, or prosecuted

24   for allegedly impersonating a police officer while off duty?

25          THE COURT:  The question is were you ever convicted

105

1  of the crime of impersonating a police officer off duty -- you

2  should ask the question not me.  That's the pertinent question.

3  BY MR. RICHMOND:

4  Q.   Were you ever convicted of impersonating a police officer

5  while off duty?

6  A.   No, never.

7        THE COURT:  All right, bring the jury back in.

8        (Whereupon, the Jury returned to the Courtroom.)

9        THE COURT:  Okay, let's go.

10  BY MR. RICHMOND:

11  Q.   I have a question, Mr. McElravy.

12        MR. MARAVICH:  Your Honor, I would make a motion

13  that that last question be stricken.

14        THE COURT:  Let me put it this way.  The last

15  question that he asked concerning charges or prosecution, you

16  should disregard that question.  I'm not even sure there was an

17  answer.  But it should play no role whatsoever in your

18  deliberations.  Go ahead.

19  BY MR. RICHMOND:

20  Q.   The next question I have for you is do you admit or deny

21  that you did attempt to stop Officer Wilkes and Bedilion from

22  employing force upon my right hand and arm through the wicket?

23  A.   I never attempted to stop them, no.

24  Q.   The reason I ask that question is because in one of your

25  responses to an admission, you deny that you attempted to, I

106

1  think I would have to -- the question during admissions was

2  admit at no time during the February 28, 1999 incident did you

3  attempt to stop your co-workers from employing force upon the

4  plaintiff's right hand, wrist and arm, causing injury?

5       MR. MARAVICH:  Excuse me, your Honor, he's trying to

6  impeach, I'd like to know what question he's referring to and

7  what admission?

8       THE COURT:  Are those requests for admissions that

9  were served upon the defendants?

10      MR. RICHMOND:  Yes, they are, your Honor.

11      THE COURT:  What is the number of the request for

12  admission that you were reading from?

13      MR. RICHMOND:  It was item number 45 request for

14  admission to defendant McElravy.

15        THE COURT:  Do you have those?

16        MR. RICHMOND:  Yes, I do.

17        THE COURT:  Do you?

18        MR. MARAVICH:  Yes, your Honor.

19        THE COURT:  All right.  Now what was the question

20  now?

21  BY MR. RICHMOND:

22  Q.    The question was at no time -- do you admit at no time

23  did he attempt to stop his coworkers from employing force?  He

24  denied that, says that he did attempt to stop --

25        THE COURT:  What does it say specifically, what does


107


1  the answer say?

2        MR. RICHMOND:  The answer says denied.

3        THE COURT:  All right, go ahead and ask the next

4  question.

5  BY MR. RICHMOND:

6  Q.    Which is contradictory to what you just said, I asked you

7  did ever stop your coworkers from employing force, you said you

8   did not.  But your response to the admission says that you did?

9        MR. MARAVICH:  Your Honor, I would object on the

10  record.

11        THE COURT:  What's the objection?

12        MR. MARAVICH:  Once, again, he's calling for a

13  conclusion that this person who's asking questions is saying.

14  It's left for the jury to decide what has been said, he has

15  attempted to impeach him, now he's made a conclusion.

16        THE COURT:  I disagree with that.  He's asking him

17  about what he perceives to be, meaning the plaintiff, an

18  inconsistency between the answer to the request for admission

19  and what he's testified to here.  He's permitted to do that.

20  Overruled.

21  BY MR. RICHMOND:

22  Q.   My next question to you, Officer McElravy, would be who

23  caused me, the plaintiff, to be injured?

24  A.   You did when you reached out and assaulted Officer Wilkes

25  and then grabbed him.

108

1   Q.   I caused myself to be injured?

2  A.   You refused all orders to let Officer Wilkes go.

3  Q.   Do you admit again for the record that you actively took

4  part in the use of excessive force upon me?

5  A.   No.

6       MR. MARAVICH:  Objection, your Honor, he did not

7  admit he used excessive force.

8       THE COURT:  He can answer however he wants.  What

9  has been said is for the jury's recollection, overruled.  You

10  already answered it.

11  BY MR. RICHMOND:

12  Q.   Did you view the videotape of the incident on 2/28/99?

13  A.   To my knowledge, there was no videotape.

14  Q.   To your knowledge, there was no videotape?

15  A.   To my knowledge, I've never seen one or heard of one.

16  Q.   Are not the pods referred to in the restrictive housing

17  unit, are they not all under videotape surveillance?

18  A.   I have no knowledge of that, I don't know.

19  Q.   So you're saying that you never viewed the videotape of

20  the incident, you have no knowledge of it?

