IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT A. RICHMOND, SR.,
      Plaintiff

v.              CIVIL ACTION NO. 99-192 ERIE

JAMES S. PRICE, et al.,
      Defendants


JURY TRIAL - DAY NO. 2



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, March 14, 2006.




APPEARANCES:
      ROBERT A. RICHMOND, SR., Plaintiff herein,
      appearing Pro Se.

      CRAIG E. MARAVICH, Esquire, Deputy Attorney

General, appearing on behalf of the Defendants.

Ronald J. Bench, RMR - Official Court Reporter

2

```
1              I N D E X

2

3     WITNESSES:           DIRECT  CROSS  REDIRECT  RECROSS

4  FOR THE PLAINTIFF:

5  JAMES BEDILION          13     3      --      --

6  ROBERT A. RICHMOND, SR.        16     42     --      --

7  CHRISTOPHER KAMINSKI           65     77     --      --

8

9

10  FOR THE DEFENSE:

11  GREGORY WILKES          86     --     --      --

12

13              - - -
```

14

15      EXHIBITS:              IDENTIFIED     ADMITTED

16   FOR THE PLAINTIFF:
       Plaintiff's Exhibit 5          10          81
17   Plaintiff's Exhibit 6           27           81
       Plaintiff's Exhibit 7         26           81
18   Plaintiff's Exhibit 8          26           81
       Plaintiff's Exhibit 9         28           81
19   Plaintiff's Exhibit 10         28           81
       Plaintiff's Exhibit 11        33           81
20   Plaintiff's Exhibits 1 - 12      81           81

21

22   FOR THE DEFENSE:
       Commonwealth's Exhibit A        46           81
23   Commonwealth's Exhibit B         52           81
       Commonwealth's Exhibit C        52           81
24

25                    - - -

3

1            P R O C E E D I N G S

2

3      (Whereupon, the Jury Trial proceedings began at

4   9:20 a.m., on Tuesday, March 14, 2006, in Courtroom C.)

5

6          THE COURT:  All right, are we ready to go.  Has this

7   witness been sworn?

8          DEPUTY CLERK:  I'm going to swear him right now.

9    Mr. Bedilion raise your right hand.

10          JAMES BEDILION, DEFENDANT HEREIN, SWORN

11            (Called as on CROSS-EXAMINATION)

12            (Testifying via Video-Conferencing)

13   BY MR. RICHMOND:

14   Q.    Officer Bedilion, can you hear me pretty well?

15   A.    Yes.

16   Q.    I have a few questions that I'd like to ask you.

17          THE COURT:  You have to go up to the podium.

18   Remember to speak directly into the microphone.

19   BY MR. RICHMOND:

20   Q.    Officer Bedilion, can you hear me now?

21   A.    Yes.

22   Q.    I'd like to ask you a few questions, if I may.  Could you

23   please state your name for the record, sir?

24   A.    James Bedilion.

25   Q.    Officer Bedilion, were you working on the pod in question


                          4


1    on the day of the incident, 28 February, 1999?

2  A.   Yes.

3  Q.   Can you give me your approximate height and weight at

4  that time -- seems like you've gained a little weight so?

5  A.   5'10", I would say I was approximately 200 pounds then.

6  Q.   Would it be safe to say that you participated actively in

7  the use of force against me on 28 February, '99?

8  A.   Yes.

9  Q.   If you would, would you please describe your initial

10  encounter with me, the plaintiff, on 28 February, '99?

11  A.   Yes.  I was on the bottom tier while we were feeding

12  inmates on D-pod.  I heard and observed Officer Wilkes on the

13  top tier.  It appeared he was struggling in front of a cell.  I

14  responded, went up to the top tier, he was stuck in front of

15  the cell door, his arms was grabbed a hold of by you.  I gave

16  verbal commands for you to let go of the officer.  I utilized

17  control technique on your right arm, eventually you released,

18  the wicket was secured.

19  Q.   Would you please state for the court who in fact secured

20  the wicket?

21  A.   Myself.  And I may have had help.

22  Q.   Could you expound on that and explain, I mean you say you

23  may have had help, do you not remember the incident clearly?

24   A.   I do remember.  There were three officers in front of one

25   cell door.  Not a lot of room to move, let alone see.  I know I


5


1   myself pushed the wicket secure.  I don't know if anyone else

2   assisted me in that close proximity.

3   Q.   Can you describe for the jury your direct use of force

4   against me, the plaintiff?

5   A.   Yes.  I took hold of your right wrist, utilized a

6   gooseneck, which is bending the top of your hand inwards

7   towards the arm to gain compliance and pushed your hand back

8   into the cell.

9   Q.   So are you saying that you actually physically pushed my

10   hand back into the cell?

11   A.   Yes.

12   Q.   And what happened at that time?

13   A.   The wicket was secured by myself.

14   Q.   The reason that I specifically asked you what happened at

15   that time is because your testimony today it differs

16   drastically from --

17          MR. MARAVICH:  Objection.

file:///A|/RICHDAY2.TXT

18        THE COURT:  Sustained.  Just ask a question.

19   BY MR. RICHMOND:

20   Q.    You stated that after applying the controlling technique,

21   that you physically pushed my hand back into the cell, for

22   clarification again, is that correct?

23   A.    Your right arm, that's correct.

24   Q.    Did you at anytime use the wicket doorway or slot as a

25   weapon or apply any force or pressure on the wicket using your

                                        6

1   own strength?

2   A.    No.

3   Q.    Could you describe for the jury how you, as you're

4   alleging, how you physically pushed my hand back into the cell

5   before you secured the wicket slot door?

6   A.    Simply pushed your hand back into the cell with both of

7   my hands, released with my left hand under my right hand,

8   secured the wicket.

9   Q.    Do recall at any time Officer Wilkes applying pressure on

10   the wicket?

11   A.    I don't recall in that close proximity.

12  Q.    How long of a period of time would you say it took for

13  you -- you indicated you were on the bottom tier, how long did

14  it take you to respond to, to come I think it's maybe a flight

15  of maybe 20 or more steps and to assist the officers as you're

16  alleging?

17  A.    It's not 20 steps.  Approximately, five to seven seconds.

18  Q.    How many steps would you say that it is from the bottom

19  of the tier to the top level?

20  A.    Ten.

21  Q.    Ten steps?

22  A.    Ten to twelve I would say.

23  Q.    So how long did you say that it took for you to respond

24  to this incident?

25  A.    Five to seven seconds.


                                    7


1  Q.    Officer Wilkes states that after the controlling

2  techniques were successful, this is indicated in the misconduct

3  report prepared by Officer Wilkes; he indicates that after

4  controlling techniques were applied by Officers McElravy and

5  yourself, that he in turn applied force to the wicket.  Do you

6    agree with that statement?

7    A.    Yes.

8    Q.    You stated just previously that you don't recall him

9    applying any force or pressure to the wicket?

10    A.    That very possibly could be the way it happened, I didn't

11    see it in the close proximity.

12    Q.    You responded to the incident in several seconds, how

13    long would you say it took before the wicket door was secured

14    after you responded?

15        THE COURT:  Let me interrupt just a second for a

16    clarification for the jury.  The term secure the wicket door

17    has been used a number of times.  I think perhaps you might

18    want to explore what that actually means with the witness.

19    BY MR. RICHMOND:

20    Q.    Could you describe, Officer Bedilion, for the jury, what

21    in fact entails for you to secure the wicket slot door?

22    A.    Yes.  The wicket or the tray slot in a cell door on that

23    pod could simply be closed by swinging it upwards and it

24    latches automatically.  Some of the wickets you need a key to

25    secure.  But from what I recall, this one secured

1    automatically.

2    Q.    And in between this time, as I stated earlier, when you

3    responded to the incident, after your initial response, how

4    long would you say it took before the wicket was secured and

5    locked by you?

6    A.    It was a stressful situation seven years ago, I dare to

7    guess, it was very fast from what I recall.

8    Q.    Was it several seconds, was it several minutes, I mean

9    how long would you say this incident, the altercation and/or

10    assault, how long did it occur?

11    A.    Several seconds.

12    Q.    And you did not witness or notice that after your

13    controlling technique was allegedly successful, that Officer

14    Wilkes then applied pressure to the wicket?

15    A.    That's not what I said.

16    Q.    What did you say, Officer Bedilion?

17    A.    I said I utilized control technique on your right arm,

18    pushed your hand back in the cell, and I myself secured the

19    wicket.  If Officer Wilkes helped, I didn't see, I can't

20    testify to what I didn't see.

21  Q.    Well, that's what he states in his misconduct report,

22  Officer Bedilion, that he applied pressure to the wicket.  Do

23  you admit or do you agree with that or do you deny that?

24         THE COURT:  This is last time on this, this has been

25  asked and answered several times.  Ask him this and then move

9

1  on to another subject.

2  BY MR. RICHMOND:

3  Q.    How would you describe the use of force, was it

4  justified?

5  A.    Yes.

6  Q.    Were you aware that when force was being used, that the

7  plaintiff was being injured?

8  A.    No.

9  Q.    Did you receive any injuries from the incident?

10  A.    No.

11  Q.    Were you aware that the plaintiff received injuries?

12  A.    Yes.

13  Q.    And what were those injuries, what did they consist of?

14  A.    I don't recall, medical was contacted.

15  Q.   Did you review the videotape of the incident?

16  A.   No.

17  Q.   Would you inform the jury why you didn't review the

18  videotape?

19      MR. MARAVICH:  Objection, your Honor, calling for

20  speculation.

21      THE COURT:  Overruled.  Go ahead.

22  BY MR. RICHMOND:

23  Q.   Could you answer that question, sir, as to why you didn't

24  review the videotape?

25  A.   I don't know that there was a videotape.


                          10


1  Q.   Who was your immediate supervisor, the RHU sergeant on

2  duty?

3  A.   I don't recall.

4  Q.   Do you recall who the RHU lieutenant on duty was that

5  day?

6  A.   I remember the shift commander was Captain Roach.

7      MR. RICHMOND:  I'd like to enter as Exhibit No. 5,

8  a report prepared by Officer Bedilion.  It's a Department of

9   Corrections' extraordinary occurrence report.

10  BY MR. RICHMOND:

11  Q.   Officer Bedilion, are you able to see the report?

12  A.   Yes.

13  Q.   As you indicated, Captain Roach was one of the

14  supervisors on duty that day, is that correct?

15  A.   Correct.

16  Q.   And this is a report prepared by you, is that correct?

17  A.   Correct.

18  Q.   I'd like for you, for the jury, for you to read that

19  report.  I'm going to slide it up a little bit so you'll be

20  able to see the text of it.  Will you please read that for the

21  jury?

22       THE COURT:  Officer, this is the judge, can you read

23  that writing?

24       THE WITNESS:  No, your Honor.

25       MR. MARAVICH:  Excuse me, your Honor.  I've faxed a

11

1   copy of this down to SCI-Greene.  Can you ask if Mr. Bedilion

2   has that copy and if it's readable.

3          THE COURT:  You probably just did ask him that, do

4   you have a copy of that?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  Why don't you just read it from your own

7   copy, because it appears to be difficult to read it from the

8   screen.  Read it very slowly because there's a court reporter

9   here who has to get it all down.  Go ahead.

10         THE WITNESS:  "On the above date and approximate

11   time while feeding D-pod on F-block, this officer observed

12   Inmate Richmond, (DB-7852), threw a cup of juice and the lid

13   from his food tray out of his pie hole at Officers Wilkes and

14   McElravy.  At this time Inmate Richmond grabbed Officer Wilkes

15   by the forearms while he attempted to close his pie hole.  This

16   officer ran to the incident at FD cell 15 and ordered Inmate

17   Richmond to let go of Officer Wilkes.  Inmate Richmond did not

18   comply.  I applied a control technique on Inmate Richmond's

19   right hand as Officer McElravy did the same on the inmate's

20   left hand.  At this time Inmate Richmond let go of Officer

21   Wilkes and I secured the pie hole.  Officers Wilkes, McElravy

22   and myself immediately exited the pod and reported the incident

23   to the block sergeant and Lieutenant Mayle."

24         MR. RICHMOND:  Thank you, Officer Bedilion.  The

25  primary reason for the jury that I had Officer Bedilion read

12

1  the report that he prepared is because Officers McElravy and

2  Wilkes also prepared similar reports.  However, the reports

3  that they prepared are almost identical --

4      MR. MARAVICH:  Objection, your Honor, argument.

5      THE COURT:  Sustained, this is argument, this isn't

6  questioning.  You'll have a chance to make an argument at the

7  conclusion of the case.  This is your time to ask questions.

8  BY MR. RICHMOND:

9  Q.   Would you say, Officer Bedilion, that the plaintiff's

10  injuries were a proximate cause of the excessive force that was

11  used on February 28, 1999?

12  A.   No.

13  Q.   Could you describe how you believe that the plaintiff was

14  injured?

15  A.   From struggling with you.

16  Q.   Could you explain that, I don't understand how you mean

17  that?

18  A.   From trying to release himself and secure you back into

19  your cell.

20  Q.    So are you saying that my injuries were self-inflicted?

21  A.    I know of no injuries you sustained.

22        MR. RICHMOND:  Thank you, very much, your Honor,

23  that's all I have for Mr. Bedilion.

24        THE COURT:  What you are going to do with this

25  witness given the circumstances, Mr. Maravich?


                            13


1         MR. MARAVICH:  Your Honor, since the hookup is

2   working, I'm going to try to finish him up right now.

3         THE COURT:  Let's do that.

4               DIRECT EXAMINATION

5   BY MR. MARAVICH:

6   Q.    Mr. Bedilion, this is Craig Maravich from the Attorney

7   General's Office.  Also, your counsel in this case.  How are

8   you?

9   A.    Fine, sir.  Good morning.

10  Q.    Okay.  We're going to make this real quick.  I'm going to

11  be referring to the document that's been marked as Plaintiff's

12  Exhibit 5 for identification purposes.  Can you refer to the

13  copies that you have in front of you, as you previously did?

14  A.   Yes, sir.

15  Q.   Sir, at the top of this document it says "Department of

16  Corrections Employee Report of Extraordinary Occurrence,"

17  correct?

18  A.   Correct.

19  Q.   And it says that it is to R. Roach, correct?

20  A.   Correct.

21  Q.   And he is the captain of the guard, is that correct?

22  A.   Correct.

23  Q.   And it's from J. Bedilion, correct?

24  A.   Correct.

25  Q.   And that is your signature right below that?

14

1  A.   Yes, sir.

2  Q.   And you wrote this report?

3  A.   Yes, sir.

4  Q.   Okay.  Now, Mr. Bedilion, there is two pages to this

5  report, I don't believe that you went beyond the first portion.

6  Just give me a moment, but what I'd like you to do is to read

7    the bottom portion of the first page that you're on, I'll put

8    that on for the jury. Can you please read that?

9    A.    Yes, sir.  "Actions taken in chronological order with

10   times listed.  1550 - Inmate Richmond threw his tray lid and a

11   cup of juice out of his pie hole and grabbed Officer Wilkes by

12   the forearms.  1555 - Block sergeant notified.  Lieutenant

13   Mayle notified.  1600 - RN Ledwich notified and arrived to

14   examine Inmate Richmond.  1625 - Inmate Richmond placed back

15   into his cell FD-15."

16   Q.    Thank you, Mr. Bedilion.  May I please direct your

17   attention to the second page of the document.  Do you see at

18   the top of the document where it indicates "description of

19   weapons, if any?"

20   A.    Yes, sir.

21   Q.    What did you write there?

22   A.    "None."

23   Q.    Do you see the next section which is described as

24   "description of injuries to staff or inmates and medical

25   attention required, if any?"

15

1  A.  Yes.

2  Q.  Can you please read what you wrote there?

3  A.  "Scratches on Officer Wilkes' right hand, approximately

4  one-inch in length.  Small cuts to the inside of Inmate

5  Richmond's right hand."

6  Q.  Thank you.  Can you turn now to the third area where it

7  is listed as "description of method in which force was applied

8  by staff and any security equipment used?"

9  A.  "Control technique utilized on Inmate Richmond's right

10  hand."

11  Q.  Thank you, you anticipated what I was going to ask.  So,

12  Mr. Bedilion, when you were previously asked by Mr. Richmond

13  regarding the injuries he sustained, are these the only

14  injuries that you were aware of that were written here on the

15  second page?

16  A.  Yes, sir.

17  Q.  You are not aware of Mr. Richmond suffering any other

18  injuries regarding this incident, is that correct?

19  A.  Correct.

20       MR. MARAVICH:  Your Honor, at this time I have

21  nothing further.  Thank you.

22          THE COURT:  All right.  Do you have any other

23  remaining questions, Mr. Richmond, are you done with this

24  witness?

25          MR. RICHMOND:  Yes, your Honor, I'm done with that


                                16


1  witness, thank you very much.

2          THE COURT:  All right.  Thank you very much, sir,

3  we're going to disconnect the video feed at this point.

4  All right, Mr. Richmond, who would be your next witness?

5          MR. RICHMOND:  That would be myself, sir.

6          THE COURT:  All right.  Is the way we'll do that,

7  come on up here, you will be sworn in and then you'll take the

8  witness stand.  And then I'll give you a few further

9  instructions once you get up here.

10          MR. RICHMOND:  Is it possible, your Honor, I could

11  ask for a short break, I have a few exhibits that I'd like to

12  have in order.

13          THE COURT:  Do you have another witness after

14  yourself?

15          MR. RICHMOND:  Yes, sir, I do.  That would be Mr.

16  Kaminski.

17       THE COURT:  Then that would complete your case?

18       MR. RICHMOND:  Yes, sir.

19       THE COURT:  We'll take a short recess.

20       (Recess from 9:48 a.m.; until 9:55 a.m.)

21       THE COURT:  All right, Mr. Richmond, come on up.

22       DEPUTY CLERK:  Please raise your right hand.

23     ROBERT A. RICHMOND, SR., PLAINTIFF HEREIN, SWORN

24       THE COURT:  All right, take the stand.  Members of

25   the jury, and also for your benefit, Mr. Richmond, he of course


                                    17


1  is proceeding pro se.  Normally someone, if you weren't pro se,

2  there would be a lawyer out there that would be questioning

3  you.  There's no one to question him in the first instance.  So

4  in a situation like this, a pro se litigant is entitled to

5  simply get on the stand and tell his or her side of the story.

6  And that's what you should begin to do right now, Mr. Richmond.

7  Using the microphone, of course.

8                 DIRECT EXAMINATION

9       MR. RICHMOND:  Ladies and gentlemen of the jury, at

10    the onset of this case, the judge, your Honor, stated that I

11    would simply have to tell my story of what happened as I

12    experienced it.  And as he just mentioned, since I am pro se,

13    I'm not represented by counsel, I can't question myself.  So

14    what I'm going to attempt to do is to give you a narrative of

15    essentially what happened as I experienced it.

16         I'd like to, in addition to the narrative, I'd like

17    to include this as Exhibit 7.  I'd also like to include No. 7

18    that you're about to see, which is the deposition that was

19    taken by the defendants in September of 2003 of me.  In which

20    they came to the facility where I was housed at and they asked

21    me questions under oath, and in reference to the incident.