21  A.   I have no knowledge of any videotape.

22  Q.   And in your estimation I caused my own injury, for the

23  jury, is that what you're saying?

24  A.   Yes, sir, it is.

25       MR. RICHMOND:  I have no further questions for Mr.


                              109


1  McElravy.

2       THE COURT:  All right.  Do you have questions for

3  him now, Mr. Maravich, or are you going to reserve and take him

4  in your case in chief?

5       MR. MARAVICH:  Your Honor, I'm going to reserve and

6  take him in my case in chief.

7       THE COURT:  All right, you can step down for now,

8  sir.  Now who do you want to call?

9       MR. RICHMOND:  I did want to call Officer Bedilion,

10  sir, that was the order in which I had intended on calling

11  witnesses.  Officer Bedilion.

12       THE COURT:  All right, call him.

13       MR. RICHMOND:  You said he will be presented

14  tomorrow?

15       THE COURT: He will be.  He's not here.  But he will

16  be by videotape.  In his absence who is the next witness that

17  you would propose to call?

18      MR. RICHMOND:  In his absence I would call Officer

19  Wilkes to the stand.

20      THE COURT:  All right.

21      DEPUTY CLERK:  Please raise your right hand.

22      GREGORY WILKES, DEFENDANT HEREIN, SWORN

23      (Called as on CROSS-EXAMINATION)

24  BY MR. RICHMOND:

25  Q.   Would you please state your full name?


110


1  A.   My full name is Gregory L. Wilkes.

2  Q.   Officer Wilkes, were you present on the date of the

3  alleged incident?

4  A.   Yes, I was.

5  Q.   You state in one of your responses to interrogatories

6  that you alone applied pressure through the wicket, is that

7  correct?

8  A.   That is correct.

9  Q.   My question to you, sir, did Officer McElravy's or

10  Bedilion's failure to act, stop you from employing force, do

11  you think that constitutes any wrongdoing by them not stopping

12  you from applying pressure through the wicket?

13          MR. MARAVICH:  Objection, calls for a legal

14  conclusion.

15          THE COURT:  Overruled.  Do you understand the

16  question?

17          THE WITNESS:  Could you repeat the question again,

18  Mr. Richmond.

19  BY MR. RICHMOND:

20  Q.   Do you believe that Officer McElravy's or Officer

21  Bedilion's failure to act, do you believe that their failure to

22  act constitutes a wrongdoing by them not stopping you from

23  applying pressure through the wicket?

24  A.   No, I do not believe there was a failure to act.

25  Q.   Can you give me your approximate height and weight?


111


1  A.   I'm approximately, 5'11" and a half, 222 pounds.

2  Q.   And from your opinion, standing outside a locked cell and

3  you indicated that I grabbed your forearms, what would be

4  the -- I can't figure out how to phrase the question.  Why

5  wouldn't it be appropriate for you to simply back up from my

6  alleged grasp of your forearms -- I'm having some trouble

7  understanding actually your allegations in the misconduct

8  report, and being that you're 5'11" and over 200 pounds, how

9  could you not simply just back away?

10  A.    Well, first of all, I was very impressed with your

11  strength.  And I was trying, I had keys in my hand, I couldn't

12  get away from you.  And there was a tier, I didn't want to pull

13  away and possibly injure myself.  Plus you had a hold of me to

14  where I could not release from your grip.  You had a death grip

15  on me, you're very strong.

16  Q.    In your misconduct report, Mr. Wilkes, you indicated that

17  I grabbed your forearms, that Officer McElravy responded that

18  he applied some type of controlling technique to get you to

19  release my grip from one of your forearms, that Officer

20  Bedilion at sometime or another shortly after that applied a

21  similar controlling technique to get me to release grip on your

22  other forearm.  But the ironic part about the misconduct is

23  that you go on to state that you re-engaged the incident by

24  applying pressure on the wicket and that you continued to apply

25  pressure on the wicket until the wicket door was secured by

1  Officer Bedilion --

2       MR. MARAVICH:  Objection, your Honor, the document

3  speaks for itself, I don't believe it says exactly what Mr.

4  Richmond says, if we could just move on.

5       THE COURT:  Pardon me.

6       MR. MARAVICH:  I said if we could just move on.

7       THE COURT:  I'll tell you when you can move on.

8       MR. MARAVICH:  Sorry, your Honor.

9       THE COURT:  This is what we're going to do.  In

10  fairness to this witness, he should have a copy of the report,

11  or the relevant portion of the report that you are talking

12  about.  And if you're going to be quoting from the report, you

13  should do it by looking at the report.  That way everybody will

14  be on the same page.