22    Much of the testimony that was presented yesterday was in

23    conjunction with defendants' version of the events as recorded

24    in the misconduct report, which you had seen yesterday.  My

25    version of the events and what actually took place differs


18


1    drastically from what you've heard via the testimony of Officer

2    Wilkes, Officer Bedilion and Officer McElravy.  As to all their

3    recollections, I'm sure you probably recall, they all seem to

4    kind of jibe or go together, for lack of a better word.

5         However, what actually happened on February 28th is

6    slightly different than what's already been presented to you as

7    evidence.  I had just arrived at SCI-Greene only four days

8    prior to the 28th February, 1999 incident.  I had arrived at

9    SCI-Greene on 24 February of 1999 from another institution.  So

10   I had no prior dealings with any of the defendants, nor had I

11   known them in any capacity, other than as an inmate and them

12   passing out the meals or laundry, whatever the normal course of

13   duties require.  I had only been there for four days.

14        While the evening meals were being distributed to

15   each cell, I requested to speak with an officer.  Or as we call

16   them, a white shirt, like the gentleman in the rear of the

17   courtroom.  He's the senior line staff officer, usually a

18   lieutenant or a captain, but he's someone that's of a higher

19   rank.  And I don't recall exactly the reason why I requested to

20   see an officer.  It might have been my medicine, it might have

21   been something that was wrong with the food that was being

22   delivered, I don't recall.

23        At no time, however, did I throw anything, my food,

24   tray, the lid, or my juice at any officer, be it Officer

25   McElravy, Officer Wilkes.  As a matter of fact, it's a common

19

1  practice when the meals are being passed out at SCI-Greene on

2  the day of the incident, that the officers that are passing out

3  the trays, they commonly take the lid off of the tray before

4  the tray is passed to the inmate.  The actual food tray

5  containing the food is the only thing that is passed through

6  the door and/or any drinks or beverages or what have you.  The

7  tray lid is normally placed outside the inmate's cell.  And on

8  the floor until the meals are finished, and we return the empty

9  food trays, and then they are retrieved.

10        At any rate, while waiting to speak to a senior line

11  staff officer, a white shirt, I was kneeling on the floor.  The

12  food slot or the wicket door was open.  I had already received

13  my food tray.  And the others were still being distributed

14  throughout the pod.  Usually the officers work distributing

15  meals, they work as a team during mealtime.  One officer opens

16  the doors, another officer will come by with a cart, with the

17  trays on the cart.  They'll take the lids off the trays,

18  they'll hand the trays to the inmates.  Another officer, if

19  there's three or four, one will pass out juice and so forth.

20          So while I'm kneeling on the floor, with my right

21  arm and hand on the wicket, without any provocation whatsoever,

22  the defendant, Officer Wilkes, ran up to my cell door, he

23  grabbed the wicket and started literally slamming my arm in the

24  slot over and over.  I don't remember what he said, whether it

25  was you ain't seeing nobody or whatever.  But I do recall that

20

1  Officer McElravy approached shortly thereafter and joined in

2  with Officer Wilkes to slam and mash my hand with the wicket.

3          I was screaming, I was terrified.  And as I began

4  screaming and hollering, hey, you're trying to break my arm,

5  help -- how long it lasted, I can't tell you.  I asked Officer

6  Bedilion a short while ago, he said it was a few seconds.  I

7  don't know whether it lasted a few minutes.  All I know is that

8  I was in a lot of fear.  I was terrified and I was trying to

9  get my hand in that cell as quick as I could.  I do know,

10  although, I don't know how long it lasted, I know Officer

11  Bedilion at some point or another joined in on the foray.  At

12  one point it appeared to me, from my recollection, that all

13  three officers were slamming my hand.  That's what I recall.

file:///A|/RICHDAY2.TXT

14          I do know that Officer Bedilion, finally when I got

15   my arm in, because I didn't have my hands out the door, I had

16   my one, my right hand out of the wicket door, trying to get it

17   in.  When I did pull my hand back into the cell, I do know that

18   Officer Bedilion locked the cell.

19          Several days after the incident, it might have been

20   one or two days, no more than maybe three days, I do recall

21   Officer McElravy coming to my cell and asking me, hey, how's

22   your hand feel, I bet you won't do that again.  I do recall

23   that.

24          And shortly after that incident I was taken to

25   medical, and my hand was bleeding, it was swollen, it was


                              21


1   bloody.  I was in a lot of pain.  My hand was like a raw

2   hamburg.  I wasn't examined by a doctor on that day.  My wounds

3   were wiped off from the blood and a few pictures were taken.  I

4   don't have copies of the pictures to show you.  I can show you

5   my hand, I can tell you that it was swollen, I can tell you

6   that it was bloody.  I can tell you that they wiped my hand

7   clean before they took a few photographs.  I don't have the

8   photographs to show you what happened.  I was scared.  They

9   asked me what happened.  I was taken back to my cell, I was in

10  severe pain, my hand was not wrapped.  There were no tests that

11  were performed, there were no X-rays.  No gauze, no ice packs,

12  no nothing, I was returned to my cell.  I think the nurse might

13  have asked me did I want an aspirin.  And I wanted to show you

14  another exhibit which will demonstrate that.

15          However, on the following day, March 1, 1999, I'm

16  going to show you another injury that was made in my medical

17  records.  That injury will indicate that I was examined the

18  following day by a physician, Dr. Falor.  Dr. Falor listed my

19  hand injury as trauma.  And he prescribed antiinflammatory

20  medicine, I believe it might have been like Motrin 600, and a

21  change of bandages for three times a day for five days.  My

22  question to the jury or my statement to the jury is does that

23  sound like my wounds were self-inflicted.  I continued to

24  complain about the severe pain and the difficulty using my

25  right hand.  I'm going to show you another exhibit --


                                22


1           THE COURT:  Mr. Richmond, you keep saying you're

2  going to show these exhibits, but then you move on without

3  showing them.  Do you intend to do that all at once at the end

4  or --

5        MR. RICHMOND:  Yes, sir.

6        THE COURT:  Is that what you're going to do?

7        MR. RICHMOND:  Yes, I am.  I'm going to show you

8  another exhibit in a succession.  I have about four exhibits

9  that I want to show you.  But the next exhibit that you're

10  going to see is going to be from an affidavit that I prepared

11  in 2000, about a year after the incident.  In which I was still

12  complaining of severe pain to my hand.  To this day I still

13  receive treatment for the injury to my hand.  I'm prescribed to

14  wear a wrist splint, as you see.  I'm medically prohibited from

15  doing any repetitive hand movements.  I've also been sent to

16  see a neurologist, a neurosurgeon specialist.  And I have

17  received on at least three different occasions what are known

18  as nerve block injections to help with the pain management.

19  The nerve block injections were administered into my wrists

20  and into my neck area and my -- I want to say shoulder region.

21  Because, as I was told by a neurologist, a lot of times when

22  there is a hand injury, there will be also be -- and I do have

23  some injury to my neck, whether it was from the pulling in the

24  course of the incident, I don't know.

25          The last time that I saw the neurosurgeon specialist


                                    23


1  was on January 23, 2006.  I tried to obtain a copy of that

2  report.  Being that I am my own attorney, it's been a

3  difficulty that I haven't been able to surmount.  But they have

4  ordered that additional tests be taken, including an MRI.  I've

5  already had an EMG, which is an electromagnetic study, which

6  indicates that there is some damage to my hand, some carpal

7  tunnel syndrome.  I've also been scheduled to receive follow-up

8  nerve block injections.

9          Presently to this day I'm taking prescription pain

10  killers.  I'm taking Tramadol, it's also known as Ultram, it's

11  a synthetic, pretty strong pain killer.  I'll also taking a

12  muscle relaxer, Baclofen, three times a day.

13          At times I don't have any feeling in my entire arm.

14  And sometimes the pain radiates from my neck down through my

15  entire arm.  At other times my whole hand and my fingers are

16  just simply numb.  It's like pins and needles.  I frequently

17  wake up at night from time to time, and I don't have any

18  feelings, it's just as if my hand has gone to sleep.

19       The specialist that I've spoken to, Dr. Rastogi,

20  most recently in January -- doctor, I believe, not Conforti,

21  Dr. Catalano, have said that surgery may be recommended, but

22  that it may not in fact repair my injury.  That I have to live

23  and manage with a certain amount of pain for the rest of my

24  life.

25       Did I deserve that for requesting to speak to a


24


1  senior line staff during mealtime, no.  Was the force against

2  me excessively, with intent to harm me and cause pain and fear,

3  yes.  Quite frankly, I'm still afraid to this day.  I'd like to

4  go, Ms. Kierzak, if I may, to the first exhibit that I have.

5       THE COURT:  Are those the exhibits that you want to

6  put up on the screen?

7       MR. RICHMOND:  Yes.

8       THE COURT:  Let's do this because you know what

9  you're looking for in each of the exhibits, you now can go down

10  there, you can talk from the microphone that's right next to

11    the video cam.

12        MR. MARAVICH:  May I review the exhibits?

13        THE COURT:  Yes.

14        MR. MARAVICH:  There's going to be some issues on

15    the way he uses the exhibits.  We can either take that up now

16    or on one of the breaks --

17        THE COURT:  Are you ready to use them now, is that

18    it?

19        MR. RICHMOND:  Yes, I am.

20        THE COURT:  Rather than I can't think of a better

21    time than to take it up right now.  Let's do this, rather than

22    watch us huddle over here at side bar, why don't you walk into

23    the jury room for a few minutes, and I'll get this straightened

24    out and bring you back.

25        (Whereupon, the Jury was dismissed from the


                           25


1    Courtroom.)

2        THE COURT:  What are the issues?

3        MR. MARAVICH:  Would you like to see these?

4        THE COURT:  Yes, let me take a look at them.

5          MR. MARAVICH:  Your Honor, if I may do these

6   separately.  If Mr. Richmond can explain to you in what his

7   intentions are in using Exhibit 7 --

8          THE COURT:  What do you want to do with Exhibit 7,

9   this is your own deposition, right?

10         MR. RICHMOND:  Yes, sir.

11         THE COURT:  What do you want to do with it?

12         MR. RICHMOND:  The purpose of showing that to the

13  jury is that my responses to the questions under oath in

14  reference to what actually took place, basically, differs from

15  what the report, the misconduct report said.

16         THE COURT:  What the jury has just heard is your own

17  live testimony.  I presume this testimony, that is your

18  deposition testimony, is the same as what you testified to here

19  today, is that right?

20         MR. RICHMOND:  That's correct.

21         THE COURT:  Well, no this isn't admissible.  It's

22  what you testified to here that is important.

23         MR. RICHMOND:  This report was prepared by the nurse

24  who examined me on the same date.

25         THE COURT:  In other words, you want the jury to see

1  what her impressions were?

2      MR. RICHMOND:  What her impressions are.

3      MR. MARAVICH:  There is no objection on that.  Your

4  Honor, the issue on this one was that it was going to be marked

5  the same as this.  Since this isn't coming in, this is fine.

6      THE COURT:  All right, that Plaintiff's Exhibit 7 is

7  not coming in.  But the new Plaintiff's Exhibit 7, which is the

8  nurse's report, will be admissible?

9      MR. MARAVICH:  Yes, sir.

10      MR. RICHMOND:  It was prepared by the doctor, your

11  Honor, the day after the incident.

12      THE COURT:  And you want to use this so the jury can

13  hear or see what his observations of you were?

14      MR. RICHMOND:  Yes, sir.  Because initially on the

15  day of the incident it was mischaracterized, it was very

16  lightly kind of glossed over in terms of what happened.  The

17  doctor actually in his examination of my hand listed my injury,

18  trauma.

19      THE COURT:  Right now that is more information than

20  I needed.  That gives me enough.  What's the objection to this?

file:///A|/RICHDAY2.TXT

21        MR. MARAVICH:  There is no objection, this document

22   speaks for itself, your Honor.

23        THE COURT:  So you can show the jury this.

24   Plaintiff's Exhibit 8 will ultimately be admitted.  While I'm

25   admitting them right now -- there are other ones you may have


                                    27


1   identified that we're going to have to sweep up at the end.

2   This should not be Plaintiff's Exhibit 9 -- is this part of the

3   same document?

4        MR. RICHMOND:  Yes, it is.

5        THE COURT:  Well, I'll have somebody take that off

6   later.

7        DEPUTY CLERK:  There is no Exhibit 6.  We went from

8   five to seven if that matters.

9        THE COURT:  Well, then, so be it.  What is this

10   exhibit?

11        MR. RICHMOND:  That was a letter I wrote to the

12   specialist in reference to obtaining a copy of his report and

13   recommendation.  From the neurosurgeon.  Then in turn a copy of

14   the report that was forwarded.  The one from April of 2004,

15  another report from July of 2004.  And this is a continuum of

16  the same report, to indicate that I was prescribed to wear a

17  splint and some of the other --

18       THE COURT:  None of this has been marked by the way.

19  Let's do this, just to get back to some kind of semblance of

20  order.  Plaintiff's Exhibit 6 will be correspondence dated May

21  30, 2004, from plaintiff to Dr. Rastogi.  Plaintiff's Exhibit 7

22  is the nurse's report.  Nicole, why don't you get these all

23  marked, then I'll come back out.

24       (Brief recess was taken.)

25       THE COURT:  All right, Exhibit 8 is physician's


                                28


1  orders.  Exhibit 9 is going to be test results.  Exhibit 10 is

2  going to be the report dated 4/23/04, from Dr. Rastogi.

3  Exhibit 11 will be the report dated July 6, '04, by the same

4  doctor.

5       MR. RICHMOND:  There was an affidavit I prepared, I

6  mentioned to the jury --

7       THE COURT:  You can't submit an affidavit, you

8  testified.  Let's get back to Mr. Maravich.

9      MR. MARAVICH:  Can I have one minute, I haven't

10  looked at all of these.  Six, no objection.  Seven, no

11  objection.  Eight, no objection.  Nine, 10 and 11, objection

12  for the record.  It's hearsay, calls for expert opinion, there

13  is no causal connection related to this subsequent treatment to

14  the incident at hand.

15      THE COURT:  First of all, if memory serves, the

16  issue of his injuries, proof of injuries -- let me see the one

17  you have an objection to.  One objection is to both reports of

18  Dr. Rastogi to Dr. Conforti.  And the basis is it's hearsay,

19  and there's no expert report drawing the connection between the

20  problems identified in those reports and the incident that

21  forms the subject matter of the case, is that right?

22      MR. MARAVICH:  Yes, your Honor.  Proximate causes.

23      THE COURT:  What do you want to say?

24      MR. RICHMOND:  I did request, your Honor, to obtain

25  a copy of the January, 2006 report which indicates on the


29


1  report from the specialist that he saw that my injuries were

2  the result of an incident that occurred.  It also lists the

3    reports or the recommended tests and the overall observations

4    of the specialist who I just recently seen.

5              THE COURT:  Didn't you get a copy of the report?

6              MR. RICHMOND:  When I requested a copy of it, they

7    didn't respond back to me.  I have a copy of the letter I sent

8    them.  I also sent a copy of the request to my superintendent.

9    My records are at SCI-Albion, I spoke to the doctor just a few

10   days ago, and he has a copy of the report and recommendation

11   from January of '06 in my files.

12             MR. MARAVICH:  That's that letter that you wrote?

13             MR. RICHMOND:  I'll have to get it.

14             THE COURT:  In any event, while he's getting that,

15   Mr. Maravich -- I had been under the impression, of course,

16   this isn't dispositive -- the issue of injuries, proof of it

17   came up in an earlier pretrial conference, it was indicated at

18   that time you would be introducing various medical records.

19   And the recollection, the problem may be mine, I was under the

20   impression that the defendant was not going to have an

21   objection to the introduction of medical records?

22             MR. MARAVICH:  I didn't have an objection to the

23   introduction of medical records that dealt with the incident.

24  That is what from the opening of this case I have started to

25  see that Mr. Richmond is trying to connect injuries and

30

1  treatment that he has in his neck and back to the incident,

2  which as the facts now stand in the record was just a

3  laceration to his hand, to his right hand.

4        MR. RICHMOND:  There is a copy of the letter to the

5  specialist --

6        THE COURT:  Hang on.

7        MR. RICHMOND:  I think they can fax that over to

8  you.

9        THE COURT:  Is this Catalano an employee or an

10  independent contractor of the Department of Corrections?

11       MR. MARAVICH:  I'm not familiar that name, your

12  Honor.

13       THE COURT:  Who is Dr. Catalano?

14       MR. RICHMOND:  Dr. Catalano is a neurosurgeon

15  operating a practice at the western Pennsylvania Neurological

16  Institute of Western PA.  I've been taken out to see him for

17  consultation on at least four separate occasions.  That's where

18  I've been receiving the nerve block injections in my wrist.

19  That is who I've been receiving the specialized treatment from

20  and that's who prescribed to me the medicines that I'm on now

21  for pain.

22          THE COURT:  So I'm clear, the DOC, the defendants

23  here, they have no control over Dr. Catalano.  Dr. Catalano, he

24  was a physician that you were referred to by who?

25          MR. RICHMOND:  By the prison.  When specialized


31


1  treatment is required, they have to in fact recommend and

2  approve it before an inmate is taken out to specialized care.

3  A copy of his January 23, 2006 report will tie in --

4          THE COURT:  How do you know there is a January 23,

5  2006 report?

6          MR. RICHMOND:  Because I saw a copy of it.  I just

7  spoke with the physician here at Albion in reference to it.

8          THE COURT:  Does Albion have it?

9          MR. RICHMOND:  They have a copy of it in my medical

10  files, yes, sir.

11          THE COURT:  You're sure of that?

12          MR. RICHMOND:  I'm positive of that.

13          THE COURT:  I'm going to direct it be faxed here.

14          MR. RICHMOND:  I spoke with Dr. Bashline at

15  SCI-Albion, I saw him on Sunday the 12th.

16          THE COURT:  What information do you need in order to

17  track that down, Mr. Maravich --

18          MR. RICHMOND:  I also saw a specialist in October.

19  The reports you have are from April '04 and from June or July

20  of '04.  There was another visit that I saw him in October of

21  '04.  In between October of '04 and January of '06, I wasn't

22  seen by a specialist because it was a cost issue involved.

23          THE COURT:  I'm going to take a break.  We'll take a

24  break, you can come in and make a call down there.

25          (Recess from 10:30 a.m.; until 10:55 a.m.)


32


1          THE COURT:  Let the record reflect that the penal

2  institution has faxed Dr. Catalano's consultation record dated

3  January 23, '06.  Is this the record you're talking about?

4          MR. RICHMOND:  Yes, your Honor.

5          MR. MARAVICH:  You are correct in reading the front

6  page, January 23, '06, at the top right corner.  The next page

7  is also January 23, '06.  But the next one is what Mr. Richmond

8  talked about, the October 4, 2004.  I don't believe they could

9  find something dated October 4, 2004.  The closest they found

10  is the third page dated October 8, 2004.  Just so you know.