15       THE WITNESS:  Thank you, your Honor.

16       THE COURT:  All right.

17  BY MR. RICHMOND:

18  Q.   Can you read the staff member's version, Mr. Wilkes,

19  please?

20  A.   Yes, I can, Mr. Richmond.  "Staff members' version.  On

21  the above date and time while feeding FD-Pod, Inmate Richmond,

22  DB-7852, who is housed in FD-15, was given a direct order to

23  remove his right arm and hand from outside his wicket.  He

24  refused this order.  At that time Inmate Richmond threw his

25  tray lid and cup filled with juice at Officer McElravy and

113

1  myself in an attempt to strike us.  As I attempted to close the

2  wicket, Inmate Richmond put both his arms and hands through the

3  wicket and grabbed my forearms.  At that time Officer McElravy

4  gave Inmate Richmond a direct order to let me go.  He refused

5  this order.  To prevent me from injury, Officer McElravy used

6  an controlling technique in an attempt to release Inmate

7  Richmond's left hand from my right forearm.  At that time

8  Officer Bedilion used a controlling technique on his right hand

9  in an attempt to release his right hand from my left forearm.

10  After the controlling techniques were successful, Inmate

11  Richmond still refused to pull his hands and arms back into his

12  cell.  I then applied pressure to the wicket in an attempt to

13  get Inmate Richmond to retrieve his hands and arms back into

14  his cell.  I was successful at this time.  After Inmate

15   Richmond pulled his hands and arms through the wicket, Officer

16   Bedilion secured the wicket."

17   Q.    My question to you again was why would you reengage me,

18   the plaintiff, by applying pressure to the wicket after being

19   allegedly released by Officers McElravy and Bedilion, it stands

20   to reason --

21        THE COURT:  Let him answer the question.  Do you

22   understand the question?

23        THE WITNESS:  Yes, I do, your Honor.

24        THE COURT:  Go ahead.

25        THE WITNESS:  Mr. Richmond, the reason I applied


114


1   pressure to that wicket was because you were still trying to

2   grab my arms as we were trying to secure the wicket and prevent

3   further injury from myself or the officers that were with me,

4   there's a force continuum that I'm authorized by the Department

5   of Corrections to use.  Okay.  And I used that force continuum,

6   starting with a show of force and the controlling techniques.

7   That did not work, you still kept your arms out of your cell,

8   which is a rule that you're not supposed to have your arms or

9    hands out of your wicket at any time to prevent injury to

10   officers or yourself.  And you violated this rule.  And, again,

11   we had to prevent injury to me or the officers, I put light

12   pressure, just with my hands, to get you to retrieve your arms

13   and hands back through the wicket.

14   Q.    You said you applied light pressure just with your hands,

15   what were you applying the pressure on, Mr. Wilkes?

16   A.    On?

17   Q.    What were you applying the pressure on -- when you said I

18   used light pressure just with my hands?

19   A.    I was applying pressure on the wicket door itself.

20   Q.    So you admit that you applied pressure on the wicket?

21   A.    That is correct, I am admitting that, just as it says in

22   my misconduct report.

23   Q.    The use of force policy, DC-ADM 201, that I introduced as

24   I believe Exhibit 1, says the least amount of force is to be

25   used at all times.  If Officer Bedilion and Officer McElravy


                                115


1    applied the alleged controlling techniques to get me to release

2    my alleged grasp on your hands, as I stated before, why would

3  you then reengage when the force continuum, as you refer to,

4  says the least amount of force is to be used at all times.  My

5  understanding would be that when I'm released from a situation,

6  why would I reengage that situation and not simply back away

7  from it?

8        MR. MARAVICH:  Objection, argumentative.

9        MR. RICHMOND:  That's my question.

10        MR. MARAVICH:  Your Honor, also, the reference that

11  Mr. Richmond made to his exhibit -- I believe it should be

12  Exhibit 2, which is the policy.  Because I believe his Exhibit

13  1 was the misconduct report, that this witness wrote.

14        THE COURT:  All right.  We'll get that straightened

15  out.  I'm going to overrule the argumentative objection, it's

16  already been asked once, I'm going to permit one more answer to

17  it and then I want you to move on to another subject.  Do you

18  understand the question?

19        THE WITNESS:  Yes, I did, your Honor.

20        THE COURT:  All right, go ahead.

21        THE WITNESS:  Okay.  I am guided by the DOC with a

22  policy, DC-ADM 201, that authorizes me the use of force in

23  certain situations.  And justification, part B, if you can see

24   it, number one, it says "use of force against an inmate is

25   justified when the acting staff member reasonably," which was

116

1   myself and two officers with me, "reasonably believes such

2   force is necessary to accomplish any of the following

3   objectives."  Okay, there's two objectives there, protection of

4   the self or another person.  The self being me or the another

5   person being Mr. Richmond, himself or the officers.  And, also,

6   if look at (e), "effect compliance with rules and regulations

7   when other methods of control are insufficient."  Okay, if you

8   go back to the top where there's a force continuum -- I'd like

9   to show the jury force continuum, please.