11       MR. RICHMOND:  That was from the last visit that I

12  had prior to the January visit.  The October, '04 visit was the

13  last visit I had before the January, '06 visit.  And in between

14  October, '04 and January, '06, there was no specialist

15  consultation that took place.  I wasn't seeing a specialist

16  during that time.

17       MR. MARAVICH:  Okay.

18       THE COURT:  In any event, let's do this.  I'm going

19  to come out and we will finish off this evidentiary issue.

20  Have you had a chance to look through these reports?

21       MR. RICHMOND:  No, sir.  But I will.

22       THE COURT:  All right.

23       (Recess from 10:58 a.m.; until 11:00 a.m.)

24       THE COURT:  Where are you, Mr. Richmond?

25       MR. RICHMOND:  I believe that you have the reports,

33

1   Exhibits 9, 10 and 11.

2        THE COURT:  Right.  Nine, cervicalgia, pain in

3   bilateral upper extremities, rule out bilateral carpal tunnel

4   syndrome.  And 10, diagnosis is cervicalgia.  Paresis in both

5   upper extremities.  Bilateral carpal tunnel syndrome.  And 11,

6   shoulder pain.  Carpal tunnel syndrome.  Neck pain.

7        MR. RICHMOND:  Those reports, those exhibits I

8   wanted to introduce, your Honor.  Mr. Maravich is saying those

9   are the exhibits that are in question.  We have other ones here

10   ready for the jury.

11        THE COURT:  Does the January 23rd report of Dr.

12   Catalano, or the October 8, '04 report, does he in there

13   express an opinion as to the cause of the injuries?

14        MR. RICHMOND:  No, he doesn't say the cause.  He did

15   question the written paper received, as numbness, no.  Because

16   normally they give a typewritten report.  These are only the

17   doctor's notes.  So they never supplied a written report of

18   when I was brought in.

19        THE COURT:  I didn't mean to interrupt you, this is

20   my ruling from an evidentiary standpoint.  He is going to be

21   permitted to testify, when you retake the stand, on the

22  question of injuries, to the extent you may have already done

23  so.  But it seems to me that any hand or wrist pain that he

24  testifies occurred immediately after the incident, you don't

25  need an expert for that.  That's common sense.  And any

34

1  continuing problem that you have in your hand or your wrist

2  allegedly as a result of that.  If your testimony is you didn't

3  have problems with your hand or wrist before, that you don't

4  need an expert for that.  But so you don't need an expert for

5  the cervicalgia and you don't need an expert to rule out carpal

6  tunnel syndrome.  But in both of these reports, one of them is

7  pain in bilateral upper extremities.  And paresis in both

8  extremities.  In my opinion there is a causal connection

9  between what allegedly occurred to you and those symptoms that

10  are at a different part of your body are such that it would

11  require some type of expert medical opinion.  So to the extent

12  you're going to testify to injury, it's going to be your hand

13  and your wrist, do you understand that?

14      MR. RICHMOND:  Yes, sir.  The report from October

15  8th of '04, which was faxed in, you didn't have it before,

16  that's one of the papers they just faxed?

17      THE COURT:  I have it.

18      MR. RICHMOND:  That does indicate at the bottom

19  about the wrist pain and that I received nerve block

20  injections.

21      THE COURT:  That's right, I just ruled on that.  All

22  right.  Take a seat -- actually, come on back up.  Those

23  documents are going to be admitted.  However, I'm going to give

24  an instruction to the jury that in terms of damages, they may

25  only consider the hand and wrist, not alleged paresis in the


                          35


1  upper arms.  All right.  So, for the record, then, those

2  documents are admitted.

3      MR. MARAVICH:  So the record is clear, I do have an

4  objection on the record to Exhibits 9, 10 and 11?

5      THE COURT:  To make it clear, state the basis on the

6  record?

7      MR. MARAVICH:  Your Honor, the basis for 9, 10 and

8  11, that has been identified as Plaintiff's Exhibits, there's

9  an objection, it's hearsay, calls for expert opinion --

10          THE COURT:  I didn't mean to interrupt you, I

11   apologize, I meant to say this before you were talking.  There

12   was an earlier hearsay objection.  In my opinion it's not

13   hearsay, it falls within the exception of the federal rules as

14   to medical records that are generated in the course of

15   treatment.  But go ahead, finish your objection so the record

16   is clear?

17          MR. MARAVICH:  That it was hearsay, that there's no

18   casual connection that has been established to submit these.

19   That there's been no expert opinion regarding these or as to

20   how these records read -- which connects the incident, which

21   was 2/28/99, and the injuries sustained of the hand injury, or

22   the hand and wrist injury to what these documents are purported

23   to say.

24          THE COURT:  Okay, very good.  Bring the jury back in

25   the courtroom.


                                36


1          (Whereupon, at 11:07 a.m., the Jury reenters

2   Courtroom C.)

3          THE COURT:  Members of the jury, sometimes the

4  wheels of justice grind quickly and sometimes they move a

5  little bit more slowly.  All right, go ahead.

6      MR. RICHMOND:  What I would like to do, members of

7  the jury, is I'd like to show you some exhibits.  The exhibits

8  that you're going to be seeing are from the date in question.

9  The first exhibit is from 28 February, 1999, and was prepared

10  by Nurse Ledwich.  Who is the first person who examined my

11  hand, and immediately after the incident.  It states, if you

12  take a look at the very top, the "inmate states the officer

13  slammed my hand in the pie hole."  This is a report was

14  prepared by the LPN, Nurse Ledwich, who examined my hand

15  immediately after the incident.  That's when my hand was

16  cleaned of the blood and a few photographs were taken, as I

17  mentioned to you earlier.  If you look down in the body of the

18  report, Nurse Ledwich identifies my injuries.  That there was a

19  right hand dorsal side at middle finger is red and swollen.

20  The middle of the right palm has a superficial -- he

21  characterized it laceration with skin removed.  The right wrist

22  has three superficial abrasions located on the inner aspect of

23  the wrist.  I'll let you take a look at the remainder of that.

24  It says the treatment rendered, that they cleaned off the site

25  or he cleaned off the sites.  He says I refused ice at the top

37

1  of my hand, which of course is not true.

2        The next exhibit that you're going to see was

3  prepared by Dr. Falor, he examined me the following day.

4        THE COURT:  For the jury's benefit, who is he?

5        MR. RICHMOND:  Dr. Falor is a prison physician.

6  I was seen by him the day after the incident, on March 1, '99.

7  His characterization of my injuries is starkly different from

8  Nurse Ledwich's.

9        THE COURT:  What is the number of the exhibit, do we

10  know?

11        MR. RICHMOND:  I believe it's 8, there's two pages

12  to eight.

13        THE COURT:  Is that it?

14        MR. RICHMOND:  Yes.

15        THE COURT:  What do you want to see on that

16  document?

17        MR. RICHMOND:  Right from where it says 3/1/99, at

18  8:25.  That actually is where the wound was cleansed.  They

19   applied a thin strip of antibiotics.  If you could go to the

20   following Exhibit 8.  Where it says at 8:05 -- there's two

21   entries, one is 8:25, the one you just saw, the other one is at

22   8:05 in the morning.  It says injured right hand on 2/28,

23   chronic low back pain.  If you look a little further down, he

24   characterizes it as trauma, and then "R" for right hand.  If

25   you put up the previous one -- if you don't mind, my point was


38


1   that after the doctor saw me, he ordered for my bandages to be

2   changed three times a day for five days.  That was starkly

3   different from Nurse Ledwich's characterization of my injuries,

4   which was I was able to move my wrist with  No problem, that I

5   returned to my cell.

6          If you'd put up Exhibit 6 now, ma'am.  Exhibit 6 is

7   a letter that I drafted to the specialist that I've been being

8   seen by --

9          THE COURT:  What is the date, just for the record,

10   is it dated?

11          MR. RICHMOND:  It's dated May 30th of 2004.

12          THE COURT:  All right, go ahead.

13          MR. RICHMOND:  That's a letter that I drafted to the

14   specialist, I've been being seen by a specialist at the

15   Neurological Institute of Western Pennsylvania.  I've been seen

16   by Dr. Rastogi and by most recently Dr. Catalano.  They're both

17   neurosurgeons, specialists that deal in neurological pains.

18   This is a letter where I requested copies of their reports and

19   recommendations from my visits.  As I mentioned to you earlier

20   in my narrative, I have seen specialists on about four

21   different occasions, and I received nerve block injections in

22   my wrists for the pain and injury that I sustained on February

23   of '99, at those consultations.  The next exhibit that you're

24   going to see is from -- I believe October of 2004.  It's just a

25   copy of a report and recommendation.


                              39


1          THE COURT:  From who?

2          MR. RICHMOND:  From Dr. Rastogi.  That's from

3   October of 2004, there were two that was before that, Ms.

4   Nicole.  One from April of '04, and there's one from July of

5   '04.  The three exhibits that you're about to see, ladies and

6   gentlemen of the jury, are from the specialists and their

7  reports and recommendations and objective findings.  You'll

8  notice that they do indicate that one of the reasons for the

9  consultation was to rule out bilateral carpal tunnel syndrome,

10  that's item three.  You'll also notice on this particular

11  report that one of the treatments that was prescribed was for

12  me to wear a wrist splint and to obtain additional reports,

13  item two.  In regards to my injuries.

14         Could you please show the next one, ma'am.  This is

15  report is from April of '04.  The diagnosis, if you'll notice,

16  is cervicalgia, because I do have some damage to my neck.  The

17  paresis in both of my upper extremities.  And bilateral carpal

18  syndrome.  If you take a look at the history, it says on the

19  last sentence that the nerve conduction study, electromyograph

20  report, showed mild bilateral carpal tunnel syndrome.  I am

21  alleging that in addition to the carpal tunnel syndrome and the

22  injuries I sustained to my hand are directly related to the

23  incident of February of '99.

24         Could you please show the next one, ma'am.  This

25  would be the last one.  This is from July, several months

40

1   after, the referring physician, Dr. Conforti, is a prison

2   doctor.  Kamal Rastogi is the specialist that I was seeing.

3   And it indicates that six nerve block sites were identified.

4   One each in the right lower suprascapular, which is just about

5   my shoulder blade area.  And that the bilateral median nerves

6   at the wrists.  So I received nerve block injections in both of

7   my wrists.  And you'll see the impression says it was for

8   shoulder pain, carpal tunnel syndrome and neck pain.

9        THE COURT:  Is that it?

10        MR. RICHMOND:  Yes.

11        THE COURT:  All right, go ahead.

12        MR. RICHMOND:  There was one, the last report you

13   had shown initially, ma'am, from October, it was the bottom

14   page.  That particular document is from October 8th of 2004.

15   Which would have been three months after the report you just

16   saw.  It indicates, it says there is cervical shoulder and

17   wrist pain.  That I received NBI or the nerve block injections.

18        MR. MARAVICH:  Objection, your Honor, on the same

19   grounds as the others, since this is not one of the documents

20   we discussed earlier, it's just been marked.

21        THE COURT:  All right, it's the same ruling for the

22   same reasons.

file:///A|/RICHDAY2.TXT

23    MR. RICHMOND:  It also says in that particular

24  report, part b, carpal tunnel, patient received procedure well.

25  And scheduled for additional treatments.  I'm not a nurse, so I

41

1  don't know some of the language in writing, but I believe one

2  of the members of the jurors is an LPN.  That's essentially it.

3  I wanted to include those exhibits to indicate that not only

4  was I injured on February 28th, but that I've continued to

5  receive treatment.  And, as I mentioned before, I'm on pain

6  medication and muscle relaxers three times a day for my

7  injuries.  And I believe that concludes my testimony.

8         THE COURT:  Is that the conclusion of your

9  testimony?

10        MR. RICHMOND:  Yes, sir.

11        THE COURT:  Mr. Maravich, you can now cross-examine

12  him.

13        MR. MARAVICH:  Thank you, your Honor.

14        MR. RICHMOND:  May I ask a question of the court,

15  your Honor?

16        THE COURT:  Yes.

file:///A|/RICHDAY2.TXT

17     MR. RICHMOND:  I was back in the back just a moment

18  ago, there's an actual wicket back there.  That's a fairly good

19  representation of what the wicket's slot door looks like.

20  There was some question, I figured I would at least pose it to

21  you.  Is it possible that perhaps the jurors can take a look at

22  the wicket to see what the wicket looks like, so that they have

23  maybe a more vivid picture of what actually we was dealing

24  with.

25     THE COURT:  I don't know, I have to take a look at


42


1  it myself.  We'd have to determine how similar it is.  I'll

2  have to take a look at it, I'll make a decision later on.

3  Let's go.

4     MR. RICHMOND:  Thank you.

5     MR. MARAVICH:  Your Honor, if he was going to

6  attempt to put this wicket portion into his direct -- then I

7  would probably make the suggestion that we take a look at that.

8     THE COURT:  No.  You're not going to lose anything

9  by it.  Nor is the jury going to have to make another sprint to

10  the jury room.  What I'm going to do is you do your

11  cross-examination.  Over the lunch hour, right after the lunch

12  hour, I'll go back and take a look at this with the court

13  reporter, to get a record.  I'll make a decision as to whether

14  it has any demonstrative value.  If it does, I'll let him

15  resume the stand only on that in there.  And you can

16  cross-examine him on that.  But for present purposes let's not

17  lose any more time.

18        MR. MARAVICH:  Yes, your Honor.

19              CROSS-EXAMINATION

20  BY MR. MARAVICH:

21  Q.   Good morning, Mr. Richmond.  The first thing I'd like to

22  do is just go through some of the exhibits that you've already

23  put into evidence.  Sir, you put into evidence marked as -- or

24  I'm sorry, you identified as Plaintiff's Exhibit 1 a misconduct

25  that you received, entitled A 149874, written by Officer Wilkes


                              43


1  and that you received, correct?

2  A.   That's correct.

3  Q.   What is a misconduct?

4  A.   What is a misconduct.  A misconduct is a report that is

5    generally written when there's a suspected infraction of a

6    prison rule or regulation.

7    Q.    Okay.  Turning your attention to Plaintiff's Exhibit 1,

8    where it says misconduct charges.  Do you see that in the

9    middle of the page?

10   A.    Misconduct charge, yes.

11   Q.    Okay.  And that reads "misconduct charged, Class 1 Cat A

12   #1A, assault, including any aggressive physical contact with a

13   potential for injury towards an employee.  Class 1 Cat A #7,

14   refusing to obey an order," correct?

15   A.    That's what it reads.

16   Q.    You were found guilty of misconduct, is that correct?

17   A.    I was alleged to have been found guilty, I never attended

18   a misconduct hearing, so I cannot attest to that.

19   Q.    Do you know if you were found guilty of that misconduct?

20   A.    No, I don't, sir.  As I said, I didn't attend a

21   misconduct hearing.

22   Q.    Did you receive any restrictions regarding that

23   misconduct?

24   A.    I can't recall.

25   Q.    There's a policy in place that talks about misconducts,

44

1   which allows you to appeal misconducts, did you appeal that

2   misconduct?

3   A.   I'm not sure if I did.

4   Q.   So you don't remember writing an appeal to appeal a

5   misconduct?

6   A.   I remember writing a grievance.  I remember -- I really

7   don't remember.  I can't say I do.

8   Q.   You don't remember writing an appeal to the misconduct?

9   A.   I'm not saying it didn't occur, I'm just saying I don't

10   remember.

11   Q.   You just mentioned writing a grievance, what's a

12   grievance?

13   A.   A grievance is a report when a person believes that

14   something is not going the way that it should according to

15   regulations.  If somebody does something wrong and say, for

16   instance, I don't get a meal and I should have received a meal,

17   then I can file an inmate grievance to complain about it.  It's

18   a complaint.

19   Q.   So it's filed by an inmate, correct?

20  A.    A grievance is typically filed by an inmate.

21  Q.    When you don't agree with something that's happening in

22  the institution, correct?

23  A.    Generally speaking, yes, sir.

24  Q.    That's totally different from a misconduct, correct?

25  A.    Those are two separate -- two separate items.


                                    45


1  Q.    You don't remember if you were found guilty of

2  misconduct, nor do you remember filing an appeal of a

3  misconduct; but you do remember filing a grievance, correct?

4  A.    I remember complaining about what happened to me, I can

5  say that.  And I contacted not only the institution, but I

6  contacted the headquarters of the Department of Corrections

7  about the incident and the way that it happened and what

8  happened to me, I remember that.

9  Q.    Regarding February 28, 1999, you admit that you had both

10  your hands outside your cell, correct?

11  A.    No, I do not admit that.

12  Q.    You admit that only one of your hands was outside the

13  cell, is that correct?

14   A.   I admit that I asked to speak to a senior staff officer,

15   I admit that I had received my meal tray.  I admit that I was

16   kneeling on the floor and I was waiting to be seen by a senior

17   staff officer while they were continuing to pass out meals.

18   I admit that Officer Wilkes assaulted me without provocation.

19   Q.   Well, how do you allege that he assaulted you?

20   A.   By slamming the wicket on my hand repeatedly over and

21   over again until he was joined by Officer McElravy and then by

22   Officer Bedilion.

23   Q.   Those are your allegations, correct?

24   A.   That's when I filed the complaint, that's what it's based

25   upon.


46


1   Q.   Sir, if your hands, as your allegations suggest, were

2   slammed in a wicket, then you have to admit that your hands

3   were outside your cell, don't you?

4   A.   I was kneeling down to receive my evening meal.  You have

5   to reach outside the cell to receive your meal, yes sir.

6   Q.   Okay.  So you admit your hands were outside the cell?

7   A.   You asked me to admit that both of my hands were outside

8  of the cell. I denied that. I said I was kneeling and my

9  right hand was outside the cell.

10  Q.    You didn't say that, but you said it now.

11        THE COURT: Don't editorialize.

12        MR. MARAVICH: I'm sorry, your Honor.

13  BY MR. MARAVICH:

14  Q.    You admit that you disobeyed a direct order to put your

15  hand back in the cell, is that correct?

16  A.    I was never given a direct order to put my hands back

17  into the cell.

18  Q.    You admit to causing a disturbance in the prison at this

19  time, don't you?

20  A.    I didn't cause a disturbance in the prison, no, sir, I

21  did not admit to causing a disturbance.

22        MR. MARAVICH: Your Honor, I'm marking what is going

23  to be Commonwealth's Exhibit A for identification purposes.

24  This is the official inmate grievance, dated 3/1/99, by Robert

25  Richmond.


47


1        THE COURT: All right.

2  BY MR. MARAVICH:

3  Q.   Sir, I have up on the projector what is purported to be

4  the official inmate grievance, dated 3/1/99, written by you,

5  Robert Richmond, DB-7852; do you recognize that?

6  A.   Yes, that's my handwriting.

7  Q.   And, sir, that's your signature as well, correct?

8  A.   That is my signature, yes, sir.

9  Q.   Okay.  Sir, before we go on, is this a second sheet that

10  was attached to that grievance?