10   BY MR. RICHMOND:

11   Q.    Your defense counsel will be able to take care of that.

12   A.    Thank you.

13   Q.    One of my questions for you, sir, is on that date who was

14   the RHU sergeant -- I know Lieutenant Mayle was the lieutenant

15   on duty, who was the RHU sergeant?

16   A.    I remember the lieutenant being the lieutenant on duty --

17   the question you asked me, I don't remember who the sergeant

18  was, and I stated that before in my previous testimony, I

19  wasn't sure who that was.

20  Q.   Have you ever been sued by another inmate for alleged

21  excessive force?

22  A.   Yes, I was, but I never went to trial for it.  No,

23  wait -- it was not for excessive force.  It was for not getting

24  legal material stuff, it was never for excessive use of force,

25  it was not included in that.


117


1  Q.   I'd like to refer to the interrogatory where Mr. Wilkes

2  stated that he didn't attempt to stop his co-workers from the

3  use of force until my hands and arms were secured in my cell?

4       THE COURT:  First of all, were these interrogatories

5  directed to this defendant?

6       MR. RICHMOND:  They were directed specifically to

7  defendant Wilkes, yes.

8       THE COURT:  What interrogatory number are you

9  referring to?

10      MR. RICHMOND:  I'm referring to interrogatory number

11  17 directed to Officer Wilkes.

12          THE COURT:  You should read the requested

13    interrogatory and you should read the answer.  Then if you have

14    a question, you ask the question, ask the witness.

15    BY MR. RICHMOND:

16    Q.    The interrogatory, the question is item number 17.

17    Officer Wilkes, could you read that question number 17?

18    A.    "Number 17.  At what point during the use of force did

19    you attempt to stop your co-workers from employing force on

20    plaintiff?"

21    Q.    Could you read the response for number 17?

22    A.    Yes.  "Number 17.  I did not attempt to stop the use of

23    force until Inmate Richmond's hands and arms were secured in

24    his cell."

25    Q.    If I understand you correctly, did you not just testify


                              118


1    that you were the only one that employed force?

2    A.    No, that is not correct.

3    Q.    You applied pressure on the wicket, you stated I was the

4    only one, I only used my hands, is that correct?

5    A.    As I was applying pressure to the wicket with my hands,

6   the officers on my left and right were attempting to push your

7   hands back into the cell at the same time.

8   Q.    That's not what you said earlier.

9           THE COURT:  Hang on a second, slow down.  Go ahead.

10  BY MR. RICHMOND:

11  Q.    That's what you just testified to just a few moments ago?

12  A.    I testified that I was the one pushing on the wicket.

13  But you didn't ask me if there was anybody else there at the

14  time, I was just stating what I was doing.  My officers were

15  there also using controlling techniques to force your hands and

16  arms back into the wicket, as I was applying light pressure on

17  the wicket door.

18  Q.    The allegations in the complaint, in the civil suit

19  against you, sir, is that not only you, but Officers McElravy

20  and Bedilion also simultaneously applied pressure and force by

21  slamming the wicket on my hand and my forearm and my fingers.

22  You said that you applied pressure to the wicket, is that

23  correct?

24  A.    The first part of your statement is not true, but the

25  second of the statement is correct.  I was the only one that

119

1  did apply pressure on the wicket, but they applied controlling

2  techniques in attempting to push your hands and arms back into

3  your cell.

4  Q.   What use of force did you not stop your co-workers from

5  employing until my hands and arms were secured, what other

6  force was being used, Officer Wilkes?

7  A.   We did not stop the use of force until our objective was

8  achieved in accordance with the DC-ADM 201, which is when the

9  objectives are achieved, which is to get your hands and arms

10  back into your cell, that is when the use of force stopped.  At

11  that time when your arms and hands were secured in your cell,

12  that's when the use of force had ceased or stopped.