11  A.    I'm not sure if it was attached to that grievance or

12  maybe there's another letter that I wrote.  But that is my

13  handwriting.  I'm not sure what that particular piece of paper

14  was attached to.  I can't say if it was attached to a

15  grievance, but I did write that document.

16  Q.    That's fine.  If you discussed this with another attorney

17  at your deposition and you verified it at the deposition that

18  it was attached or not attached, we can take that up later on,

19  how's that.  That is your handwriting, correct?

20  A.    That is my handwriting.

21  Q.    Looking at Commonwealth's Exhibit A, which is one sheet

22  which you've already identified that you wrote.  Does this

23  purport to describe the incident on 2/28/99?

24   A.    It purports to describe the incident, especially where it

25    says about the middle of the page, he returned, began without


                                    48


1    any provocation to slam my hand and arm in the slot.  When

2    unsuccessful and almost immediately, two other COs arrived and

3    continued the barbaric attempt to break my hand or wrist

4    without any regard for my safety, DOC policy or procedure, and

5    in full view of the entire FD-pod while shouting and yelling

6    and screaming in pain, yes.

7    Q.    Sir, how many times did they slam your hand in the

8    wicket?

9    A.    During my deposition I think I indicated anywhere from 20

10    to 25, maybe 30 times.  But my hand was repeatedly slammed

11    inside the wicket, and I wasn't able to pull it in.  I was

12    attempting to pull my hand --

13   Q.    While they --

14          THE COURT:  Hang on a second, let him finish, you're

15    talking over him.  Go ahead.

16          MR. MARAVICH:  Sorry, your Honor.

17   BY MR. MARAVICH:

file:///A|/RICHDAY2.TXT

18  Q.    Are you finished, Mr. Richmond?

19  A.    Sure.

20  Q.    Your allegations are that they continued to slam your

21  hand in the wicket 25 to 30 times, you did not pull your hand

22  in during that period?

23  A.    I couldn't pull my hand in, that's correct.  I was

24  attempting to pull my hand in and I wasn't able to get my hand

25  in until finally, you know, when I was able to get my whole --

49

1  it was kind of coming in a bit at a time.  I was on my knees

2  pulling my hand in, as pressure was being applied to the

3  wicket.

4  Q.    You don't admit to creating a disturbance today, do you,

5  we already asked you that?

6  A.    In this courtroom today?

7  Q.    Did you create a disturbance on that day?

8  A.    What are you asking me?

9  Q.    I'm sorry, I'll start over.  On 2/28/99, you created a

10  disturbance, did you not?

11  A.    No, I asked to see a senior officer.  As I mentioned

12  earlier in my narrative, that I don't know what it was

13  specifically for.

14  Q.    You didn't throw a cup --

15         THE COURT:  I'm going to ask you again, I know

16  everybody wants to, you think of a question, you want to ask

17  it.  You got to slow down because he can't get it all down.

18  And wait until he finishes asking before you answer it.

19         MR. RICHMOND:  Yes, sir.

20         THE COURT:  Go ahead.

21         MR. MARAVICH:  Sorry, your Honor.

22  BY MR. MARAVICH:

23  Q.    Do you admit to throwing a cup outside your cell?

24  A.    No, I didn't throw a cup, no, sir.

25  Q.    Do you admit to throwing your tray outside the cell?

50

1  A.    I didn't throw my tray.

2  Q.    You didn't do anything to create a disturbance outside

3  your cell?

4  A.    No, I did not throw my tray, I did not throw a cup.  It

5  says so right on the document that you're referring to.

6  Q.   Okay.  Well, why don't we turn to the document that I'm

7  referring to and I'm going to read to you what you've written

8  in the middle of the page.  It says "while kneeling on floor

9  with my arm on wicket door slot, I poured my Kool-Aid onto

10  floor and dropped my meal lid outside cell door while CO1 was

11  serving meals further down."  Does it say that?

12  A.   Yes, sir, it does.  And it not does say that I threw my

13  lid at anybody or threw a cup of liquid at anyone.

14  Q.   It does say these things occurred outside of your cell,

15  correct?

16  A.   Outside of my cell.

17  Q.   And would you agree that that's a disturbance outside

18  your cell?

19  A.   I wouldn't call it a disturbance, I would call it a

20  protest.  I was protesting, I was asking to get a full cup of

21  soup, I think is what I said on the report.

22  Q.   I understand you're not calling it a disturbance, you

23  already testified today that you did not create a disturbance,

24  correct?

25  A.   That's correct.

1   Q.   But the document seems to show that you admitted that a

2   disturbance was made back on 3/1/99, correct?

3   A.   On 3/1/99?

4   Q.   That's when you wrote this document, correct?

5   A.   That's when the document was written, that would have

6   been a day after the incident.

7   Q.   Sir, you told us today that you were suffering an injury

8   to your right hand, correct?

9   A.   That's correct.

10  Q.   Now, is that the only injury that you're suffering from?

11  A.   I don't know if I understand your question.  Is it the

12  only injury, I have some injury to my neck, also.  I have a

13  partially crushed disc at T-11 in my lower back.

14  Q.   Are those injuries you're alleging related to this

15  incident of 2/28/99?

16  A.   No, I have a copy of the X-ray report that indicates that

17  the partially crushed discs in my lower back has been there

18  for -- since maybe 1997 or 1998.

19  Q.   What injuries are you alleging occurred at this time at

20  this incident?

21  A.   I'm alleging that because of the excessive force that was

22  used against me by the officers, that my right hand, my arm, I

23  guess my right arm and my right hand have been injured.  I've

24  sustained neurological damage to them.

25  Q.   And, sir, I'm going to turn your attention to what you

52

1  have marked as Plaintiff's Exhibit 7.  Do you recognize what

2  you have marked as Plaintiff's Exhibit 7, which is a medical

3  incident/injury report, dated 2/28/99, at approximately 1605

4  hours; do you recognize that?

5  A.   That was prepared by the nurse that examined me shortly

6  after the incident.

7  Q.   And there, as you've already testified on the record, it

8  says "inmate states that the officer slammed my hand in the pie

9  hole," is that correct?

10  A.   That's correct.

11  Q.   And then down at the bottom it indicates that your right

12  hand, is what you're alleging was injured, correct?

13  A.   That's correct, yes, sir.

14  Q.   And you've talked about some pictures on your right hand.

15  I'm going to show you two pictures --

16        MR. MARAVICH:  May I approach, your Honor?

17        THE COURT:  You don't have to ask permission.  Have

18  they been identified yet, Mr. Maravich?

19        MR. MARAVICH:  They are not yet, your Honor, I'm

20  going to identify them.

21  BY MR. MARAVICH:

22  Q.   Can you take a look at those, take your time if you need

23  to.  Sir, I've shown you two pictures.  Now, for identification

24  purposes, they are marked Commonwealth's Exhibit B and

25  Commonwealth's Exhibit C.  Commonwealth's Exhibit B purports to


                           53


1  be a picture of Inmate Richmond's, DB-7852, hand, right hand,

2  with palm facing out, is that correct?

3  A.   That's correct.

4  Q.   Is that a picture of your hand?

5  A.   That's a picture of my hand.

6        THE COURT:  Keep your voice up, sir.

7        THE WITNESS:  That is a picture of my hand, yes,

8  sir.

9   BY MR. MARAVICH:

10  Q.   I'm showing you what has been marked as Commonwealth

11  Exhibit C, this is purported to be Inmate Richmond, I believe

12  it's DB-7852, a picture of his hand from 2/28/99, the right

13  hand, palm down; is that your hand, sir?

14  A.   That is my hand, yes, sir.

15       MR. MARAVICH:  Your Honor, may I distribute these to

16  the jury?

17       THE COURT:  You may.

18       (Whereupon, Commonwealth's Exhibits B & C were

19  published to the Jury.)

20       THE COURT:  What were the dates on those

21  photographs, Mr. Maravich?

22       MR. MARAVICH:  2/28/99, your Honor.

23  BY MR. MARAVICH:

24  Q.   Sir, those pictures were taken on 2/28/99, is that

25  correct?


54


1   A.   That's correct.

2   Q.   That is the date of the incident, is that correct?

3  A.   That's correct.  If I might add, it's also correct that

4  my hand has been cleaned, wiped clean before those photographs

5  were taken.

6  Q.   I see you've added that.  Sir, do you remember having

7  your deposition taken in this case?

8  A.   Yes.

9  Q.   And when was that deposition conducted?

10  A.   September 29, 2003.

11  Q.   2003?

12  A.   2003.

13  Q.   And at that time you were discussing your injuries,

14  correct?

15  A.   That's correct.

16  Q.   And whether your injuries have healed from this incident,

17  correct?

18  A.   I'm not sure of the entire discussion, I can't say.

19  Q.   Well, can you see this?

20       THE COURT:  What page are we on just for the record?

21       MR. MARAVICH:  Your Honor, we are on page 34 of the

22  deposition of Robert A. Richmond.  As Mr. Richmond has already

23  said, it was conducted by an attorney in our office on

24  September 29, 2003.

25          THE COURT:  All right.


                                55


1  BY MR. MARAVICH:

2  Q.   Sir, as you were discussing your injuries, it was asked

3  of you "was it eventually permanently healed?"  Your response,

4  "no, it's not permanently healed.  I have some nerve damage to

5  my left hand and there's some damage to my right hand.  There's

6  some numbness."  Sir, how did you suffer damage to your left

7  hand if you didn't have both hands out of the cell on 2/28/99?

8  A.   How did I suffer damage to my left hand -- could you

9  repeat that just a little slower so I can understand what

10  you're saying -- how did I receive damage to my left hand if I

11  didn't have both of my hands out of the cell, is that your

12  question?

13  Q.   Yes, sir.

14  A.   My response to that, Mr. Maravich, would be that the

15  damage and the numbness to my left hand and my left extremity

16  is directly related to the damage I have to my neck.  I have

17  some damage to my neck at C-4, 5, 6 and 7.  And I have an X-ray

18  report that will verify that.  That is where the damage for my

19  left hand comes from.  The damage to my right hand and the

20  numbness associated with my right side is from the injury that

21  I sustained on 2/28/99.  They're two separate injuries.

22  Q.    But at your deposition you were talking about an injury

23  to your left hand based on this incident?

24  A.    I said there's some numbness, there's some damage, some

25  nerve damage to my left hand and some nerve damage -- would you

56

1  mind showing it to the jury again, to my right hand.  Which

2  there is.  As a matter of fact, as a footnote in the exhibit

3  that I just provided to the jury, it says bilateral, carpal

4  tunnel syndrome.  It says paresis.  And in both upper

5  extremities, meaning both my left and my right hands.

6  Q.    That's what you believe bilateral means, two hands, is

7  that correct?

8  A.    How do you determine, define bilateral?

9  Q.    I'm asking you, is that to you what bilateral means?

10  A.    That's my understanding, that's what the specialists have

11  told me.

12  Q.    And the date that the medical injury report only

13    indicates that the injury occurred to the right hand, correct?

14    A.    That's right.  That's the hand that was injured on that

15    day.

16    Q.    The grievance you wrote on that day didn't indicate that

17    you had any injuries besides your right hand, is that correct?

18    A.    I didn't refer to my left hand because my left hand was

19    not injured on the 28th of February.  It was my right hand.

20    Q.    Sir, did you grab Officer Wilkes?

21    A.    At no time did I grab Officer Wilkes, no, sir.

22    Q.    You never projected anything outside your cell, is that

23    correct?

24    A.    I never threw anything outside my cell.  As it was

25    indicated in the misconduct report, they said or he said,


57


1    Officer Wilkes described the misconduct as I threw my tray lid

2    and a cup of juice at him and Officer McElravy.  That is simply

3    not true.

4    Q.    It would seem you're playing semantics.

5          THE COURT:  Hang on a second, ask questions, do not

6    editorialize.

7          MR. MARAVICH:  Yes, sir.

8          THE COURT:  I'm not going to tell you again on that.

9   Go ahead.

10         MR. MARAVICH:  I apologize, your Honor.

11  BY MR. MARAVICH:

12  Q.    Where did the tray lid end up?

13  A.    Outside of my cell, right in front of my cell on the

14  floor.

15  Q.    Did one of the officers throw it there?

16  A.    No, on the misconduct or the grievance, rather, I

17  apologize, on the grievance that I wrote the day after, I

18  admitted that I dropped the tray lid.  The normal procedure is

19  that before the meal trays are given to you, normally the tray

20  lids are removed and the inmate is normally not given a tray

21  with a lid on it.  If I had my tray perhaps when my meal was

22  given to me, I had the entire tray.  I dropped the tray lid

23  outside of my cell on the floor.

24  Q.    And pouring the juice on to the floor?

25  A.    Just a little bit of juice that I poured out on to the

58

1   floor, I never threw anything at anybody.  And I admitted that

2   in the grievance the day that I filed it, one day after the

3   incident.

4       MR. MARAVICH:  Your Honor, at this time I have no

5   further questions.

6       THE COURT:  All right.  Do you have anything very

7   briefly, this would be your redirect.  Do you have anything

8   else you want to say before you get off the stand?

9       MR. RICHMOND:  No.  The only thing that I'd like to

10  say is that when the incident occurred, I did not throw a tray

11  lid or a cup of juice at Officer McElravy or Mr. Wilkes as

12  described in the misconduct report.  I did not grab Officer

13  Wilkes at anytime on his forearms.  Officer McElravy never

14  applied a control technique to release my left or right hand

15  from Officer Wilkes' forearm.  And Officer Bedilion never

16  applied a control technique to release my other hand from the

17  officer's forearm.  They viciously, without provocation,

18  Officer Wilkes initiated, for lack of a better word, the

19  attack, when he ran up to my cell and began slamming my right

20  hand inside of the wicket.  And until I could pull it in, while

21  I was kneeling on the floor, I wasn't able to get my hand in

22    for several seconds or a minute or so, and I was injured as a

23    result.

24         THE COURT:  All right.  You can step down.

25         MR. RICHMOND:  Thank you, your Honor.


                              59


1         THE COURT:  Members of the jury, it is like 11:53,

2    I'm not going to start another witness right now and then break

3    in six minutes.  We're going to go to lunch and I would ask

4    that you be back and ready to go at 1:15.

5         (Luncheon recess from 11:54 a.m.; until 1:10 p.m.)

6         THE COURT:  Let the record reflect that we are

7    inside, we are now inside the holding area just off my

8    courtroom at the Federal Courthouse.  And Mr. Richmond has

9    indicated that he wanted the jury to be able to view what he

10   claims to be is a wicket or opening device in the door here

11   which is similar to what was at SCI-Greene at the time of the

12   incident.  Mr. Richmond, do you want to describe how it is

13   similar?

14         MR. RICHMOND:  It's similar in the fact it's about

15   16 to 18 inches long, it's about four to five inches in height.

16    And the door itself opens, actually folds down.  That is the

17    slot where meals are passed through.

18        THE COURT:  Does the door at SCI-Greene open in the

19    same fashion that this wicket does?

20        MR. RICHMOND:  Very similar.  I don't know if this

21    one locks in place upright or comes all the way down, I haven't

22    seen it open, I can't say.  It's very similar.

23        U.S. MARSHAL BARTON:  Your Honor, very rarely do we

24    use it, we don't feed meals in here.

25        THE COURT:  That doesn't open?


                                    60


1        U.S. MARSHAL BARTON:  I don't have the key down here

2    with me.  This simply drops down and rests here against the

3    bottom.

4        THE COURT:  I understand at SCI-Greene the wickets

5    slide up and slide down, is that incorrect?

6        MR. RICHMOND:  No, sir.  It folds down.

7        THE COURT:  Would it open like this, (indicating)?

8        MR. RICHMOND:  Yes, sir.

9        THE COURT:  Is this similar to the arrangement, to

10  what you have at SCI-Greene?

11      MR. MARAVICH:  Yes, your Honor.  The only exception

12  is the ones down here are quite a bit wider.  I mean the height

13  is about right in the door, except they're longer.

14      THE COURT:  That having been said, what would be the

15  purpose in having the jury see this?

16      MR. RICHMOND:  I wanted them to see this particular

17  one, this isn't opened now.  To understand that essentially I

18  was in my cell kneeling down when they were serving the meals.

19  My hand would be on the ledge in some fashion or another.  When

20  I'm alleging that Officer Wilkes came in and started slamming

21  my hand.  My hand would have been outside this wicket, I was

22  pulling my hand back in.

23      THE COURT:  With the exception of the length of the

24  opening here being somewhat shorter than the length of the

25  opening at SCI-Greene, aside from that, does this grossly


61


1  approximate the same system used at SCI-Greene?

2      OFFICER WILKES:  Yes, it does, your Honor.

3      THE COURT:  It does?

4          OFFICER WILKES:  Yes, your Honor.  This would all be

5    closed, with the exception there's two windows about three-feet

6    in length.  And then this would all be enclosed.

7          THE COURT:  This is what I'm going to do.  I'm going

8    to let the jury come back here.  I'm going to tell them there

9    has been an agreement between the parties that, I'm not talking

10   about the rest of the door, that the feeding area here, with

11   the exception of it being somewhat shorter in length than the

12   one at SCI-Greene, is very similar to the same mechanism used

13   there, and let the jury look at it.  And that's it.

14          MR. MARAVICH:  If I may say right now, though,

15   before we do that, I would like to see the apparatus opened.

16          THE COURT:  We're not going to have any testimony

17   here, this is just so the jury can visually see it.  There's

18   already been testimony about what occurred.  Okay.

19          (Whereupon, a brief recess was taken.)

20          THE COURT:  Now, the Marshal just opened what I call

21   the wicket gate, for lack of a better term.  Is that how yours

22   works at SCI-Greene?

23          MR. MARAVICH:  Yes, sir.

24          THE COURT:  Is that how it works at SCI-Greene?

25          MR. RICHMOND:  Yes, to my recollection.

62

1        THE COURT:  I want to be as precise with the jury as

2   I can.  They're going to see it like that.  How much shorter is

3   the length of this open space in front of the wicket than it is

4   at SCI-Greene?

5        MR. MARAVICH:  I would say four to six inches.

6        OFFICER WILKES:  Two inches on each side.

7        THE COURT:  Do you agree that at the SCI it's about

8   two inches on either side longer, roughly?

9        MR. RICHMOND:  No, I would say this is about 16

10   inches.  It may be an inch shorter, not longer.  It's about the

11   right size, about an inch longer.

12        MR. MARAVICH:  Your Honor, if I may.  Since we have

13   only this wicket and opening in front of us, for the record we

14   could just measure this wicket, so they know the length of this

15   wicket that we're seeing and its opening.

16        THE COURT:  Do we know for sure precisely the length

17   of the wicket opening at SCI-Greene?

18        MR. MARAVICH:  No, your Honor.  That's been

19   presented one way by the inmates and one way by us.

20          THE COURT:  What I would propose to say, I'm going

21  to bring the jury in and say that the parties agree as to the

22  general configuration of the wicket space.  However, there's a

23  disagreement between the parties as to the length, and leave it

24  at that.

25          MR. MARAVICH:  That's fine.


                                63


1          THE COURT:  You can argue about it out there.  All

2  right, let's bring the jury back.