13  Q.   What I had emphasized earlier in my opening remarks to

14  the jury was that there's two components to proving an

15  excessive force claim.  One of them being subjective, and that

16  subjective component having already been met.  The thing that

17  I'm attempting to prove or demonstrate to the jury now is that

18  to determine whether force was used in a good faith effort or

19  maliciously and sadistically to cause harm.  There are several

20  factors that the courts have identified.  And those factors

21  include, one, the need of the application of force.  Two.  The

22  relationship between the need and the amount of force that was

23  used.  Three.  The extent of injury inflicted.  Four.  The

24  extent of the threat to the safety of staff and inmates as

25  reasonably perceived by responsible officials on the basis of

120

1  the facts known to them.  And, five, any efforts made to temper

2  the severity of a forceful response.  My question to you,

3  Officer Wilkes, is what if any efforts did you make to temper

4  the severity of a forceful response?

5  A.   Could you repeat that last question, you lost me in the

6  first part?

7       THE COURT:  He's not going to repeat the whole

8  question, just the last part of it.

9  BY MR. RICHMOND:

10  Q.   Mr. Wilkes, what if any efforts did you make to temper

11  the severity of a forceful response?

12       THE COURT:  Do you understand the question?

13       THE WITNESS:  I don't understand the question, your

14  Honor.

15       THE COURT:  Is it the temper, the severity part

16  that's giving you a problem?

17      THE WITNESS:  Yes, your Honor.

18      THE COURT:  Far be it for me to explain to an

19  appellate court what they meant, but I think what they meant

20  was -- let me put it this way.  I think what the court there

21  meant was what efforts, if any, did you take to make the

22  response that you took less forceful; do you have any objection

23  to that?

24      MR. MARAVICH:  I do not, your Honor.

25      THE COURT:  Do you understand the question?


                          121


1      THE WITNESS:  I do now, your Honor, thank you.

2      THE COURT:  Go ahead.

3      THE WITNESS:  Like I stated before, I am authorized

4  to use force under DC-ADM 201.  And from there, there is a

5  sequence of events that have to happen in order for me to use

6  force.  Okay.

7  BY MR. RICHMOND:

8  Q.   Is there a way for me to increase the size for this

9  portion of this text on the screen possibly to see this.

10   A.   If you go to the 201, the first part, the force

11   continuum.

12        MR. RICHMOND:  Can I make a note, your Honor, of the

13   situation involving my witnesses --

14        THE COURT:  You can do that with me privately out of

15   the presence of the jury.

16        MR. RICHMOND:  Yes, sir.

17        THE COURT:  Are you ready to keep going here.

18   BY MR. RICHMOND:

19   Q.   I was specifically relating, Mr. Wilkes, to item number

20   five, in terms of efforts made to temper the situation.  One of

21   the things that I'm trying to demonstrate, Officer Wilkes, is

22   that the need for the amount of force that was used was

23   unnecessary.  It was uncalled for, a, because I was in a locked

24   cell; b, because being I was in a locked cell, the extent of

25   threat of any kind of danger to you or any of the other


122


1   officers would have been minimal at best.  So, therefore, the

2   need for the application of the amount of force that was used

3   against me that caused me to sustain the injuries and the

4   damage I've sustained was unnecessary.

5        THE COURT:  Mr. Richmond, you have to ask questions.

6   You're going to have a chance to make your argument to the jury

7   at the end of the case.  But remember you have to keep asking

8   these people questions.

9   BY MR. RICHMOND:

10  Q.   Is there a casual connection, Mr. Wilkes, between the

11  injuries I sustained on 2/28 and the defendants use of force on

12  that date?

13        MR. MARAVICH:  Objection, your Honor, I think there

14  is a lack of foundation as to what the injuries actually are.

15        THE COURT:  Well, just so the record is clear, I

16  think you unintentionally misspoke, you said is there a casual

17  connection between the incident and the injuries, I think you

18  meant to say is there a causal connection between them.  What's

19  the nature of your objection?

20        MR. MARAVICH:  Your Honor, the objection is on lack

21  of foundation regarding what the injuries are.  I don't think

22  this witness could possibly answer just on that question alone.

23        THE COURT:  Do you even know what his alleged

24  injuries are?

25          THE WITNESS:  I know a few of them, your Honor, yes.


123


1          THE COURT:  Based upon what you observed there that

2   day, just that day, are you -- let me put it this way, from a

3   foundational standpoint.  Do you have any direct knowledge

4   based upon what you perceived as to what his injuries were?

5          THE WITNESS:  Your Honor, as far as the injuries, I

6   know he cut his hand.  He could have did that in a number of

7   ways.  We were wrestling with him quite a bit.  I had keys in

8   my hand, he could have cut them on the keys as I'm trying to

9   secure the cell door.  Or when he was trying to bring his arms

10  back in the cell, it could have happened -- I'm not sure how he

11  did it.  But I know the cut on his hand from reading, I did not

12  see any injuries -- from reading the report, he had a cut on

13  his hand, as far as I remember.  But as far as how they

14  happened, they could have happened a number of ways.