3          (Whereupon, the Jury is escorted back into the

4  Marshal's holding cell area.)

5          THE COURT:  The record should reflect now that I

6  have brought the jury back into the holding cell area for the

7  purpose of a view.  Members of the jury, the purpose of this is

8  to give you some sense as to some of the physical

9  characteristics of the wicket and the wicket mechanism.  The

10  parties, that is Mr. Richmond and the defendants, having looked

11  at this and generally agree that the wicket area that you see

12  in front of you is similar in design and function to that which

13  appeared at SCI-Greene.  The folding portion, as you see it, is

14  also similar to the way it works at that institution.  The only

15  material point that the parties disagree on, the question for

16  you to resolve as the finders of fact, while there appears to

17  be some general agreement as to the width of the opening, there

18  is disagreement as to whether the length that you see in front

19  of you, the length of the opening accurately depicts what

20  existed at SCI-Greene.  Okay.

21          MR. MARAVICH:  Your Honor, may I add?

22          THE COURT:  You may.

23          MR. MARAVICH:  While we're seeing it opened with the

24  view -- can we either lift it or show the functionality of it?

25          THE COURT:  The Marshal just did it


                             64


1           U.S. MARSHAL BARTON:  It's fairly heavy, this is

2  solid steel.  It simply moves this way.  You can push it in and

3  it locks here.

4           THE COURT:  Just so I'm clear once again, Mr.

5  Richmond, you agree that the wicket door at SCI-Greene folds up

6  in the same fashion as this door just folded up when

7  demonstrated by the Marshal, is that correct?

8          MR. RICHMOND:  Yes, your Honor.

9          THE COURT:  And the defendant agrees with that as

10  well, is that right?

11          MR. MARAVICH:  Yes, your Honor.

12          THE COURT:  All right, let's continue out in the

13  courtroom.

14          (Whereupon, at 1:35 p.m., proceedings recessed in

15  the holding cell area; and at 1:38 p.m., reconvened in the

16  Courtroom.)

17          THE COURT:  All right, Mr. Richmond, call you next

18  witness.

19          MR. RICHMOND:  Your Honor, I would call Christopher

20  Kaminski.

21          THE COURT:  All right, Mr. Kaminski tell my court

22  reporter your full name and spell it for him?

23          THE WITNESS:  Christopher Kaminski.

24  C-h-r-i-s-t-o-p-h-e-r, K-a-m-i-n-s-k-i.

25          CHRISTOPHER KAMINSKI, PLAINTIFF WITNESS, SWORN


                                65


1                    DIRECT EXAMINATION

2  BY MR. RICHMOND:

3  Q.    Good afternoon.  Mr. Kaminski, could you please state

4  your full name for the record again, sir?

5  A.    Christopher Kaminski.

6  Q.    And, Mr. Kaminski, were you present at SCI-Greene on the

7  day of the incident, February 28, 1999?

8  A.    Yes, I was.

9  Q.    Were you housed on the same pod as the incident occurred?

10  A.    Yes.

11  Q.    Earlier there was some discussion about the fact that

12  this case, being that it occurred in 1999, it's taken quite

13  sometime to actually come to trial.  The case was initially

14  scheduled for trial back in December of 2003.  Did you receive

15  at that time a notice to testify in reference to a civil

16  action?

17  A.    On December 9th I was ordered by a block officer to pack

18  all my belongings up, I was going to be transferred ATA.  I

19  didn't know where I was going until I got up here.  The 10th,

20  that's when I found out I was going to court for Richmond,

21  because he was still upstairs, I didn't know, he was here.  I

22  never did it make it court.  Because I had trouble getting my

23   diabetic medication.  The COs kept on disrespecting me and

24   things like that.  Pulled me out, kept me out of my cell,

25   jumped on me --


                                66


1    Q.   If I could stop you for a moment, Mr. Kaminski.  I think

2    for the understanding for the jurors, Mr. Kaminski is referring

3    to being transferred ATA, where were you assigned when you

4    received notice that you were to appear in court?

5    A.   Somerset.

6    Q.   You were assigned at SCI, State Correctional Institution

7    at Somerset?

8    A.   Yes.

9    Q.   You received notice that you were to testify on my behalf

10   at trial that was scheduled initially for December of 2003, is

11   that correct?

12   A.   I didn't know none of that until I got to --

13         THE COURT:  Let me make a suggestion just by moving

14   this along.  What happened in 2003 is not germane.  Let's roll

15   the tape forward, this witness is here now.  I presume he's

16   prepared to testify about the events that bring us here, is

17   that right?

18         MR. RICHMOND:  Yes, sir.  And the only reason that

19   I'm stating that it is germane to the incident is because in

20   2003, Mr. Kaminski, while assigned to SCI-Albion, awaiting to

21   go to trial, he was assaulted by several correctional officers.

22         MR. MARAVICH:  Objection, your Honor.

23         THE COURT:  Sustained.

24         MR. RICHMOND:  And he in turn filed a complaint.

25         THE COURT:  Let me see you at side bar.


                              67


1          (At side bar on the record.)

2          THE COURT:  Tell me in your own words what this

3    witness would say about being assaulted at SCI -- where was it?

4          MR. RICHMOND:  At SCI-Albion, just as we are now.

5    In 2003 when the case was initially called --

6          THE COURT:  You were allegedly assaulted or there

7    was excessive force was employed against you at SCI-Greene, is

8    that right?

9          MR. RICHMOND:  That's correct.

10         THE COURT:  What is the relevance?

11          MR. RICHMOND:  Two days before we were scheduled to

12   appear for trial for the case in 2003, Mr. Kaminski, because he

13   was testifying on my behalf, was assaulted by several

14   corrections officers.

15          THE COURT:  These aren't the same defendants -- in

16   other words, the corrections officers there are not the

17   corrections officers that are defendants in this case, are

18   they?

19          MR. RICHMOND:  No, sir.

20          THE COURT:  Sustained.

21          MR. MARAVICH:  While we're here, based on already

22   what's come into evidence, I would ask for an offer of proof

23   regarding what this witness is going to say because it sounds

24   like he already said he was downstairs.

25          THE COURT:  Tell me as much as you can, tell me what


                                    68


1   do you believe this witness will say about his observations on

2   the day in question and at SCI-Greene?

3          MR. RICHMOND:  He was directly across from my cell

4   on the day of the incident.  He witnessed the entire incident.

5           THE COURT:  When you say directly cross, was he to

6  the side of you or --

7           MR. RICHMOND:  I mean directly across the tier.

8  It's about 12 to 15 cells.

9           THE COURT:  All right.

10          (End of discussion at side bar.)

11          THE COURT:  Members of the jury, before we go on

12  with the questioning, there was some questions about assaults

13  in 2003 at some other place.  Disregard all that, it has

14  nothing to do with this case.  Go ahead.

15  BY MR. RICHMOND:

16  Q.   Regarding the incident of February 28, 1999, Mr.

17  Kaminski, you say that you witnessed the actual incident from

18  the beginning to the end, is that correct?

19  A.   Almost all of it, yeah.

20          THE COURT:  Sir, keep your voice up a little bit.

21          THE WITNESS:  Almost all of it.

22  BY MR. RICHMOND:

23  Q.   In your own words and could you go a little slow and be

24  as precise as you can for the jury, can you describe to the

25  jury what you witnessed actually take place on 28 February,

69

1   1999, from the beginning of what you saw until the end of the

2   incident?

3   A.    Okay.  It was suppertime.  Usually the workers come in

4   first with food carts, half of them they take the trays

5   upstairs, half of them they leave them upstairs.  Really

6   there's like two COs upstairs to pass the food around.  One

7   open the slots, one puts the tray in and takes the lid off.

8   Put the lid on the floor by the front of the door.  The two

9   downstairs are doing the same thing.  Richmond, I was standing

10  at my door, if you don't stand at your door, you don't eat,

11  they just go passed your cell.  So you have to stand at your

12  door to get them to open up the door.  They opened the doors

13  up, Richmond had his hand out the door.  I couldn't understand

14  what he was saying, but I guess he wanted to see somebody,

15  something like that, I couldn't hear him.  He received his tray

16  and waited for the food carts -- the tray's this way

17  (indicating), on the cart.  And the juices are about this big

18  (indicating), like this here, it sits like this here on the

19  cart (indicating).  And juice on the floor comes from the juice

20  from the top of the lids, they slide off, through the cart.  If

21  he would have threw the lid off the thing, it would have landed

22  on the bottom tier.

23        THE COURT:  Sir, really try to enunciate, I'm having

24  some difficulty hearing you.

25        THE WITNESS:  I'll slow down a little bit.


                                70


1        THE COURT:  Keep going.

2        THE WITNESS:  When they come with the food carts,

3  okay, the trays, the CO, the guy that runs the block will go

4  around and open up the doors.  The other guy will pull the cart

5  up and start putting trays out.  He puts the tray on the food

6  slot, takes the lid off.  You never receive the lids.  The lids

7  are off, are always thrown on the floor outside the door.  You

8  get this tray and everything like that.  He still asked to see

9  somebody, he was yelling about seeing somebody, he walked over,

10  I don't know the names --

11        THE COURT:  Hang on a second.  You're saying he, if

12  you know the name, use it, use the name.  If anybody is in

13  court that you recognize as having been there or involved, you

14  can identify them even if you don't know their name.

15        THE WITNESS: Okay.  At the time he gave Richmond,

16   this guy in the middle, Wilkes, gave Richmond his food tray.

17   He moved on to the next cell.  That's how you do it, give the

18   food tray, you move on to the next cell.  Richmond still had

19   his hands down there, he came back and told him to put his hand

20   in so he could lock the doors.  Okay.  I couldn't understand

21   what was going on here.  They don't usually give orders.  They

22   just get the slot like that there, when they do that there, you

23   pull your hands in, (indicating).  That's really usually how

24   everything happens there.  They put the slot up, he caught his

25   hand in it.  They were holding his hands up in there.  The


71


1   other one came up there and was putting pressure on, pressure

2   on it, stuff like that.  If you notice the locks out here,

3   they're a little different, the locks up there the edges are

4   real sharp.  If you put your hand up, put the slot up, your

5   hands automatically move.  From moving, you get caught, you

6   always get cut here or here (indicating), or on the palm here,

7   up in here, from the doors.  Everybody gets cut like that when

8   they do this kind of stuff.  It happens like two, three times a

file:///A|/RICHDAY2.TXT

9  week up there in Erie County.  What he did, he probably cut his

10  hand on the bottom of the lock.  Because when he pushes the

11  door up, your hands slide, but you catch it, that's why he

12  probably got cut.  They kept putting pressure on the door -- at

13  the end they did the thing, his hand was going in, but they

14  didn't have a hold of his hands.

15  BY MR. RICHMOND:

16  Q.    If I might interrupt you, Mr. Kaminski, you were

17  describing the incident as you saw it?

18  A.    Yeah.

19  Q.    Can you tell the jury who in fact initiated the use of

20  force; when did the use of force begin and who was the actor

21  that initiated this incident, in terms of the use of force?

22  A.    The first one that started to push on the wicket was

23  Wilkes.  Wilkes there, he was the first one.  And then

24  McElravy, whatever his name is, he come up, he was putting

25  force, putting force on it like this here, (indicating),


72


1  putting pressure on it so he could swing his hands in.

2         THE COURT:  Excuse me, Mr. Kaminski, you have to

3  describe for the record the movement you were just making with

4  your two hands because the court reporter can't get that down

5  unless you do that?

6        THE WITNESS:  I'm sorry.  He put pressure on the

7  tray door like that there, so when the pressure is going on

8  your arms, inmates usually slide their hands in, so they could

9  shut the wicket door.  But on him they just were pressing,

10  putting pressure on it, not coming down or away with it.

11  That's what caused cuts and everything on his hand from the

12  bottom of the lock.

13  BY MR. RICHMOND:

14  Q.    You indicated that Officer Wilkes had initiated the

15  incident or the use of force and that was followed by Officer

16  McElravy, is that correct?

17  A.    Yes, sir.

18  Q.    At what point did Officer Bedilion take part in the use

19  of force or this incident at all?

20  A.    To tell the truth, he was the one -- what's his name,

21  Officer Bedilion?

22  Q.    Officer Bedilion.

23  A.    I think he had the key in the thing, to lock the door,

24    you have to turn the key.  I think he had the key to the door.

25    Q.    Did you see Officer Bedilion at any time use force

73

1    against me during this incident?

2    A.    There would have been no room.

3    Q.    Did you witness Officer Bedilion when he initially

4    responded to the incident, while Officers Wilkes and McElravy

5    were already using force against me?

6    A.    Yeah, he, McElravy, whatever his name is, came up on the

7    other side to the right --

8        THE COURT:  Let's get his name.

9    BY MR. RICHMOND:

10    Q.    You're saying Officer McElravy?

11    A.    No --

12    Q.    Officer Bedilion?

13    A.    Yeah.

14    Q.    Okay.  Where did he come from, do you recall where he

15    came from?

16    A.    He was downstairs passing trays out.

17    Q.    And when the use of force began, if I may repeat, you

18  said that Officer Wilkes initiated the use of force, is that

19  correct?

20  A.   Yes.

21  Q.   And he was joined by Officer McElravy, is that correct?

22  A.   Yeah.

23  Q.   When did Officer Bedilion respond to the incident?

24  A.   It would be about a minute later.

25  Q.   You indicated that he came from downstairs?

74

1  A.   Yes.

2  Q.   To the upstairs area?

3  A.   He was downstairs passing out trays, by the time he ran

4  up the steps and that, that was about a minute.

5  Q.   What did you witness Officer Bedilion doing at that time?

6  A.   He ran all the way up towards the end of the block, he

7  was on the right.  He had a key in his hand.  I think he put

8  the key into the lock, so when you move it, you could shut it

9  real fast.

10  Q.   Did you witness him at any time using force to force my

11  hands back into the cell or to apply or employ force on the

12   wicket by pushing the wicket?

13   A.   No.

14   Q.   You didn't witness that?

15   A.   No.

16   Q.   Did you witness --

17   A.   There are too many people in front of the door.  I just

18   seen the key, he had a key in his hand and reached over to put

19   the key in the lock.

20   Q.   Physically where was your cell located at when you

21   witnessed these things?

22   A.   Straight across.  I'm straight across.

23   Q.   How many feet would you say, if you were to take a guess,

24   were you away from the incident?

25   A.   Here to the exit sign on the wall back there.


75


1   Q.   It was about -- if I may say, about 30 feet away?

2   A.   Yeah, about.  About 30-feet straight across.

3   Q.   After the wicket was secured, did you notice anything

4   that took place after that?

5   A.   I'd say about 20, 25 minutes later, they came and got you

6    out.  Took you out and a couple workers came up there and

7    started wiping up.

8    Q.    Have you had any prior dealings with Officer McElravy or

9    Officer Wilkes or Officer Bedilion before?

10   A.    Not that bad.  But I had dealings with them.

11   Q.    When did you arrive -- do you recall when you initially

12   arrived at SCI-Greene?

13   A.    '98 something.

14   Q.    And when did you depart SCI-Greene -- what institution

15   were you transferred to when you departed?

16   A.    Somerset.

17   Q.    You were transferred to SCI-Somerset?

18   A.    Yeah.

19   Q.    Where are you presently assigned to?

20   A.    SCI-Dallas.

21   Q.    As a material witness in the incident, you arrived here

22   from SCI-Dallas, you were transferred to SCI-Albion, is that

23   correct?

24   A.    Yes.

25   Q.    What date were you transferred to SCI-Albion for your

76

1   testimony today?

2   A.   The 7th.

3   Q.   If I'm correct in my recollection, you have to go before

4   a review committee when you arrive at a new institution and

5   they tell you essentially why you're being transferred, whether

6   it's temporary or permanent, is that correct?

7   A.   Yes.

8   Q.   Did you attend a meeting such as I've described?

9   A.   Yes.

10         MR. MARAVICH:  Objection, relevance.

11         THE COURT:  Sustained, it's irrelevant.

12         THE WITNESS:  Yes.

13         THE COURT:  It's irrelevant on this subject.  Go to

14   your next question -- if you have another question?

15         MR. RICHMOND:  Yes, I do.

16         THE COURT:  Go ahead.

17   BY MR. RICHMOND:

18   Q.   How would you characterize the incident as you saw it, I

19   mean in your own words, was there forced used, was it excessive

20   force, was it --

21         MR. MARAVICH:  Objection, leading.

22          THE COURT:  Sustained.  It calls for a conclusion

23   that's for the jury.  He already testified to what he observed,

24   it's repetitive, it's sustained.

25          MR. RICHMOND:  I don't have any further questions.


                                    77


1          THE COURT:  Thank you, Mr. Richmond. Mr. Maravich,

2   do you have some cross-examination?

3          MR. MARAVICH:  Yes, your Honor.

4                    CROSS-EXAMINATION

5   BY MR. MARAVICH:

6   Q.   Mr. Kaminski, you said originally that Mr. Richmond was

7   upstairs on February 28, 1999, is that correct?

8   A.   Yes.

9   Q.   And based on you saying those words, were you downstairs?

10   A.   No, sir, I was upstairs in 21 cell.

11   Q.   You testified today that Mr. Richmond had his hand

12   outside the door, is that correct?

13   A.   Yes, I did.

14   Q.   When you mean outside the door, do you mean outside the

15   wicket?

16  A.   Right, on the wicket about that much, hanging off the

17  wicket, (indicating).

18       THE COURT:  The record should reflect that the

19  witness has his right hand in a perpendicular fashion a few

20  inches above his wrist.  Go ahead.

21  BY MR. MARAVICH:

22  Q.   Sir, you testified earlier today that if Mr. Richmond

23  would have thrown the lid out, it would have fallen to the

24  bottom of the tier; do you remember saying that, sir?

25  A.   Yes, I did.


                              78


1  Q.   You weren't ever asked a question about any lid, what lid

2  are you talking about?

3  A.   I'm talking on the trays, they're always a cover.  Every

4  time the CO puts a tray in the slot, the CO always takes the

5  cover off, puts it right down by the door.

6  Q.   Why did you bring this lid up on your own?

7  A.   He asked about the trays.

8       THE COURT:  Hang on a second, sir.  See this fellow

9  right here --

10          THE WITNESS:  Sorry.

11          THE COURT:  Well, he's got to get it down, slow down

12    a little bit, wait until he finishes before you start

13    answering.  Go ahead, ask the question again.

14    BY MR. MARAVICH:

15    Q.    Sir, why did you bring up the lid on your own when you

16    weren't asked about it?

17    A.    He asked me how you served the trays.  I told exactly him

18    how they serve the trays.  In order to get the tray, the CO

19    takes the lids off the tray, puts it --

20          THE COURT:  You're going too fast.  Do you always

21    talk that fast?

22          THE WITNESS:  Yes.

23          THE COURT:  If you always do, try to slow down at

24    least here.  Start that explanation over again and try to slow

25    down.