15         THE COURT:  We're going to take a short recess.

16         (Recess from 3:30 p.m.; until 3:40 p.m.)

17         THE COURT:  All right, let's go.

18  BY MR. RICHMOND:

19  Q.    Officer Wilkes, could you please read the interrogatory

20  listed here in number 20, it's the interrogatory that you

21  received quite sometime ago?

22  A.    Number 20.  "Gratuitously slamming the hand of plaintiff

23  by three corrections officers simultaneously using the wicket

24  slot or door as a weapon be considered appropriate use of force

25  pursuant to DOC policy and law."


124


1  Q.    Would you answer that, please?

2  A.    I answered it on my other portion there.

3  Q.    Would you mind answering it again today, sir?

4  A.    The slamming of the hand of the plaintiff by the three

5  corrections officers is not allowable under the use of force.

6  Q.    Would you please take a look now at item number 22 and

7  read that?

8  A.    "Would a good faith effort to restore order at least

9  include stepping back and/or summoning a line staff officer

10  prior to the use of force on plaintiff?"

11  Q.    Would you please answer that, sir?

12  A.    If I was able to step back and be released from your

13  grip, I probably would have summoned a line staff officer.  But

14  it escalated to the next level use of force when I could not

15  break your grip.

16  Q.    It says here under number 22, that's your response,

17  Officer Wilkes, would you read that?

18  A.    "I would have stepped back if I was able to."

19  Q.    When officers --

20  A.    There's more to it if I could read it, please.

21        THE COURT:  Go ahead.

22        THE WITNESS:  "I made every attempt to free myself

23  from Inmate Richmond's grasp."

24  BY MR. RICHMOND:

25  Q.    When you were free allegedly by Officers McElravy and


                              125


1  Bedilion, did you not have an opportunity to step back?

2  A.    Well, at that time you were still attempting to grab me.

3  And the objective was not met in accordance with 201.

4  Q.    You're saying that I grabbed on to your arms, your

5  forearms, that it took two other officers to, quote unquote,

6  release my grasp from your forearms because you say you thought

7  I was a pretty strong guy, however you characterize it, rather

8  than just to step back, it took two, allegedly two other guards

9  to free my grasp from your forearms. Why then, Mr. Wilkes,

10  didn't you simply just step back, instead of employing force

11  further on?

12  A.  I could not step back because the objective was not met.

13  If I would have stepped back, your wicket would have been

14  unsecured, I could not leave your wicket unsecured.

15  Q.  Do you still maintain that my wounds -- how did I receive

16  the injuries that I sustained, Mr. Wilkes?

17  A.  Mr. Richmond, you could have received your injuries in a

18  number of ways, I'm not sure. You could have -- received your

19  injuries from the wicket when we were struggling with you.

20  From the keys that I had in my hand when I was attempting to

21  secure the wicket. Or just, there was a lot going on at that

22  time, I'm not sure how you received injuries.

23  Q.  Did you review photographs of the plaintiff's injuries?

24  A.  That's a negative, I did not, no.

25  Q.  Were you involved in a use of force investigation at

126

1   SCI-Greene during 1999?

2   A.   Yes, I was.

3   Q.   Were you named as one of the officers involved in this

4   extensive investigation involving prevalent use of force at

5   SCI-Greene by corrections officers?

6   A.   Yes, I was.

7   Q.   What was the result of that investigation?

8   A.   Could you repeat the question.

9   Q.   What was the result of that investigation involving a

10   prevalent use of force by corrections officers at Greene?

11   A.   I don't recall a situation like that.

12   Q.   Were you named in an investigation involving the use of

13   force at SCI-Greene during the year 1999?

14   A.   Yes, I was named in the lawsuit as the use of force, but

15   I wasn't actually involved in the use of force incident that

16   you are referring to.  It was referred to me as he supposedly

17   saw I threw snowballs at his window, wasn't allowing him legal

18   materials.  As far as the use of force claim, I was never

19   involved in a use of force.

20   Q.   Do you still maintain that my injuries could have been

21   self-inflicted, is that your stance in terms of a response

22   standpoint?

23  A.   That is correct, that is my stance.

24  Q.   You say you immediately notified your supervisor after

25  the incident, who would that have been?

127

1  A.   That would have been Lieutenant Mayle, who was the

2  lieutenant in charge of the RHU that day.

3  Q.   Why wasn't he called as a witness in this proceeding

4  today?

5  A.   I couldn't answer that, I don't know why he's not.

6  Q.   Who was your RHU sergeant for that day?

7  A.   As I stated before, I'm not sure who the RHU sergeant was

8  that day.