79


1          THE WITNESS:  Okay.  When the COs put the tray on

2    the pie hole or tray slot or what they call it, the CO always

3    takes the lid off.  The lids never go inside the cell.  The CO

4   always puts the lid in front of the cell on the outside.  Okay.

5   He asked me how they did this thing, that's why I mentioned the

6   thing.  If he would have thrown the lid, the lid would have

7   went over the tier.  There's only about, I'd say about four

8   feet of the walkway up there.  With the carts, there ain't no

9   room with the cart there.

10  BY MR. MARAVICH:

11  Q.    Sir, you testified that you are presently at SCI-Albion,

12  is that correct?

13  A.    Yes.  Right now, yeah.

14  Q.    Did you meet with Mr. Richmond at SCI-Albion on Sunday?

15  A.    I met him on Sunday for about an hour and 40 minutes.

16  Q.    Where did you meet him?

17  A.    In the library.

18  Q.    Did you talk about this case?

19  A.    Yes, we talked about the case.  He showed me the

20  documents, what he had and everything like that, that was it.

21  Q.    Sir, earlier you testified that too many people were in

22  front of the door for you to see exactly what happened, do you

23  remember saying that?

24  A.    Yes, I did.

25  Q.   How many people were in front of the door?

80

1  A.   There was three COs.

2  Q.   Three COs were in front of the door?

3  A.   Yes.

4  Q.   And was that blocking your view of the wicket?

5  A.   Towards the end, yes.  But at the beginning, no.

6  Q.   Have you discussed this case with Mr. Richmond after you

7  discussed it with him on Sunday for about an hour and 45

8  minutes?

9  A.   No.  When we talked Sunday, we talked Sunday.  In here,

10  you hear everything that goes on in here.  When you're out in

11  this room, you hear everything that goes on in here.  I was

12  listening to everything he said.

13  Q.   You've heard everything while you're incarcerated in the

14  holding cell?

15  A.   I hear everything you say.

16  Q.   You heard it all?

17  A.   Yeah.

18      MR. MARAVICH:  Thank you, I have nothing further,

19  your Honor.

20      THE COURT:  Are you done with the witness now?

21      MR. RICHMOND:  Yes, sir, I am, thank you, your

22  Honor.

23      THE COURT:  All right, Mr. Kaminski, you're excused.

24  Does that conclude your case?

25      MR. RICHMOND:  Yes, your Honor, it does, yes, sir.


81


1       THE COURT:  Have you moved for the admission of all

2   of your exhibits?

3       MR. RICHMOND:  No, sir, I wasn't familiar with the

4   procedures.

5       THE COURT:  What are the exhibit numbers, do you

6   know, Nicole?

7       THE CLERK:  Plaintiff's Exhibits 1 through 12.

8       THE COURT:  Exhibits 1 through 12.

9       MR. MARAVICH:  And, your Honor, Commonwealth's

10  Exhibits A, B and C.  Your Honor, if I may --

11      THE COURT:  Hang on just one second.  Is there any

12  objection to Plaintiff's Exhibits 1 through 12 being admitted?

13          MR. MARAVICH:  At this time there's not.  As noted

14   before, there is an objection on the record regarding certain

15   exhibits.

16          THE COURT:  Right, which is preserved.  As far as

17   the Commonwealth's exhibits, have you had a chance to move

18   those yourself?

19          MR. MARAVICH:  Yes, sir.  They were discussed in his

20   case, if you want to put those in at this time.

21          THE COURT:  Then those are admitted as well.  All

22   right.

23          MR. MARAVICH:  Your Honor, has the plaintiff

24   declared that he's rested?

25          THE COURT:  He's rested.


                                82


1          MR. RICHMOND:  I did have one question, your Honor,

2   that I wanted to ask since this is the close of evidence.  I'm

3   only asking in reference to what I've read.  Could I approach.

4          MR. MARAVICH:  Excuse me, your Honor, I do intend on

5   raising a Rule 50.

6          THE COURT:  We'll do it all over here at side bar.

file:///A|/RICHDAY2.TXT

7          (At side bar on the record.)

8          THE COURT:  Go ahead.

9          MR. RICHMOND:  What I wanted to ask the court, your

10  Honor, was at the close of evidence, I have made a note to

11  myself to ask you in reference to considering a judgment as a

12  matter of law on the liability of the officers.

13          THE COURT:  That is denied.

14          THE COURT:  Go ahead.

15          MR. MARAVICH:  Your Honor, at this time the

16  defendants move for a Rule 50 on two separate grounds.  The

17  first ground is judgment as a matter of law.  That no

18  reasonable fact finder could find in favor of the plaintiff.

19  The second reason is based on qualified immunity.  So if I may

20  start now to separate the two for your Honor.  Pursuant to Rule

21  50 of the Federal Rules of Civil Procedure, defendants move for

22  judgment as a matter of law against plaintiff.  Rule 50

23  provides that judgment as a matter of law is appropriate if

24  during the trial by jury, a party having been fully heard on

25  the issue and there is no sufficient evidentiary basis for a

83

1  reasonable jury to find for that party on that issue.  The

2  court may determine the issue against the party and may grant a

3  motion for judgment as a matter of law against the party with

4  respect to the claim or defense that cannot, under controlling

5  law, be maintained or defeated without a favorable finding on

6  that issue.  Federal Rule of Civil Procedure, Rule 50(a)(1),

7  with regard to timing, Rule 50 states that motions can be made

8  any time --

9        THE COURT:  I don't have to have that read to me.

10  I'm very familiar with the rule and what it says.  Go to the

11  merits.  In the interest of cutting to the chase, tell me what

12  your merits position is?

13        MR. MARAVICH:  Your Honor, basically, it comes down

14  to, is that based on the alleged use of force in this case,

15  that that did not violate his rights.  And under that, I would

16  cite to certain case law that agrees with me.  In deciding

17  penological interest issues, courts should afford deference to

18  decisions made by prison officials who possess the necessary

19  expertise.  There is no question force can be used to maintain

20  discipline.  As a matter of law, maintaining order and security

21  within a prison system is a legitimate penological interest.

22  In this particular case the force was used to maintain and

23  restore discipline.  Even if we're discussing -- I'm trying to

24  just jump to the essentials, we're talking about a wicket being

25  closed on his hands.  When he is creating a disturbance.  Then

84

1  a reasonable fact finder cannot find in his favor.

2        THE COURT:  Let me interrupt you for a second.  I

3  see material issues of fact in dispute.  Let me tell you what

4  they are.  His version is he wasn't creating a disturbance, at

5  least a disturbance sufficient to require the type of force

6  that was used.  There is a distinct difference, a material

7  difference between his testimony and his witnesses' testimony,

8  and your defendants as to the manner, method and number of

9  times that the wicket was allegedly closed on his wrists.

10  According to him, it was an attack.  According to your people,

11  there was no attack, it was a reasonable means of maintaining

12  order.  How for goodness sakes can I take away the issue from

13  this jury as a matter of law, there are two diametrically

14  opposed stories?

15        MR. MARAVICH:  Well --

16        THE COURT:  I'm not faulting you for protecting the

17  record here, that to me is the essence. If you can look me in

18  the face and tell me we don't have two essentially

19  diametrically opposed versions here, I would be willing to

20  reconsider my opinion.

21        MR. MARAVICH: We do have different versions.

22        THE COURT: Right.

23        MR. MARAVICH: But when we go to Rule 50, we can

24  still say that a reasonable fact finder -- I think the rule

25  reads reasonable jury, a reasonable fact finder.


                              85


1         THE COURT: Fair enough.

2         MR. MARAVICH: That's what I propose.

3         THE COURT: The motion on that basis is denied.

4  What was your other thing?

5         MR. MARAVICH: The next thing is qualified immunity

6  in the case. I know you're very familiar with qualified

7  immunity. Regarding qualified immunity, if there's a mistake,

8  that's not enough. That's the first thing. Secondly,

9  qualified immunity is -- if there was not a clearly established

10  law when it occurred -- for that I would cite to your Honor,

11  Outlaw_v._Newkirk, 259 F.3d 833 (7th Cir.) --
    _____ __ _____

12      THE COURT:  What's the name, Outlaw?
                    _____

13      MR. MARAVICH:  Yes, your Honor.  Outlaw_v._Newkirk,
                                        _____ __ _____

14  259 F.3d 833 (7th Cir. 2001).  I believe that case stood for in

15  the closing of a cuffport on an inmate's hand, which caused

16  severe bruising, did not sustain an Eighth Amendment claim,

17  that was in 2001.  This alleged incident occurred in February

18  of '99.  I think that there's also, for brevity sake I will not

19  go through all my case cites.  I don't think, in essence,

20  clearly established law existed at the time, that is February

21  of 1999, which shows that these defendants would be considered

22  incompetent and they knew that they were plainly incompetent.

23      THE COURT:  I'm going to deny that.  I'm going to

24  deny the motion on that basis as well.  Because, number one,

25  there are material issues of fact in dispute with respect to


                              86


1  what happened here, with what the facts are.  Number two, it

2  was clearly established law in 1999 that excessive force, in

3  whatever form or fashion that might take, could not be

4  utilized.  All right, let's go.

5          (End of discussion at side bar.)

6          THE COURT:  All right, we're now moving to the

7  defendants' case, ladies and gentlemen.  Call your first

8  witness.

9          MR. MARAVICH:  Your Honor, at this time the

10  defendants will call defendant Gregory Wilkes.

11          THE COURT:  All right.  Mr. Wilkes, you're still

12  under oath from your previous testimony.

13          THE WITNESS:  Yes, your Honor.

14      GREGORY WILKES, DEFENDANT HEREIN, PREVIOUSLY SWORN

15              DIRECT EXAMINATION

16  BY MR. MARAVICH:

17  Q.    Good afternoon, Mr. Wilkes.

18  A.    Good afternoon, sir.

19  Q.    Now, we've already had an opportunity to hear from you --

20          THE COURT:  And not by way of interrupting you, but

21  just by way of maybe streamlining it, I would simply remind

22  both of you that this man and the other defendants have already

23  been on the stand once.  So without trying to unnecessarily

24  tread on your examinations, let's be mindful that we might be

25  able to be somewhat shorter, given the fact they've already


87


1  been up here.

2      MR. MARAVICH:  Yes, your Honor.

3  BY MR. MARAVICH:

4  Q.    Sir, first I'd like to ask you a few questions regarding

5  the demonstration of the wicket.  Did you see the wicket in the

6  cell that's connected to this courtroom?

7  A.    Yes, sir, I did see the wicket.

8  Q.    Okay.  And how does that wicket compare to a wicket at

9  SCI-Greene?

10  A.    I would say that the approximate height is right, but the

11  width, the one they have here is a little shorter, probably

12  about an inch and a half to two inches on each side.  And the

13  weight of it, it looks like that's an aluminum wicket, the ones

14  we have at SCI-Greene are much heavier.

15  Q.    Sir, we also talked about, I believe that is Exhibit 1 of

16  the plaintiff's case, a misconduct you wrote.  Do you remember

17  writing this misconduct?

18  A.    Yes, sir, I do.

19  Q.   Sir, have you read this misconduct?

20  A.   Yes, many times.

21  Q.   Do you stand by what you wrote there?

22  A.   Pardon me, sir.

23  Q.   Do you stand by what you wrote in the misconduct?

24  A.   Yes, sir, I do stand by that.

25  Q.   Sir, the plaintiff has testified today, were in the room

88

1   to hear his testimony?

2   A.   Yes, I was.

3   Q.   Did you hear him say that you slammed his hand 25 to 30

4   times in the wicket?

5   A.   Yes, sir, I did hear that.

6   Q.   Did you slam his hand 25 to 30 times in the wicket?

7   A.   No, sir, I never slammed his hand one time in the wicket.

8   Q.   Sir, have you ever suffered injury from a wicket?

9   A.   Yes, I have.

10  Q.   How did you suffer injury from it?

11  A.   Just basically moving around.  In this case whenever

12  Inmate Richmond disobeyed the order, we were doing --

13          THE COURT:  Sir, you're mumbling a little bit, slow

14   down a little bit.  Go ahead.

15   BY MR. MARAVICH:

16   Q.   Sir, you're familiar with the wicket, we've already

17   established that, correct?

18   A.   Yes, sir.

19   Q.   Sir, you've worked in the Department of Corrections for

20   how long?

21   A.   Nine years, sir.

22   Q.   Sir, you are familiar with the weight of the wicket, is

23   that correct?

24   A.   Yes, sir.

25   Q.   And how it operates, is that correct?


                            89


1   A.   Yes, sir.

2   Q.   Sir, I'm going to show you what's been marked as

3   Commonwealth's Exhibits B and C, which already have been

4   admitted into evidence.  Can you please take a look at those.

5   Commonwealth's B and C have already been identified by the

6   plaintiff as being pictures of his hands from February 28,

7   1999.  As you look at those pictures, do those pictures look

8   consistent to being slammed 25 to 30 times in a wicket?

9   A.   No, sir.

10        MR. MARAVICH:  Your Honor, I have nothing further.

11        THE COURT:  Okay.  Do you have some additional

12   questions for this man?

13        MR. RICHMOND:  No, your Honor, I do not.

14        THE COURT:  All right.  Sir, you're excused.

15        THE WITNESS:  Thank you, your Honor.

16        THE COURT:  Mr. Maravich.

17        MR. MARAVICH:  Your Honor, the defendants rest.

18        THE COURT:  All right.  Well, members of the jury,

19   the good news is that we've moved a little faster today than I

20   anticipated, I thought we'd be taking testimony all day.  We're

21   not, we're done.  The bad news is that we now have some --

22   actually, before I give you the bad news, if it's going to be,

23   let me ask you to go back to the jury room just for a second,

24   if you would.

25        (Whereupon, the Jury was excused from the

90

1  Courtroom.)

2       THE COURT:  We have prepared a draft charge in this

3  case.  We need to have a quick charge conference, it seems to

4  me.  I would prefer that we do that, and then -- how long do

5  you think your closing would be, do you have any idea?

6       MR. MARAVICH:  Your Honor, I believe my closing

7  would roughly be a half hour.

8       THE COURT:  Have you prepared closing remarks for

9  the jury?

10       MR. RICHMOND:  Yes, your Honor.  I prepared some

11  brief remarks, it wouldn't be very long, I'd say probably under

12  10 minutes.

13       THE COURT:  All right.  I'm going to get off the

14  bench here.  I'm going to have my Deputy Clerk bring you a

15  proposed draft of my charge.  I want both of you to read it.

16  And then once you're done reading it, we'll go on the record,

17  you can make any objections, suggestions, additions.  We ought

18  to be able to get this done today.

19       MR. MARAVICH:  Your Honor, while you're still on the

20  bench, I'd like to make, after the defendants' case in chief, a

21  motion for Rule 50.  I can stand on the grounds that I raised

22  at the previous Rule 50, with the addition of the additional

23  evidence that was offered during the defendants' case in chief.

24      THE COURT:  Okay, good enough.  And the motion is

25  denied for the same reasons I previously put on the record.


91


1  All right.

2      (Recess from 2:17 p.m.; until 2:52 p.m.)

3      THE COURT:  Why don't you on come up, Mr. Maravich.

4  This is our charge conference.  All right, Mr. Maravich, the

5  floor is yours.

6      MR. MARAVICH:  Yes, your Honor.  Then I do have few

7  issues that I'd like to bring to your attention.

8      THE COURT:  Go ahead.

9      MR. MARAVICH:  I'm looking at the final instructions

10  to the jury, which are pages 1 through 16.  I'll just reference

11  the page number for your benefit.

12      THE COURT:  All right.

13      MR. MARAVICH:  Sir, if you can flip to page three,

14  this is only because I understand when you read these -- the

15  second line down I believe should be Eighth Amendment, as

16   guaranteed by the Eighth Amendment.

17       THE COURT:  You're quite right.

18       MR. MARAVICH:  Your Honor, the longest discussion

19   I'll have is on page 10.  So why don't we skip over that and

20   we'll come right back to that, I have a few more.  Go to page

21   11, please, the last line, for when you are you reading this,

22   if you return a verdict, I believe that should say for?

23       THE COURT:  Yes.

24       MR. MARAVICH:  Page 12, middle of the paragraph

25   which begins with finally, jump down about eight lines, the


                                92


1    sentence begins with indifferent to the plaintiff's -- I think

2    it would be Eighth --

3        THE COURT:  Thank you.

4        MR. MARAVICH:  Your Honor, page 13.

5        THE COURT:  Right.

6        MR. MARAVICH:  Second paragraph, the sentence that

7    begins with this lawsuit was begun, I think we have to say

8    seven, I don't know, though.  Because it's been on appeal and

9    things --

10          THE COURT:  This is one of my older lawsuits.  It

11    would have commenced with its filling, would it not?

12          MR. MARAVICH:  Which was in '99.

13          THE COURT:  I think it's seven years.

14          MR. MARAVICH:  Your Honor, in the same paragraph

15    while we're on this, I request a revision to the sentence --

16          THE COURT:  Just as an aside, this just occurred to

17    me.  Rather than have the jury sitting there trying to compute

18    interest if a damage award should be awarded, doesn't it make

19    more sense to have an agreement in advance that the court would

20    simply mold the verdict?

21          MR. MARAVICH:  That's fine, your Honor.

22          THE COURT:  Is that all right with you?

23          MR. MARAVICH:  Yes.

24          THE COURT:  Do you understand that, Mr. Richmond?

25          MR. RICHMOND:  Yes, I do understand.


93


1          THE COURT:  Is that acceptable?

2          MR. RICHMOND:  Yes, it is.

3          THE COURT:  All right, we're going to take out that

4    paragraph, the one we just stated on interest, on page 13.  Go

5    ahead, sir.

6         MR. MARAVICH:  So that I'm clear, we're taking out

7    the paragraph that begins with "if and only if?"

8         THE COURT:  Correct.

9         MR. MARAVICH:  I have another change on that

10   paragraph but we don't have to address it.  No, if we can

11   switch back to page 10.

12        THE COURT:  Right.

13        MR. MARAVICH:  The section of joint and several

14   liability.

15        THE COURT:  Yes, sir.

16        MR. MARAVICH:  I have an issue there because I think

17   it could be confusing to the jury, especially the way the

18   interrogatories to the jury are set up.  So because the

19   interrogatories come across to me as being so clear, when they

20   separate one, two and three, concerning the officers.  And then

21   you have at point four just an in general number of the amount

22   of compensatory damages.

23        THE COURT:  Yes.

24        MR. MARAVICH:  I don't think that we need to put in

25   joint and several liability regarding that because we're not

94

1  actually asking them to determine separate numbers for these

2  individuals.  We're only asking them to determine one number

3  under compensatory damages.  Even if they were to only find

4  against one person or if they were to find against all three

5  people.

6        THE COURT:  In other words, your concern is there

7  can't be duplicative or triplicative, if is there is such a

8  word, recovery?

9        MR. MARAVICH:  Yes.

10        THE COURT:  But, on the other hand, each defendant

11  is entitled to be passed on individually, don't you agree?