9  Q.   But you immediately filled out reports after the incident

10  detailing what you say took place, the lieutenant was notified,

11  yet you have no idea who the sergeant was on duty that day?

12  A.   That's correct.

13  Q.   Can you give me some understanding of what is the

14  procedure involving videotapes that are run of the security

15  wings, like FD-pod, can you give us some indication of the

16  process of about videotapes and how that takes place?

17  A.    As far as the process, what process are you talking

18  about?

19  Q.    Are there not cameras on the block?

20  A.    Yes, there are cameras on the block.

21  Q.    Are those security cameras not running, in terms of

22  taping on a continuous basis?

23  A.    As Mr. Maravich said before, they don't actually tape.

24  If something is happening, they can just watch.  But it doesn't

25  film anything.  It doesn't film, that came later on.  Back in

128

1  '99, it was seven years ago, they didn't have that.  It was

2  just to watch.  What they had is they had hand-held cameras,

3  whenever there was a planned use of force, we actually used

4  hand-held cameras.  We couldn't use a hand-held camera because

5  it wasn't planned, it happened all of a sudden, we couldn't get

6  a hold of a hand-held camera.  But as far as the cameras on the

7  pod you're talking about, you couldn't film with those, they

8  were just to observe, from my understanding.  That's how I

9  understand it.

10  Q.    You indicated in some of the reports that you prepared

11  shortly after the incident that there were no other observers,

12  isn't there someone that's in the security area, the bubble, if

13  you will, at all times?

14  A.   Yes, there is somebody in the bubble.

15  Q.   And if an incident occurred as you described it in your

16  misconduct report, wouldn't it stand to reason that someone in

17  the bubble had to know that something was going on?

18  A.   Well, at the time I'm sure the officer didn't know what

19  was going on because we have four pods, he just doesn't go to

20  one side.  When he's talking about is the control bubble --

21       THE COURT:  You know if you were a car at

22  Indianapolis, you would have lapped the pack by now, you've got

23  to slow down a little bit.

24       THE WITNESS:  Thank you, your Honor.

25       THE COURT:  Start that all over again.


                                129


1        THE WITNESS:  It's called the control bubble.  And

2  in the control bubble it has a panel for opening doors.  And

3  there's four pods.  One would be in this corner, one would be

4  over here for this one, and the two on this side.  So you have

5    four windows for four pods.  At the time of the incident, the

6    officer was not up watching this particular pod.  He was either

7    doing paperwork at the desk or getting a door.  There's no way

8    that he would have known that I was being assaulted unless it

9    was brought to his attention.  I can yell as loud as I want

10   help, he's not going to be able to hear me through the glass.

11   Okay, he was not observing the incident that day that took

12   place.

13   BY MR. RICHMOND:

14   Q.   Officer Wilkes, have you ever been reprimanded, either

15   orally or in writing, as a corrections officer regarding

16   excessive force?

17   A.   No, never.

18   Q.   Were you ever involved, and again I'm asking you, this is

19   a repeat question, were you involved in an investigation

20   involving excessive force at SCI-Greene?

21   A.   Yes, I was involved in that lawsuit, but it was not for

22   excessive force, I received no type of reprimand for that.  I

23   do not know how the lawsuit turned out, I was never there at

24   the actual lawsuit.

25   Q.   How long have you been a corrections officer, Mr. Wilkes?

130

1  A.   I've been a corrections officer for nine years.

2       MR. RICHMOND:  I don't have any other questions at

3  this time, your Honor.

4       THE COURT:  All right.  Are you going to defer

5  similarly with this individual to your case in chief?

6       MR. MARAVICH:  Yes, your Honor.

7       THE COURT:  All right, you can step down for now,

8  sir.

9       THE WITNESS:  Thank you.

10      THE COURT:  Who would be your next witness, sir?

11      MR. RICHMOND:  My next witness would be Mr. Chris

12  Kaminski.  If I may have a side bar with you for a moment, your

13  Honor.

14      THE COURT:  All right, come on up here.

15      (On the record at side bar.)

16      MR. RICHMOND:  If we could go on the record, we

17  haven't had lunch.  Mr. Kaminski is a diabetic.  He's an inmate

18  that takes a thousand milligrams of medications a day.  We

19  haven't had anything outside of, I think some muffins this

20  morning when they brought us in.  There was no provisions for

21  lunch.  I'm trying to preclude that from happening tomorrow.

22  We've been having some problems, even being able for me to

23  speak with my witnesses.

24        THE COURT:  Wait a minute, I specifically had given

25  you an opportunity to consult with that previous witness and

131

1  you have had an opportunity, in fact I confirmed you had that

2  opportunity.