12        MR. MARAVICH:  I do, your Honor.

13        THE COURT:  Just so I'm clear, you do want me to ask

14  one, two and three as they're presently set forth, is that

15  right, on the special interrogatory form -- do you want to

16  segregate them that way and ask about each defendant, is that

17  correct?

18        MR. MARAVICH:  Yes, I'm fine with that.

19        THE COURT:  So maybe the problem is mine.  Tell me

20  again what you think is confusing?

21      MR. MARAVICH:  Okay.  When we sometimes talk about

22  these cases and we get into the personal involvement -- there

23  is a legal issue on that.  I'm not getting into the personal

24  involvement in the case of Evancho v. Fisher, and we're talking

25  about personal involvement.  All three people as the remaining

95

1  defendants are, in essence, personally involved in the

2  allegations from February 28, 1999.  I'm simply saying that I

3  don't think that these joint and several liability language

4  found in here needs to be in the final instructions to the

5  jury.  Because I find that to be sometimes confusing.  And

6  regarding the questions, the way that they're presented in the

7  interrogatories to the jury, the issue really doesn't come up

8  of your asking for joint and several liability.  You are simply

9  saying okay, did you find against one or two or three or all

10  three.

11      THE COURT:  All right, but this is your point for

12  charge, isn't it, did you submit this?

13      LAW CLERK:  I wrote that.

14          THE COURT:  So would you prefer that we simply say

15   in this case -- we're on page 10, in this case there are three

16   defendants and you must determine whether any or all of them

17   are liable to the plaintiff.  In so doing, you should examine

18   the conduct of each individual defendant to determine whether

19   his conduct violated the plaintiff's constitutional rights,

20   period?

21          MR. MARAVICH:  That's excellent.

22          THE COURT:  Period?

23          MR. MARAVICH:  Yes, your Honor.

24          THE COURT:  All right, then, that's what we'll do.

25          MR. RICHMOND:  Will the remainder of the paragraph


                                    96


1   still --

2          THE COURT:  No, the remainder is not going to be

3   given.  Everybody will be looked at individually.

4          MR. MARAVICH:  Your Honor, then just turning to the

5   interrogatories to the jury, I apologize to the law clerk, I'm

6   not trying to beat up on the law clerk here, there is in

7   question one, second line, says eight.  Question two and three,

8  I think should be consistent with question one.

9         THE COURT:  Okay.

10        MR. MARAVICH:  Now, going down to the bold print, I

11  would like this to be added on the first sentence.  If you have

12  answered no to questions one, two and three above, stop and

13  inform the court clerk that you have reached a verdict in favor

14  of the defendants.

15        THE COURT:  Well, I guess that would be self -- that

16  would certainly be self-evident, wouldn't it?

17        MR. MARAVICH:  Should be.  But what I don't want to

18  have happen, your Honor, is that someone flip it over, even

19  though -- flip it over and then go to answer questions like

20  what are compensatory damages and what are the punitive

21  damages.  So we can either stop there, like it says to stop --

22        THE COURT:  It's so self-evident, the directions are

23  so clear -- put it this way.  If all of those are marked, one

24  two, three are marked no, and the jury would go on and somehow,

25  in violation of the instructions, and go on to award damages,


97


1  the verdict would be for the defendant given that -- is that

2  your concern, that they might stumble into the second page, is

3  that what it is?

4          MR. MARAVICH:  Yes.

5          THE COURT:  Well, it stays stop and inform the clerk

6  that you have reached a verdict.  I can't believe that's going

7  to be a problem, so I'm not going to change the form.  When

8  else?

9          MR. MARAVICH:  That's all I have, your Honor.

10          THE COURT:  In my initial charge here, the draft

11  charge, I charge on nominal damages, do you recall -- if you

12  find the plaintiff has not sustained any actual damages.  I'm

13  not asking you to fall on your own sword here, but I want to

14  get this right.  Is this really an appropriate case for a

15  nominal damage charge?

16          MR. MARAVICH:  It is not, your Honor.

17          THE COURT:  I'm going to take it out then.

18          MR. MARAVICH:  That's fine.

19          THE COURT:  Thank you.  Go ahead.

20          MR. RICHMOND:  I only have one question, your Honor,

21  in reference to the interrogatories at number four.  In

22  reference to Mr. Maravich's joint and several liability issue,

23  should or will question or interrogatory number four will that

24  be split into three parts?

25        THE COURT:  No, it will remain as it is.  Do you

98

1  mean state the amount of compensatory damages.  You are only

2  entitled to one recovery.  Even if three defendants would be

3  found liable, you are only entitled to -- if the jury were to

4  award you a thousand dollars, and they found that two of the

5  three officers were liable, you're only entitled to a thousand

6  dollars, not $2,000, do you understand?

7        MR. RICHMOND:  I understand.

8        THE COURT:  All right.  Just so the record is clear,

9  then, Mr. Maravich, with that, recognizing you want defendant

10  inserted in three, you have no objections to the interrogatory

11  form, is that right, as is set forth?

12        MR. MARAVICH:  No, your Honor, the only corrections

13  I had were on two and three --

14        THE COURT:  Aside from the misspelling, you have no

15  problem with the substance of the form?

16        MR. MARAVICH:  Correct.

17          THE COURT:  All right, we'll make those changes.  My

18  clerk has two Plaintiff's Exhibit 4.

19          MR. RICHMOND:  One item four was the actual

20  question, and the other item four was the responses.

21          THE COURT:  All right.  Then what we'll do is we'll

22  leave the Exhibit 4 sticker on the interrogatories and we will

23  attach them together as one exhibit, rather than break them up.

24          MR. MARAVICH:  Your Honor, the only issue I have

25  with four is that if we're dealing with interrogatories, the


                                99


1   interrogatory that would be in question is only I believe one.

2   So send out the entire packet is sending things that are out of

3   evidence.

4          THE COURT:  Is there a way to do that?

5          MR. MARAVICH:  I think we could rip the packet

6   apart.

7          THE COURT:  I don't want to do that.

8          MR. MARAVICH:  And put the question in with the

9   answer as just 4 and 4A.

10          THE COURT:  Do you really care?

11        MR. MARAVICH:  I don't.

12        THE COURT:  We'll send it all out.  All right, let's

13  do this.  We're going to bring the jury back, we're going to at

14  least do the closing arguments.  And then I'll decide whether

15  I'm going to send them home or whether I'm going to let them

16  deliberate.

17        (Whereupon, at 3:07 p.m., the Jury reenters the

18  Courtroom.)

19        THE COURT:  Members of the jury, now you're going to

20  hear the closing arguments in the case.  Mr. Maravich.

21        MR. MARAVICH:  Thank you, your Honor.  Good

22  afternoon, ladies and gentlemen of the jury.  As I told you

23  yesterday I guess, we are here in a court of law, you're going

24  to hear this case and it is plaintiff that has the burden to

25  establish his case by a preponderance of the evidence.


                              100


1        What is his case.  You've now heard the evidence,

2  what is his case.  His case is he says that excessive force was

3  used against him when his hand was slammed 25 to 30 times in a

4  wicket.  Does this look like a hand that was slammed 25 to 30

5   times in a wicket.

6        Now, a court of law and a requirement for the burden

7   of proof is different than just the outside world.  Where

8   you're telling a story and taking it for whatever it's worth.

9   We have established here rules of law.  The judge instructs you

10  on the rules.  You'll hear the rules, as I explained to you

11  before, you then determine the facts under the rules.

12       In this case the plaintiff has the burden of

13  establishing by a preponderance of the evidence his case.  And

14  his case is that hand was slammed 25 to 30 times in a wicket.

15  Not merely did something happen on that day.  I told you the

16  first day that we met that you were going to hear that

17  something happened.  That there was an incident at his door.

18  There is disputes over what happened there, but it is not the

19  defendants' burden to demonstrate what happened.  It was the

20  plaintiff's.

21       The evidence is closed, okay.  The things that you

22  hear on this pedestal are not into evidence.  You have the

23  evidence.  The evidence consists of the times when people spoke

24  up there on the witness stand and were under oath.  The

25  evidence consists of the things that were admitted into

1  evidence.  These documents, these pictures, and you'll have the

2  opportunity to take those back with you and look at them.  What

3  is said here in opening statements, what is said here today to

4  you is not in evidence.  If you're guessing as to what happened

5  at all, then the plaintiff has failed his burden, all right.

6         We talk about preponderance of the evidence.  And

7  you'll hear this through the judge's instructions, the

8  preponderance of the evidence.  What is the preponderance of

9  the evidence.  Well, the best example of the preponderance of

10  the evidence is if you think of the scales of justice.

11  Preponderance of the evidence.  For the plaintiff to prove his

12  case, the scales of justice have to tip in his favor.  If

13  they're equal or they tip in the defendants' favor, then

14  plaintiff has failed to prove by a preponderance of the

15  evidence his case.  If he fails to tip, he will then have a

16  failure to carry his burden of proof imposed by law and as you

17  will be told by this court.

18         This is an open and shut case.  Is it believable

19  that the plaintiff and his hand were slammed 25 to 30 times in

20  a wicket on that day.  Believability is a factor that can enter

21  your minds.  It must, and you will be instructed on it by the

22  court.

23          In order to find for the plaintiff, you must find

24  that he has proven by the preponderance of the evidence that

25  his Eighth Amendment right to be free from excessive force was

                              102

1  violated.  In order to find for the plaintiff, based on the

2  evidence, you must find that his hands were slammed in the

3  wicket 25 to 30 times.  And I am asking you to find in favor of

4  the defendants because that simply is not believable.  The

5  evidence that's been presented to you demonstrates that that is

6  not believable.  The evidence that has been presented to you

7  demonstrates that plaintiff fails to prove his case.  I thank

8  you.

9          MR. RICHMOND:  Good afternoon, ladies and gentlemen

10  of the jury.  I want to begin by thanking you for your service

11  as jurors.  I know that the weather isn't the best, I realize

12  that you all have your our own individual lives and things to

13  do, I appreciate your time and your efforts.

14          I believe that I have presented a prima facie case

15  of excessive force by the defendants against me.  If you agree,

16  you must find for the plaintiff and against any or all of the

17  three defendants as to being liable according to law.  It

18  should be clear from the undisputed evidence, however, that my

19  injuries were caused by the use of excessive force.

20      As I mentioned in my opening statement, regardless

21  of how the altercation began, the fact remains that I was

22  injured.  The damages claimed by me as a result of the

23  excessive force by the defendants break down roughly into two

24  categories.

25      One, or category one, pain and suffering during the


103


1  beating itself and the days immediately after it.

2      And, two, the alleged injury to my right arm, hand,

3  and wrist.  And the permanent neurological damage and nerve

4  damage that I now suffer.

5      Personal involvement in the use of force as

6  established for purposes of damages if either, a, a person

7  directly participates in an assault or, b, was present during

8  the incident but failed to intercede on behalf of the victim,

9  even though he had a reasonable opportunity to do so.

10        As I mentioned in my opening remarks at the

11  beginning of this case, I'm 45-years-old.  I spent about 11

12  years in prison, I'm due to get out probably in about 60 days.

13  During the course of my 11-years incarceration, I pretty much I

14  guess you could say paid almost the balance of my debt for my

15  offenses.  And I will forever be wrong for the offense that got

16  me in jail.  And that's something that I believe I paid my debt

17  to society for.  As a result, I believe that the Pennsylvania

18  Department of Probation and Parole will see fit for me to be

19  released from prison in a very near term.

20        As such, I worked the majority of my adult life.

21  Absent the 10 years that I've spent in prison.  As I mentioned

22  to you earlier, I've spent 10 years in the United States Air

23  Force.  Prior to being incarcerated, I have marketable job

24  skills.  I've worked in various positions, anywhere from

25  general labor to quality control assurance.  I have some office


104


1  skills as well.

2        In summary, the injuries that I've sustained,

3  including pain, suffering and the loss of enjoyment of life and

4  lost earning capacity, it's going to continue indefinitely.

5      I anticipate, as I said before, being released from

6  prison.  As such, I will have to try to reenter the work force.

7  How I'll be able to do that with the damage that I sustained to

8  my hand and in any full-time capacity, I can't tell you.

9  I can't tell you how difficult it will be for me to use a mouse

10  or to type on a keyboard or to do repetitive hand movements as

11  a packer or sorter or as a landscaper, even at a menial job, a

12  minimum wage job.

13      But in terms of future earning capacity, an injured

14  person, it's my understanding of the law, that an injured

15  person is entitled to recover the difference between what he

16  would have reasonably expected to make without the injury and

17  what he could have reasonably expected to make with the injury,

18  over a period reasonably he expected to remain in the work

19  force.  What that kind of boils down to is, I'm 45-years-old, I

20  probably have 20 good years of work left in me.  How that has

21  been diminished by the fact that I have a sustained injury to

22  my hand, I can't tell you.  Normally, if I were to be

23  represented by counsel, there would have been vocational

24  experts that would been presented, that would have told you

25  that over my prior work history that I made a maximum amount of

105

1   dollars, X amount of dollars per year, and that because of my

2   diminished capacity, that I could probably be expected to make

3   X amount less dollars over the remaining 20 years.

4          It would be a grave mistake for me to ask for an

5   amount of recovery if you find for the plaintiff in terms of

6   damages.  But I can say that we live in a very imperfect world,

7   health care costs are expensive.  I know one of my medications

8   that I take, Tramadol, it costs about $100 a month for that

9   prescription.  I don't have any health care coverage.  So when

10  I return to society and I attempt to gain employment, I'm going

11  to be on Medicare, Medicaid.

12         There is a big possibility that I may have to have

13  surgery for my hand.  I don't know how much surgery of the

14  nature of my injury would cost.  But I know that health care

15  costs are expensive.

16         I don't know how difficult or how easy it is going

17  to be for me to obtain employment when I get out.  And the

18  pictures that you saw during the course of this presentation of

19  the evidence, they don't clearly reflect what happened.  My

20  hand was swollen for days after.  I still suffer from a lot of

21  pain.  And sometimes I wake up at night and I can't even feel

22  my whole arm.  That's for you to decide.

23       I believe that we have a pretty good cross reference

24  of people in terms of being able to have heard the evidence and

25  to evaluate the evidence as it's been presented.


106


1       I really don't have very much else to say except

2  that I trust your judgment.  Faith is kind of one of those

3  things, as it's put in Hebrew, the substance of things hope for

4  in the evidence that remains to be seen.  I leave it in your

5  hands.  I was injured, and I believe that as a result of my

6  injury, I deserve to be compensated.

7       I would like to thank you for your time and your

8  efforts.

9       THE COURT:  Let me see you at side bar just for a

10  second.

11       (On the record at side bar.)

12          THE COURT:  Two things.  One, I propose to tell the

13    jury that with respect to medical injuries, they may see the

14    exhibits, that may include items other than carpal tunnel or

15    hand or wrist injuries.  They are to disregard those, such as

16    neck and things like that, I'm going to tell the jury that.

17          Secondly, Mr. Maravich, you indicated, I didn't want

18    to interrupt your closing, you indicated in closing to the jury

19    that in order to find excessive use of force, they must find

20    that his hand was hit 25 or 30 times.  I don't think that's

21    correct as a matter of law, is it?

22          MR. MARAVICH:  Based on the evidence in the case,

23    that's what we have presented what happened here.  It wasn't a

24    disputed fact, he has offered it as his story, his story was 25

25    to 30 times his hand was struck.


                                107


1          THE COURT:  Then that is what you said, 25 to 30

2    times?

3          MR. RICHMOND:  That's what I testified to during

4    deposition.  If I were to make the argument, your Honor --

5          THE COURT:  Put it this way, I'm not going to tell

6   the jury it's 25 or 30 times.  I'm just going to charge

7   generally on excessive force.  They may choose to accept it was

8   25 times, they may accept it was 15 times, they may accept it

9   was nothing.  But it's up to them.  It's up to them to

10  determine under all the circumstances whatever happened, what

11  the amount of excessive force was.

12          (End of discussion at side bar.)

13          THE COURT:  Ladies and gentlemen, it is now my duty

14  to tell you about the law that is to be applied to this case

15  and in which you are the finders of fact.  You have heard all

16  the arguments and all of the evidence, and it is my function to

17  charge you on the law which you are required to consider and

18  which will govern your deliberations.

19          For convenience, in the course of these

20  instructions, Robert A. Richmond may be referred to as the

21  plaintiff, which is just the legal name of the person filing

22  the lawsuit.  Correctional Officers Wilkes, McElravy and

23  Bedilion may be referred to as the defendants, which is the

24  legal name for the party against which a suit is filed.

25          In deciding these issues of fact, it is your duty to

108

1  follow these instructions.  In doing so, you must take into

2  consideration all of the instructions which I give you, and not

3  pick out any particular instruction and disregard another one.

4  Your duty is to determine the facts from the evidence that has

5  been produced in open court.  You are to apply the facts as you

6  find them to the law that I am giving you, and neither sympathy

7  nor prejudice should influence you in any way.  Our system of

8  law does not permit jurors to be governed by sympathy,

9  prejudice or public opinion.

10        At the outset you should understand that I am

11  absolutely neutral in presenting these instructions to you.  I

12  will not give you my opinion about any issue of fact to

13  determined by you.  Nothing in the way in which I give my

14  instructions to you is intended as an expression of my opinion

15  about any fact at issue in this case.

16        Ladies and gentlemen, I will now instruct you on the

17  substantive principles of law that govern the plaintiff's claim

18  in this case.

19        The federal Civil Rights Act of 1871, 42 U.S.C.

20  Section 1983, allows a plaintiff to recover damages for a

21  violation of his or her constitutional rights where the

22  plaintiff can carry their burden of establishing the following

23  three elements by a preponderance of the evidence.  First, that

24  the conduct complained of was committed by the defendants while

25  acting under color of state law.  Second, that the defendants'

109

1  conduct deprived plaintiff of a right, privilege or immunity

2  secured by the U.S. Constitution.  And, third, that the

3  defendants' acts were the proximate cause of the injuries and

4  consequent damages sustained by the plaintiff.  I will now

5  instruct you on each of these elements in further detail.

6        Regarding the first element, I am instructing you

7  that this element has been satisfied as a matter of law.  Thus,

8  the defendants' actions, whatever you determine them to be,

9  were conducted under color of state law.

10        The second element is satisfied only if the

11  plaintiff proves by a preponderance of the evidence that he was

12  deprived of a federal right by the defendants.  Here, plaintiff

13  claims that the defendants violated his right to be free from

14  cruel and unusual punishment, as guaranteed by the Eighth

15  Amendment to the United States Constitution.  This

16  constitutional prohibition against cruel and unusual punishment

17  includes the right to be free from the use of excessive force

18  by correctional officers, as alleged by the plaintiff in this

19  case.

20        In an excessive force claim, the central question is

21  whether the force was applied in a good-faith effort to

22  maintain or restore discipline, or maliciously and sadistically

23  to cause harm.  In this context, maliciously means

24  intentionally injuring another without just cause or reason.

25  Sadistically means engaging in extreme or excessive cruelty or


110


1  delighting in cruelty.