3        MR. RICHMOND:  Yes, sir, I did.

4        THE COURT:  All right.  So pursuant to my

5  instructions, they permitted you to talk to your witnesses?

6        MR. RICHMOND:  Yes, sir, pursuant to the

7  instructions.

8        THE COURT:  All right.  Well, then, that's a good

9  thing.  Your point is you want to make sure you have your lunch

10  tomorrow?

11        MR. RICHMOND:  Yes, sir.

12        THE COURT:  I'll make sure that is taken care of

13  tomorrow.  Now, you want to call the last prisoner that was in

14  here?

15          MR. RICHMOND:  Mr. Kaminski, I would like to call

16  him tomorrow if at all possible.

17          THE COURT:  Have you had a chance to talk to him?

18          MR. RICHMOND:  I had a chance to briefly talk to him

19  Sunday for about an hour.

20          THE COURT:  Are you telling me you don't feel you've

21  had a sufficient opportunity to talk to him?

22          MR. RICHMOND:  That's what I'm saying, sir.

23          THE COURT:  All right.

24          CORRECTIONS OFFICER:  Your Honor, I'm Officer David

25  Sayers, I work in the restricted housing unit where he's


                                  132


1  housed.  He did have an opportunity to have two and a half

2  hours with Kaminski in the law library yesterday.  And that is

3  on record out at SCI-Albion.

4          MR. RICHMOND:  We've been there since Tuesday, I

5  didn't speak to him until Sunday for about -- he says two and a

6  half hours.  I'm not going to dicker.

7          THE COURT:  Did you have an opportunity to discuss

8    your case as to what you anticipated his testimony would be for

9    two hours, two and a half hours in the law library on Sunday,

10   yes or no?

11        MR. RICHMOND:  I have not had a chance to fully go

12   over it.

13        THE COURT:  But did you meet with him on Sunday?

14        MR. RICHMOND:  Yes, sir.

15        THE COURT:  You're not saying he's not telling me

16   the truth, are you?

17        MR. RICHMOND:  No, sir, I'm not disputing that.

18        THE COURT:  Did you have an opportunity to talk to

19   him here at the courthouse?

20        MR. RICHMOND:  For maybe 10 minutes when we walked

21   inside the cage during the recesses.

22        THE COURT:  You've had an opportunity to talk to

23   him.  How long did you anticipate he's going to be on the

24   stand?

25        MR. RICHMOND:  For a significant period.


133


1         THE COURT:  All right, that's going to be all for

2   today.

3        (End of discussion at side bar.)

4        THE COURT:  Members of the jury, for a variety of

5   reasons, we've gone as far as we can today.  We have to break

6   about 15 minutes earlier than I anticipated, but we're still

7   making pretty good headway.  I'm going to ask that each of you

8   be back here and ready to go at 9:15 tomorrow.  Let me remind

9   you again don't talk about the case with friends or family.  In

10  the unlikely event there should be anything in the newspapers,

11  don't read it.  I'm going to stay on the bench here for a bit,

12  so have a pleasant evening.

13       (Whereupon, at 3:56 p.m., the Jury was dismissed for

14  the day.)

15       THE COURT:  Now, the reason, one of the reasons we

16  broke earlier is I was informed that there was a problem with

17  lunch for the inmates, that the plaintiff and the other inmates

18  that were here today, in that they had no lunch.  Can someone

19  please explain to me what the problem was?

20       CORRECTIONS CAPTAIN:  They didn't send any bags with

21  us this morning, your Honor.

22       THE COURT:  Had they packed them and they just

23  didn't get in?

file:///A|/RICHDAY1.TXT

24        CORRECTIONS CAPTAIN:  We brought three bags,

25  thinking that was their lunch, it was their breakfast.


134


1        THE COURT:  Well, that type of problem can happen

2  from time to time.  But I expect it will not happen again.  And

3  I know nothing more about it, other than I'm informed that a

4  gentleman in custody is a diabetic.  You're aware of that.

5  So you can take whatever appropriate measures you think are

6  necessary.  So we're in recess --

7        MR. RICHMOND:  Your Honor, can we get a shower when

8  we get back because if it's not ordered for us to get a

9  shower --

10        THE COURT:  You know a long time ago I decided that

11  except in unique circumstances, certain circumstances, judges

12  shouldn't try to run prisons.  And that's a BOP decision,

13  that's up to them, I'm not going to make any orders along those

14  lines.  All right, that's it.

15

16        (Whereupon, at 4:00 p.m., the Jury Trial proceedings

17  were adjourned for the day.)

18

19                    - - -

20

21

22

23

24

25

                                        135


1            C E R T I F I C A T E

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12  _____

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25