2        To determine whether a constitutional violation has

3  occurred, you may consider such factors as the need for the

4  application of force, the relationship between the need and the

5  amount of force used, the extent of the injury inflicted, the

6  extent of the threat to the safety of staff and inmates, and

7  any efforts made to temper the severity of a forceful response.

8  A showing of significant or serious injury is not necessary,

9  rather, a prisoner can suffer excessive force even if the force

10  resulted in minor or de minimus injuries.  Stated another way,

11  if you find that the plaintiff suffered only de minimus

12  injuries but that the force used was excessive, you should find

13  for the plaintiff.

14        The third element is satisfied only if the plaintiff

15  proves by a preponderance of the evidence that the defendants'

16  actions were the cause of the injury.  In considering this

17  issue of causation, you should decide whether the defendants'

18  wrongful conduct was a substantial factor in the resulting

19  harm.  It need not be the only cause, nor the last cause or the

20  nearest cause.  It is sufficient if it occurs concurrently with

21  some other cause acting at the same time that in combination

22  causes the injury.

23        I will now give you a few guidelines on how to

24  deliberate upon the evidence you heard.

25        As I told you the beginning of the case, the


111


1  evidence which you are to consider consists of the testimony of

2  the witnesses and the exhibits offered and received into

3  evidence.  The procedures during this trial have been governed

4  by the rules of law, as you know, we have had a number of

5  conferences to determine what evidence should be allowed to be

6  submitted to you.

7          From time to time it has been my duty to rule on

8  evidence to be submitted, and you should not concern yourselves

9  with the reasons for those rulings.  You are not to consider

10  any testimony or any exhibit to which I have sustained an

11  objection, or any exhibit which may have been ordered stricken

12  from the record or which has not been introduced into evidence.

13          Now, the attorneys or parties here have argued very

14  well and thoroughly, and they have been well prepared.  But

15  their arguments, that is what they have said to you, is not

16  evidence.  They have argued to help you understand the facts

17  and their respective theories of the case, but their arguments,

18  again, are not evidence.  You must consider as evidence only

19  the testimony and the exhibits.  If you find that any argument,

20  statement or remark of counsel or Mr. Richmond has no basis in

21  the evidence, then you should disregard that argument,

22  statement or remark.  Similarly, if you find that anything I

23  tell you about the facts is not based on the evidence, you

24  should disregard that, too, because you are the finders of

25  fact.  And it is up to me only to tell you what the law is.


112


1       The next matter about which I will no instruct you

2  is the applicable burden of proof.  The burden of proof is a

3  concept which you must understand in order to give the case

4  proper consideration because a verdict cannot be based on

5  speculation, guess or conjecture.

6       In civil cases such as this case, the plaintiff has

7  the burden of proving those contentions that entitle him to

8  relief by a preponderance of the evidence.  Thus, the plaintiff

9  carries the burden of proving by a preponderance of the

10  evidence each of the elements that I have previously set forth

11  for you.

12       The fair weight or preponderance of the evidence

13  means evidence which has more convincing force when it is

14  weighed against the evidence opposed to it, so that the greater

15  probability of truth lies therein.  If you were to visualize

16  evidence as something weighed on an ordinary balance scale and

17  if the evidence admitted in support of a claim made by the

18  party having the burden of proof is more weighty in probative

19  value than the evidence offered in opposition so that it tips

20  the scales on the side of that party, then that party has

21  proved the claim by the fair weight or preponderance of the

22  evidence.

23      If, on the other hand, the evidence admitted in

24  opposition to the claim of the party having the burden of proof

25  outweighs or equally balances the evidence produced in support

113

1  of the claim, it can be said that there has been a failure to

2  carry the burden of proof imposed by law.

3      It is important to note that we speak of the quality

4  of evidence, not necessarily its quantity.  Also, all of the

5  evidence admitted in support of, and in opposition to, a claim

6  must be considered, and not just the evidence offered by the

7  party having the burden of proof.  In short, the test is not

8  which side brings the greater number of witnesses or presents

9  the greater quantity of evidence, but which witness or

10  witnesses and which evidence you consider most worthy of

11  belief.  Even the testimony of one witness may outweigh that of

12  many.  If you have reason to believe his or her testimony in

13    preference to their testimony.

14        In deciding the facts of this case, you should

15    consider all of the evidence presented by the parties.

16    Consideration of all of the evidence, however, does not mean

17    that you must accept all the evidence as true or accurate.  In

18    this connection, the evidence in this case consists of the

19    sworn testimony of the witnesses, regardless of who may have

20    called them; all exhibits received into evidence, regardless of

21    who may have produced them; and all facts which have been

22    admitted or stipulated to by the parties.

23        There are two types of evidence which you may

24    properly consider in deciding the issues of fact in this case.

25    One type of evidence is called direct evidence.  Direct

114

1    evidence is where a witness testifies to what he or she saw,

2    heard or observed.  In other words, when a witness testifies

3    about what is known to him or her of his or her own knowledge

4    by virtue of a witness's senses, what he or she sees, feels,

5    touches or hears, that is called direct evidence.

6        The other type of evidence is called circumstantial

7  evidence.  Circumstantial evidence is evidence which tends to

8  prove a disputed fact by proof of other facts.  I will give you

9  an example of what the term circumstantial evidence means.

10  Assume that when you came into the courthouse this morning, the

11  sun was shining, it was a nice day.  Assume that the courtroom

12  blinds here were drawn so you couldn't look outside.  As you

13  were sitting here, somebody walked in the back with an umbrella

14  that was dripping wet.  Somebody else then walked in with a

15  raincoat that was also dripping wet.  You cannot, of course,

16  look outside of the courtroom to see whether it is raining, so

17  you have no direct evidence of that.  But based on the facts

18  that I've asked you to assume, it would be reasonable and

19  logical for you to conclude that it had been raining.

20          That is all there is to circumstantial evidence.

21  You infer on the basis of reason, experience and common sense

22  from an established fact, the existence or non-existence of

23  some other fact.

24          Circumstantial evidence is of no less value than

25  direct evidence.  And as a general rule, the laws makes no

115

1  distinction between direct and circumstantial evidence.  The

2  law simply requires that before making a finding of fact the

3  jury must be satisfied that the fact has been proved by a

4  preponderance of the evidence from all of the evidence in the

5  case.

6          While you may consider only the evidence in the case

7  in arriving at your findings of fact, you are permitted to draw

8  such reasonable inferences from the testimony and exhibits of

9  counsel and Mr. Richmond, as you feel are justified in light of

10  common experience.  An inference is not a suspicion or guess.

11  A suspicion is a belief based on circumstances which do not

12  amount to proof.  A guess is speculation or conjecture.  An

13  inference, on the other hand, is a reasoned logical decision to

14  conclude that a disputed fact exists on the basis of another

15  fact that you know exists.  In other words, you may reach

16  conclusions which reason and common sense lead you to reach

17  from the facts which have been established by a preponderance

18  of the evidence in the case.

19          There are times when different inferences may be

20  drawn from the facts, whether proved by direct or

21  circumstantial evidence.  Plaintiff will ask you to draw one

22  set of inferences, while the defendants will ask you to draw

file:///A|/RICHDAY2.TXT

23   another.  It is for you, and you alone, to determine what

24   inferences you will draw.

25        In deciding this case, members of the jury, you are


                              116


1    required to pass on the credibility of witnesses.  Credibility

2    simply means believability.  Your function here is to decide

3    what is believable, who is believable, and then how much weight

4    to give it.  In doing this, use your common sense, your varied

5    background and experiences, the usual indicators of truth that

6    you use in your daily lives.

7        A witness's testimony depends on the witness's

8    observation and perception of what he or she testifies to.  It

9    also depends on the witness's memory and what he or she

10   experienced at the time, and the witness's ability to create

11   that experience in court.

12        You may consider the degree of the witness's

13   intelligence, the demeanor and appearance of the witness, the

14   witness's frankness, his or her candor, the evasiveness or

15   responsiveness, as well as the reasonableness or

16   unreasonableness of a witness's testimony in light of all the

17  circumstances.  You may also consider any interest or bias that

18  might lead a witness to exaggerate, understate or otherwise

19  color their testimony, such as a witness's interest in the

20  outcome of the case or a bias or prejudice that a witness might

21  have in favor of or against a party.  This is not to suggest

22  that the interest or bias of a witness would lead that witness

23  to tell you a falsehood or color his or her testimony one way

24  of the other, but bear these factors in mind in passing on the

25  credibility or believability of every witness.


117


1        I charge you that if you find that a witness has

2  lied to you in any material portion of his or her testimony,

3  you may disregard that witness's testimony in its entirety.  I

4  say that you may disregard that testimony, not that you must.

5  If you choose to disregard the testimony of any witness because

6  you believe the witness has been truthful with you, it must

7  have been untruthfulness in a material portion of that

8  witness's testimony.  You must be careful, though, that the

9  untrue part of the testimony was not a result of a mistake or

10  inadvertence, but was, rather, willful and stated with a design

11   or intent to deceive.

12          Regardless of whether a witness's testimony is

13   untruthful by design or inadvertence, however, you may reject

14   all or any portion of the testimony, as in the case of any

15   witness, if the testimony is not believable by you.  On the

16   other hand, you may be convinced that, despite the falsity of a

17   part of a witness's testimony, he or she, in other parts,

18   testified truthfully.

19          Now, you may find inconsistencies in the evidence,

20   even actual contradictions in the testimony of witnesses,

21   although it does not necessarily mean that any witness has been

22   willfully false.  Poor memory is not uncommon.  Sometimes a

23   witness forgets.  Sometimes he or she remembers incorrectly.

24   It is also true that two persons witnessing the same event may

25   see it or hear it differently.  If different parts of the

118

1   testimony of any witness or witnesses appear to you to be

2   inconsistent, you should try to reconcile the conflicting

3   statements, whether of the same or different witnesses, and you

4   should do so if it can be done satisfactorily.  If, however,

5   you find that there is a genuine and irreconcilable conflict in

6   the testimony, it is your function and your duty to determine

7   which, if any, of the contradictory statements you will

8   believe.

9        In this case there are three defendants, and you

10  must determine whether any or all of them are liable to the

11  plaintiff.  In doing so, you should examine the conduct of each

12  the individual defendants to determine whether his conduct

13  violated plaintiff's constitutional rights.

14        I will now instruct you on the law as it relates to

15  damages.  The fact that I am instructing you as to the proper

16  measure of damages should not be considered as intimating any

17  view of mine as to which party is entitled to your verdict in

18  this case.  Instructions as to the measure of damages are given

19  for your guidance, in the event you should find in favor of the

20  plaintiff from a preponderance of the evidence in this case and

21  in accordance with the other instructions.  Plaintiff is not

22  required to prove his damages by mathematical certainty, but he

23  does have the burden of proving his entitlement to damages by

24  the preponderance of the evidence.

25        You may award compensatory damages on plaintiff's

119

1   Section 1983 claim only if you find in favor of the plaintiff

2   as to that claim.  You will not consider damages unless you

3   find that one or more of the defendants are liable to the

4   plaintiff.  If you find for the plaintiff, you may award him

5   compensatory damages.  Compensatory damages include

6   compensation for any physical or emotional pain, suffering,

7   inconvenience, mental anguish, and the loss of the enjoyment of

8   life that plaintiff suffered as a result of the defendants'

9   violation of his constitutional rights.  Of course, for items

10  such as these, there is not and cannot be a fixed measurement.

11  It is measured by the character, nature and extent of the

12  injuries as shown by the evidence.  It is not compensation from

13  a sentimental or benevolent standpoint, but an amount that

14  would be the most reasonable amount of compensation under the

15  circumstances as shown by the evidence.  You should consider

16  all of the facts and circumstances in evidence, and give to the

17  plaintiff the amount that you believe will fairly, equitably

18  and justly compensate him for these damages.

19          Finally, in addition to the damages mentioned above,

20   the law permits the jury in certain circumstances to award the

21   injured person punitive damages in order to punish the

22   defendant for some extraordinary misconduct and to serve as an

23   example or warning to others not to engage in such conduct. If

24   you find that a defendant is liable for violating plaintiff's

25   rights, then you may, but do not have to, award punitive

120

1   damages against that defendant. You may only award punitive

2   damages if the plaintiff proves by a preponderance of the

3   evidence that the defendants' conduct was reckless and

4   callously indifferent to the plaintiff's Eighth Amendment right

5   to be free from cruel and unusual punishment. However, even if

6   the plaintiff proves by a preponderance of the evidence that

7   the defendants' conduct was recklessly and callously

8   indifferent, you are still not required to award punitive

9   damages; rather, you must also determine whether the

10   defendants' conduct is of the sort that calls for deterrence

11   and punishment. In determining the amount of punitive damages

12   to award, you should take into consideration all of the

13   circumstances surrounding the particular incident, including

14  the nature of the wrongdoing, the extent of the harm inflicted,

15  the intent of the defendant, and the wealth or lack of wealth

16  of the defendant.  Punitive damages must be considered with

17  respect to each defendant individually and based upon that

18  defendant's individual actions.

19      Remember, the amount of punitive damages awarded, if

20  any, must not be the result of passion or prejudice against the

21  defendants.  The sole purpose of punitive damages is to punish

22  allegedly outrageous conduct and to deter the defendants and

23  others from similar accounts.

24      As I mentioned at the beginning of the case, the

25  court is entirely neutral about its the outcome.  I do not want

121

1  you to think that anything I have said, any instruction I have

2  given you, any ruling I made on the evidence or any statement I

3  have made either to Mr. Richmond or to counsel for the

4  defendants, implies that I have any position in this case at

5  all, other than to give you fairly the law that you are

6  required to apply, and to rule fairly and impartially on the

7  evidence that has been submitted to you.  I have absolutely no

8   interest in how this case resolves itself, but only in the

9   procedure by which it is done.

10      As I told you before, it is for you, and you alone,

11   to determine the facts of the case and the credibility of the

12   witnesses.  If your recollection of the testimony varies with

13   any statements that are inadvertently made by me or counsel or

14   Mr. Richmond in reviewing the testimony, you have to be guided

15   by your own memory and your own recollection of the testimony.

16   You determine the facts from all the testimony that you have

17   heard, and the other evidence which has been received during

18   the trial.  Neither I nor anyone else may infringe on your

19   responsibility as the judges of the facts.  On the other hand,

20   and of equal importance, you must accept the rules of law as I

21   give them to you and apply those rules to the facts of the

22   case.

23      I'm now going to instruct you on your deliberations,

24   that is what you are to do when you retire to the jury room.

25   First, the attitude and conduct of the jury at the outset of

122

1   the deliberations are matters of considerable importance.  When

2   you retire to the jury room for your deliberations, they should

3   proceed in an orderly fashion.  The first order of business in

4   the jury room will be to select one of you to act as the

5   foreperson.  You are free to select any one of you to act in

6   that capacity.  The foreperson will preside over your

7   deliberations and will speak for you here in court should that

8   become necessary.  One more thing about the foreperson.  The

9   fact that somebody is a foreperson does not mean that his or

10   her vote is entitled to any greater weight than the vote of any

11   other juror.

12          In the course of your deliberations, if you should

13   find yourself in doubt concerning any part of my instructions

14   to you about the law, you may request further instructions.  In

15   that event, you should transmit a note, signed by the

16   foreperson, to me through my courtroom deputy.  Nobody should

17   try to communicate with me by means other than a signed

18   writing.  I will not communicate with any juror on any subject

19   relating to the merits of the case except in writing or orally

20   here in court with all counsel present.

21          You should not at any time reveal even to me how you

22   stand numerically until you have reached a verdict.  Your

23   responsibility to reach a fair conclusion from the evidence and

24  the applicable law is an important one.  Your verdict should be

25  reached only after careful and thorough deliberations during


123


1  which you should consult with each other and discuss the

2  evidence and the reasonable inferences to be drawn from the

3  evidence freely and fairly in a sincere effort to arrive at a

4  just verdict.

5          It is your duty to consider the evidence with a view

6  toward reaching agreement on a verdict if you can do so without

7  violating your own individual judgment and conscience.  You

8  must decide this case for yourself, examining the issues in

9  evidence with candor, frankness, and with proper deference to

10  and with regard for the opinion of each other.  Mature

11  consideration requires that you be willing to re-examine your

12  own views and to change your opinions if you are convinced that

13  your opinions lack merit or validity.  On the other hand, while

14  you may maintain this flexibility, no juror is required to

15  surrender his or her honest conviction as to the weight or

16  effect of the evidence because another juror's opinion differs

17  from his or hers, or for the mere purpose of returning a

18   verdict.

19        The verdict must represent the considered judgment

20   of each juror.  In order to return a verdict, it is necessary

21   that each juror agree thereto.  Your verdict, therefore, must

22   be unanimous.

23        Keep in mind that the dispute here between these

24   parties in this case is for them a very serious matter.  They

25   and the court rely on you to give full and conscientious


124


1   deliberation and consideration to the issues and evidence

2   before you.  You should not allow prejudice or sympathy to

3   influence your deliberations.  You should not be influenced by

4   anything other than the law and the evidence in the case.  All

5   parties here stand equal before the court and each is entitled

6   to the same fair and impartial consideration at your hands.

7        One other thing I forgot to mention to you when I

8   was charging on the damage portion of the case.  In considering

9   damages, if you find one or more defendants liable, if you do

10   move on to the damage issue, the damages which you award,

11   you'll see some medical records that are going to go out with

12  you.  The damages which you award should be restricted to any

13  damages you find as a result of injury to the plaintiff's hand

14  or wrist.  No cervical area or other areas unrelated to that,

15  it's the hand and the wrist area.

16        Now, let me ask you a question.  It's now 4 o'clock.

17  By the time we gather up these exhibits and get everything out

18  to you -- as a practical matter, it will be another ten minutes

19  or so.  So, for a variety of reasons, particularly at this time

20  of year, I never keep a jury beyond 5 o'clock.  So I'm going to

21  be guided by your collective wishes in the case.  The case is

22  over, you have been charged.  Your options are to call it a day

23  now if you want and come back with nothing else to do but to

24  begin your deliberations fresh at 9 o'clock tomorrow.  That's

25  option one.  Option two is to go out and start your

125

1  deliberations, probably for the next 50 minutes or so, and

2  either reach a verdict or start and come back tomorrow.  That's

3  option two.  Let me see a vote of hands; who would prefer to

4  break now and come back fresh and start at 9 o'clock tomorrow?

5        (Jurors indicate.)

6            THE COURT:  All right, I think that makes the most

7     sense.  It's been a long day, we've accomplished a lot, we got

8     the case done except for deliberations in a couple days, which

9     is pretty good.  So we're going to be in recess until --

10    remember what I told you, don't talk about the case, we're in

11    recess until 9:00 a.m. tomorrow morning.  One other thing, you

12    were taking notes, I'm going to send a copy of my jury

13    instructions out with you because I think that is generally

14    helpful.  All right, we're in recess.

15

16            (Whereupon, at 3:55 p.m., the Jury Trial proceedings

17    were adjourned for the day.)

18

19

20                    - - -

21

22

23

24

25

1            C E R T I F I C A T E
            _ _ _ _ _ _ _ _ _ _

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11  _____

12  Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25